# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, et al., | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., | ) | |
| | ) | |
| Appellants, | ) | Civ. Action No. 25-cv-0307-JLH |
| | ) | |
| v. | ) | |
| | ) | |
| YELLOW CORPORATION, et al.,[1] | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

## PRINCIPAL AND RESPONSE BRIEF FOR APPELLEE/CROSS-APPELLANT YELLOW CORPORATION AND AFFILIATES

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

Laura Davis Jones (No. 2436)
Timothy P. Cairns (No. 4228)
Peter J. Keane (No. 5503)
Edward Corma (No. 6718)
PACHULSKI STANG
ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
(Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400l
Email:      jones@pszjlaw.com
            tcairns@pszjlaw.com
            pkeane@pszjlaw.com
            ecorma@pszjlaw.com

George W. Hicks, Jr. (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Telephone:  (202) 389-5000
Facsimile:  (202) 389-2500
Email:      george.hicks@kirkland.com

Patrick J. Nash, P.C. (*admitted pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      patrick.nash@kirkland.com
            allyson.smith@kirkland.com

Michael P. Esser (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
555 California, Suite 27
San Francisco, CA  94104
Telephone:  (202) 389-5000
Facsimile:  (415) 439-1500
Email:      michael.esser@kirkland.com

Dated: June 20, 2025

*Counsel for Appellees/Cross-Appellants Yellow Corporation and Affiliates*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Yellow Corporation and its affiliated debtors and debtors in possession (collectively, "Yellow") make the following disclosure:

1) <u>For non-governmental corporate parties please list all parent corporations:</u>

USF Holland LLC and New Penn Motor Express LLC are wholly owned subsidiaries of Yellow Corporation. YRC Inc. (d/b/a YRC Freight) is wholly owned subsidiary of Roadway LLC, which is a wholly owned subsidiary of Yellow Corporation. USF Reddaway Inc. is a wholly owned subsidiary of YRC Regional Transportation, Inc., which is a wholly owned subsidiary of Yellow Corporation. There are no other parent corporations.

2) <u>For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:</u>

No publicly held company owns more than 10% of Yellow's stock. For completeness of disclosure, MFN Partners (through MFN Partners, LP, MFN Partners GP, LLC, MFN Partners Management, LP, MFN Partners Management LLC, Farhad Nanji, and Michael F. DeMichele) and the U.S. Department of Treasury each own 10% or more of Yellow's stock, but those entities are not publicly held companies.

3) <u>If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:</u>

None.

4) <u>In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.</u>

(4.1) The debtors and debtors in possession are: Yellow Corporation; 1105481 Ontario Inc.; Express Lane Services, Inc.; New Penn Motor Express LLC; Roadway Express International, Inc.; Roadway LLC; Roadway Next Day Corporation; USF Bestway Inc.; USF Dugan Inc.; USF Holland International Sales Corporation; USF Holland LLC; USF RedStar LLC; USF Reddaway Inc.; Yellow Freight Corporation; Yellow Logistics, Inc.; YRC Association Solutions, Inc.; YRC Enterprise Services, Inc.; YRC Freight Canada Company; YRC Inc.; YRC International Investments, Inc.; YRC Logistics Inc; YRC Logistics Services, Inc.; YRC Mortgages, LLC; and YRC Regional Transportation, Inc.

(4.2) The members of the creditors committee are: BNSF Railway; Michelin North America, Inc., Daimler Trucks, N.A.; RFT Logistics LLC; Pension Benefit Guaranty Corporation; International Brotherhood of Teamsters; Central States, Southeast and Southwest Areas Pension Fund; New York State Teamsters Pension and Health Funds; and Mr. Armando Rivera.

(4.3) None.

Dated: June 20, 2025          */s/ Laura Davis Jones*
                              Laura Davis Jones

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

JURISDICTIONAL STATEMENT ..........................................................................3

STATEMENT OF ISSUES ON APPEAL ................................................................3

STATEMENT OF ISSUES ON CROSS-APPEAL ..................................................4

STATEMENT OF THE CASE..................................................................................4

    A.    Factual Background................................................................................4

    B.    Procedural Background .........................................................................9

SUMMARY OF ARGUMENT................................................................................12

ARGUMENT ON APPEAL ...................................................................................17

I.    The Bankruptcy Court Correctly Held That Yellow Was Not An "Employer" Under The WARN Act When It Ordered The Union Employees Laid Off..................................................................................17

    A.    Yellow Was Not An "Employer" Under the WARN Act When It Ordered the Union Employees Laid Off on July 30, 2023 .................17

    B.    The Unions' Counterarguments Are Meritless....................................19

II.    Alternatively, Yellow Is Not Liable Under the WARN Act Because It Satisfies Both The "Faltering Company" And "Unforeseeable Business Circumstances" Defenses .................................................................33

    A.    Yellow Met the Substantive Qualifications for the Faltering Company and UBC Defenses..............................................................34

    B.    Yellow Conveyed Sufficient Information to the Union Employees to Avail Itself of the Faltering Company and UBC Defenses, Contrary to the Bankruptcy Court's Decision ....................38

III.    Even If Yellow Violated The WARN Act, The Bankruptcy Court Correctly Held That Yellow Satisfied The Act's Good-Faith Provision .......46

      A.     Yellow Satisfied the Subjective Prong of the Good-Faith
            Provision .............................................................................46

      B.     Yellow Satisfied the Objective Prong of the Good-Faith
            Provision .............................................................................48

      C.     The Unions' Arguments that Yellow Did Not Satisfy the
            Objective Prong of the Good-Faith Provision are Meritless ...............50

ARGUMENT ON CROSS-APPEAL ......................................................57

I.    The Bankruptcy Court Erred When It Determined That, Even If
     Yellow Satisfies the Good-Faith Provision, It Is Still Liable For 14
     Days Of Back Pay And Benefits Per Affected Employee, Rather Than
     Zero Liability ....................................................................57

II.   The Bankruptcy Court Erred In Holding That Yellow Is An
     "Employer" Under The New Jersey WARN Act ...........................61

CONCLUSION ..........................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re AE Liquidation, Inc.*,
   866 F.3d 515 (3d Cir. 2017) ...............................................25, 35, 37

*Alarcon v. Keller Indus., Inc.*,
   27 F.3d 386 (9th Cir. 1994) ...............................................57

*Becker v. ARCO Chem. Co.*,
   207 F.3d 176 (3d Cir. 2000) ...............................................4, 61

*Bledsoe v. Emery Worldwide Airlines*,
   635 F.3d 836 (6th Cir. 2011) ...............................................58

*Brown v. Philip Morris Inc.*,
   250 F.3d 789 (3d Cir. 2001) ...............................................20

*Butler v. Fluor Corp.*, 511 F.Supp.3d 688 (D.S.C. 2021),
   *aff'd sub nom. Pennington v. Fluor Corp.*,
   19 F.4th 589 (4th Cir. 2021) ...............................................50

*Carpenters Dist. Council of New Orleans & Vicinity
   v. Dillard Dept. Stores, Inc.*,
   15 F.3d 1275 (5th Cir. 1994) ...............................................39, 45

*Carter v. United States*,
   530 U.S. 255 (2000) ...............................................22

*Castro v. Chi. Hous. Auth.*,
   360 F.3d 721 (7th Cir. 2004) ...............................................46, 53, 54

*Cooper Indus. v. Aviall Servs., Inc.*,
   543 U.S. 157 (2004) ...............................................23

*DeRosa v. Accredited Home Lenders, Inc.*,
   22 A.3d 27 (N.J. App. Div. 2011) ...............................................63

*Does 1-5 v. Obiano*,
___ F.4th ___, 2025 WL 1522993
(5th Cir. May 29, 2025) ...................................................................29

*Easom v. US Well Servs., Inc.*,
37 F.4th 238 (5th Cir. 2022) ...........................................................19

*Easom v. US Well Servs., LLC*,
2023 WL 6279359
(S.D. Tex. Sep. 26, 2023) .............................................39, 42, 45, 48

*In re Energy Future Holdings Corp.*,
558 B.R. 684 (D. Del. 2016)...........................................................3, 4

*In re Energy Future Holdings Corp.*,
585 B.R. 341 (D. Del. 2018)...............................................................20

*Fleming v. Bayou Steel BD Holdings II L.L.C.*,
83 F.4th 278 (5th Cir. 2023) ...........................................................27

*Frymire v. Ampex Corp.*,
61 F.3d 757 (10th Cir. 1995) .............................................46, 47, 48

*Heinz v. Dubell Lumber Co.*,
2020 WL 6938351 (D.N.J. Nov. 25, 2020) ....................................63

*Hotel Employees and Restaurant Employees Int'l Union Local 54 v.
Elsinore Shore Associates*,
173 F.3d 175 (3d Cir. 1999) .........................................22, 23, 27, 37

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)...........................................................................21

*Int'l Ass'n of Machinists and Aerospace Workers,
AFL-CIO v. Gen. Dynamics Corp.*,
821 F. Supp. 1306 (E.D. Mo. 1993) .........................................50, 58

*Jennings v. Stephens*,
574 U.S. 271 (2015)...........................................................................34

*Kalwaytis v. Preferred Meal Sys., Inc.*,
78 F.3d 117 (3d Cir. 1996) .........................................38, 42, 44, 45

*Kildea v. Electro Wire Prods., Inc.*,
  60 F.Supp.2d 710 (E.D. Mich. 1999),
  *aff'd*, 2000 WL 1909383 (6th Cir. 2000)....................................58, 59

*Law v. Am. Cap. Strategies, Ltd.*,
  2007 WL 221671 (M.D. Tenn. Jan. 26, 2007) .................................31

*Marques v. Telles Ranch, Inc.*,
  867 F.Supp. 1438 (N.D. Cal. 1994),
  *aff'd*, 133 F.3d 928 (9th Cir. 1997).......................................39, 42, 45

*Martin v. Cooper Elec. Supply Co.*,
  940 F.2d 896 (3d Cir. 1991) ........................................................3, 54

*Messer v. Bristol Compressors Int'l, LLC*,
  2020 WL 4548125 (W.D. Va. Aug. 6, 2020) ................................39

*In re Old Electroalloy Corp.*,
  162 B.R. 121 (Bankr. W.D. Pa. 1993)..........................................46

*Roberts v. Genting New York LLC*,
  68 F.4th 81 (2d Cir. 2023) ...........................................................58

*Saxion v. Titan-C-Mfg., Inc.*,
  86 F.3d 553 (6th Cir. 1996) .........................................................39

*Schmelzer v. Off. of Compliance*,
  155 F.3d 1364 (Fed. Cir. 1998) ............................................38, 42, 45

*Sides v. Macon Cnty. Greyhound Park, Inc.*,
  725 F.3d 1276 (11th Cir. 2013) ....................................................45

*In re Start Man Furniture, LLC*,
  647 B.R. 116 (D. Del. 2022)...............................................18, 24, 31

*In re Surrick*,
  338 F.3d 224 (3d Cir. 2003) .........................................................57

*Tri-Arc Fin. Servs., Inc. v. Evanston Ins. Co.*,
  725 F.App'x 97 (3d Cir. 2018) .....................................................20

*United Auto. Aerospace & Agr. Implement*
  *Workers of Am., Loc. 1077*
  *v. Shadyside Stamping Corp.*,
  1991 WL 230841 (6th Cir. Nov. 8, 1991) ...................................49, 59

*In re United Healthcare Sys., Inc.*,
  200 F.3d 170 (3d Cir. 1999) .......................................................*passim*

*United States v. Avila*,
  88 F.3d 229 (3d Cir. 1996) ...............................................................34

*In re Wettach*,
  811 F.3d 99 (3d Cir. 2016) ................................................................20

*In re World Mktg. Chi., LLC*,
  564 B.R. 587 (Bankr. N.D. Ill. 2017) ...............................................31

**Statutes**

28 U.S.C. §158(a)(1)............................................................................3

29 U.S.C. §2102(a) ........................................................1, 17, 21, 26

29 U.S.C. §2102(b)(1)..................................................................34, 35

29 U.S.C. §2102(b)(2)(A) ..................................................................37

29 U.S.C. §2102(b)(3)..................................................................*passim*

29 U.S.C. §2104(a)(1)..............................................................21, 26, 27

29 U.S.C. §2104(a)(4)..................................................................*passim*

N.J. Stat. Ann. §34:21-1....................................................................61

**Other Authorities**

20 C.F.R. §639.3(a)(1)(ii) ..................................................................62

54 Fed. Reg. 16042 (1989) .................................................................62

54 Fed. Reg. 16065 (1989) .................................................................62

**INTRODUCTION**

Under the federal Worker Adjustment and Retraining Notification Act (WARN Act), an "employer shall not order a plant closing or mass layoff until the end of a 60-day period after" the employer gives notice of that order to employees. 29 U.S.C. §2102(a). The Act provides two defenses—the "faltering company" and "unforeseeable business circumstances" defenses—and a good-faith provision permitting the reduction of any liability. *Id.* §§2102(b), 2104(a)(4).

In May 2023, Yellow Corporation (here, with its affiliates, "Yellow") was facing liquidity issues while also attempting to overhaul its operations. It could not obtain additional financing without agreement to the overhaul by its unionized workforce, represented by the International Brotherhood of Teamsters and International Association of Machinists and Aerospace Workers ("Unions"). As negotiations dragged on, Yellow's liquidity worsened, prompting it to defer certain pension and healthcare contributions. The Unions responded by issuing a strike notice—a tactic that shocked Yellow and its customers and triggered a precipitous decline in its business. Within two weeks, Yellow concluded it would have to liquidate, and it ordered the union employees laid off on July 30, 2023, issuing a WARN notice that same day. As the bankruptcy court later found, "it is not too much to say that Yellow's ultimate failure was caused, at least in substantial part, by the [Unions'] miscalculation about the effect of sending a strike notice." A0481.

The Unions nevertheless filed claims against Yellow in Yellow's subsequent chapter 11 proceedings, claiming that Yellow violated the federal WARN Act and certain state analogues by not issuing WARN Act notices 60 days before the July 30 layoffs. On summary judgment, the bankruptcy court held that Yellow substantively satisfied both the faltering company and unforeseeable business circumstances defenses but could not avail itself of them because it committed a "technical" violation of the Act by issuing a slightly insufficient WARN notice. After trial, the court held that Yellow was not liable under the WARN Act because it was no longer an "employer" when it ordered the layoffs. Alternatively, the court held, Yellow satisfied Act's good-faith provision and thus was liable for only 14 days of liability.

The bankruptcy court properly held that Yellow is not subject to the WARN Act because it was not an "employer" when it ordered the layoffs. It also correctly held that Yellow substantively satisfied the two defenses, although it erred in holding that Yellow's purportedly insufficient WARN notice precluded Yellow from relying on them. Finally, the bankruptcy court properly held, in the alternative, that Yellow satisfied the good-faith provision, although it erred in reducing Yellow's liability only to 14 days rather than zero, and it separately erred in holding that Yellow is subject to New Jersey's WARN Act. For any number of reasons, therefore, this Court should hold that Yellow is not liable to the Unions in any respect.

## JURISDICTIONAL STATEMENT

Yellow agrees with the Unions' jurisdictional statement as to their appeal. This Court has jurisdiction over Yellow's cross-appeal because Yellow timely filed its notice of cross-appeal on March 26, within 14 days after the Unions filed their notice of appeal. A0633; *see* 28 U.S.C. §158(a)(1); Fed. R. Bank. P. 8002(a)(2).

## STATEMENT OF ISSUES ON APPEAL

1.     Whether Yellow is not liable under the WARN Act because it was not an "employer" under the Act when it ordered the union employees laid off. This legal determination is reviewed *de novo*, and the bankruptcy court's underlying factual findings are reviewed for clear error. *See In re Energy Future Holdings Corp.*, 558 B.R. 684, 686 (D. Del. 2016).

2.     Whether, alternatively, Yellow is not liable under the WARN Act because it qualified for the "faltering company" and "unforeseeable business circumstances" defenses and provided sufficient information to union employees to avail itself of those defenses. These legal determinations are reviewed *de novo*.

3.     Whether, if Yellow is liable under the WARN Act, the bankruptcy court correctly held that Yellow satisfied the Act's good-faith provision. The bankruptcy court's underlying findings, including its finding of subjective intent, are reviewed for clear error, while its objective reasonableness determination is reviewed *de novo*. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d Cir. 1991).

## STATEMENT OF ISSUES ON CROSS-APPEAL

1.     Whether, despite correctly holding that Yellow satisfied the Act's good-faith provision, the bankruptcy court erred in reducing Yellow's liability only to 14 days, rather than zero days.  This determination is typically reviewed for abuse of discretion, *In re Energy Future Holdings*, 558 B.R. at 686, but where a court "fail[s] to explain its grounds" for a discretionary determination, review is *de novo*, *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 181 (3d Cir. 2000).

2.     Whether the Bankruptcy Court erred in determining that the Yellow is an "employer" subject to New Jersey's WARN Act analogue.   This legal determination is reviewed *de novo*.

## STATEMENT OF THE CASE

### A.     Factual Background

**1.**   Yellow was the largest unionized less-than-truckload carrier in North America.  SA0269.37:18-22.  On an average day, Yellow handled some 50,000 shipments.  SA0270.38:1-3.  Approximately two-thirds of Yellow's employee base was unionized.  SA0269.37:23-25.

As Yellow grew, it acquired various entities across North America. SA0269.38:8-16.  To eliminate redundancies from overlapping operations, Yellow developed the One Yellow initiative.  SA0269.38:8-16; A0600.  Yellow planned to implement One Yellow in three phases, each of which required negotiations with the Unions.   SA0270.38:17-19; A0272.41:11-15; A0600.   Yellow and the Unions

successfully negotiated the implementation of One Yellow's Phase One in October 2022. A0600.

During 2023, as Yellow sought to negotiate with the Unions to implement Phase Two of One Yellow, it was having liquidity issues. SA0271.40:2-11; A0599. In early 2023, Yellow hired Ducera Investment Partners to develop strategic financing alternatives for the company, all of which hinged on Yellow reaching a deal with the Unions for implementation of Phase Two, since no lender would provide capital unless a new plan was in place to integrate the company's businesses and reduce costs. SA0272.41:5-25; SA0273.42:10-23; A0600.

As negotiations over Phase Two "dragged on" into summer 2023, "the company's cash position continued to weaken." A0600. During this time, Yellow's CEO, Darren Hawkins, sent several emails to Yellow's employees. *See* A1070; A1073; SA0221; A1077; A1078. These communications provided updates to employees on negotiations with the IBT, steps the company was taking to preserve capital, and the potential consequences of the failure to reach a deal with the IBT. A0601. The communications were sent to all Yellow employees with email addresses, displayed prominently on bulletin boards throughout Yellow's terminals, and often made their way into online forums frequented by Yellow employees. A0602. Yellow's purpose in sending these communications was twofold: to be transparent with employees and to keep the IBT at the negotiating table. *Id.*

In June 2023, due to worsening liquidity issues, Yellow requested to defer certain pension and healthcare contribution payments to Central States Pension Fund. A0601; SA0275.47:4-6. In previous years, Yellow had occasionally sought and received similar payment deferrals to free up liquidity, all without employees losing benefits because Yellow paid the deferral amount and retroactively reinstated benefits. SA0275.47:13-17. When Yellow made the request this time, it provided the Unions with documents reflecting its precarious financial position. A0601. The IBT's General President, Sean O'Brien, responded: "HELL NO." *Id.*; SA0223. Accordingly, the requests were denied. A0601; SA0275-276.47:25-48:1.

Nevertheless, on July 7, 2023, given its dire liquidity issues, Yellow elected not to make its contribution payments to Central States. SA0276.48:2-7. Yellow deferred the payments to buy the company more time to successfully negotiate a deal with the IBT. A0603; SA0276.48:8-12. On Monday, July 17, 2023, Central States informed the IBT that Yellow had deferred its monthly contributions. A0603-604. Later that same day, the IBT responded by issuing a strike notice with a strike date of the following Sunday, July 23, at midnight. SA0276-277.48:19-49:1.

**2.** The strike notice came as a complete "shock" to Yellow and its customers. SA0278.50:8-10. It was quickly publicized, triggering a "precipitous decline" in Yellow's business. A0604; SA0278-279.50:22-51:6. Within 24 hours, Yellow's core customers moved their shipments to other carriers. A0604. Within days, Yellow's

shipments "evaporate[d]," and the exodus of customers "created a domino effect" in a way that "had never happened" before. A0604; A0527.51:4-6. Additionally, union employees used their sick/PTO days, resulting in high absenteeism and leaving other employees in the "wrong places" without an adequate volume of shipments to properly sustain Yellow's network. A0527.51:11-19. The company plunged into "[c]haos." A0527.51:10.

The strike notice also required Yellow to make strike preparations, including returning all equipment to its terminals; however, because its trucks operated 24 hours every day, Yellow lacked sufficient space to "house all of its equipment at once." A0604-605; SA0282.60:21-25. Accordingly, to prepare for a strike set for July 23 at midnight, Yellow "had to cease normal operations" by the end of Saturday, July 22. A0605. Yellow was particularly concerned about mitigating potential violence, as emotions were "high," with reports of intimidation and threats at several terminals after the strike notice. SA0283.61:18-22; SA0284.62:8-14; SA0299-300.138:1-139:25.

The Teamsters called off the strike late on Sunday, July 23, only hours before the start time. A0605. Unfortunately, by Monday, July 24, the damage was irreparable. Yellow could not accept new shipments because its equipment was in "gridlock" on "terminal lots," plus it needed to move already-existing freight stuck in its system while customers insisted on priority delivery. A0605; SA0285.66:14-

17. Customers—including Amazon, Walmart, and Home Depot—quickly diverted freight to non-union competitors. SA0294.117:20-23. Concurrently, Citizens Bank, the agent for Yellow's $1.5 billion loan, imposed $25 million reserve requirements on July 19 and July 25. SA0281.59:15-21.

**3.** On July 26, Yellow's board met and decided that there was no viable path forward, and the company would liquidate. A0606. That same day, Yellow's advisors began working in earnest to prepare for a bankruptcy filing. A0607. In subsequent days, Yellow worked to effectuate an orderly shutdown; it was particularly focused on achieving a "safe and efficient winddown" that minimized customer disruption and maximized employee welfare. A0606. Yellow laid off the majority of non-union employees on July 28, issuing WARN notices to them that day. A0476.

Yellow planned to shut down and lay off union employees on Sunday, July 30, because that was the day the fewest employees would be on Yellow's properties, minimizing the risk of inflamed emotions or physical altercations. A0609; SA0289.77:16-21. By the evening of July 29, every remaining shipment had either been delivered or staged for retrieval. A0609. Yellow "made its final delivery at 11:30 p.m. Eastern Time on July 29, 2023." *Id.*; *see also* A0609-610 (the "last shipment was delivered at 11:30 p.m. on July 29"). From that point forward, Yellow existed solely "to ensure all equipment was inside the gates" and employees were

"back at [the] facilities" by noon on Sunday, July 30, when the shutdown would take place.  A0610.

On July 30, at 12:00 p.m. Eastern, Yellow ordered the remaining approximately 22,000 union employees laid off.  A0470.  That same afternoon, WARN notices were transmitted to every affected local union; individualized notices were mailed to every affected union employee the next morning.  SA0301-302.143:1-144:25.

From July 26 to July 30, Yellow's human resources and legal teams worked around the clock planning for the shutdown.  SA0303.155:8-10.  For three decades, Yellow had "always complied with WARN."  SA0301-302.143:1-144:25.  This time, however, the company had five days to prepare for a process that often takes several months.  SA0308-309.13:23-14:11.  During this period, Yellow avoided blaming the Unions for the shutdown, in order to avoid escalation and possible violence.  A0607-608.  Regardless, Yellow's employees "were aware of the impact the strike notice had on the company," A0608; they "already had a front-row seat" to the strike-induced collapse and knew why the company was closing, SA0291-292.100:1-101:25.

## B.    Procedural Background

On August 6, 2023, Yellow commenced chapter 11 proceedings.  The Unions filed proofs of claim and adversary complaints alleging that Yellow violated the

federal WARN Act and certain state analogues by not issuing WARN Act notices to employees 60 days before the July 30 layoffs. A0597.

After discovery, the parties cross-moved for summary judgment. On December 19, 2024, the bankruptcy court held that Yellow substantively satisfied the "faltering company" and "unforeseeable business circumstances" defenses to the WARN Act, which allow the usual 60-day period for WARN notices to be reduced. A0473-483. Nevertheless, the court held that Yellow could not avail itself of those defenses because its WARN notices to the union employees "did not contain enough facts adequately to justify the reduced notice"; thus, it granted summary judgment to the Unions on both defenses. A0485-497. The court also granted summary judgment to the Unions on Yellow's liability under the New Jersey WARN Act because, in its view, the New Jersey Act does not include "faltering company" or "unforeseeable business circumstances" defenses, and Yellow is an "employer" subject to that law. A0517-519. The court held that factual disputes prevented summary resolution of two issues: (1) whether, when the union employees were ordered laid off on July 30, 2023, Yellow was an "employer" subject to the federal WARN Act; and (2) if Yellow was liable under the WARN Act, whether its conduct

warranted a reduction in liability based on the Act's good-faith provision.  A0497-504; A0514-517.[2]

The bankruptcy court held a three-day bench trial on the remaining issues.  On February 26, 2025, the bankruptcy court issued findings of fact and conclusions of law.  The court first held that Yellow was not an "employer" when it ordered the July 30 union layoffs, so it is not subject to the WARN Act.  Reviewing the evidence, the court found as a factual matter that "Yellow made its final delivery at 11:30 pm Eastern Time on July 29, 2023."  A0609; *see also* A0609-610 (Yellow's "last shipment was delivered at 11:30 p.m. on July 29").  Then, examining applicable case law, the court explained that "once an entity that is winding down has stopped its business but is merely in the process of liquidating, it is no longer an employer, but is instead a liquidating fiduciary."  A0611; *see also* A0617.

The court concluded that Yellow "crossed the line from being an 'employer' to being a 'liquidating fiduciary' at 11:30 pm on July 29, 2023, when it completed its final delivery"; thus, it was not an "employer" when it ordered the union employees laid off on July 30.  A0616.  That was so even if some employees did some tasks after July 29 bearing some resemblance to their work in the ordinary course—for example, staging freight for customer pickup or providing security at

_____

[2] The Court also addressed other issues that are no longer relevant following settlements.

terminals—because those tasks were "no longer in the service of generating future revenues" and instead were "focused on winding down [Yellow's] affairs." A0617-618.

The court next held that, even if Yellow were liable under the WARN Act, Yellow satisfied the Act's good-faith provision. A0624-627. The court found that "the company intended to comply with the WARN Act and … its efforts to do so were objectively reasonable." A0625-626. The court nevertheless declined to reduce Yellow's liability to zero and instead limited it to 14 days of backpay and benefits per employee. A0624-629. The court acknowledged that there is a "common sense" to reducing Yellow's liability to zero, because adding even one more sentence to the WARN notices "[p]robably" would not have "made a difference to the employees." A0628. But the court believed it had no "legal basis" to reduce Yellow's liability to zero. *Id.* Instead, if Yellow violated the WARN Act in any respect, the court had to impose "some liability." *Id.*

## SUMMARY OF ARGUMENT

**I.** The bankruptcy court correctly held that Yellow was not an "employer" subject to the WARN Act when it ordered the union employees laid off on July 30, 2023. Under Third Circuit precedent, a company that has ceased operating as a going concern and is merely winding up its affairs is no longer an "employer" under the Act. The bankruptcy court found that Yellow made its last delivery on July 29,

12

at which point it began preparing itself for liquidation. Thus, Yellow was not an "employer" on July 30 when it ordered the layoffs.

The Unions contend that whether a company is an "employer" should be measured by when it "knew of a likely plant closing or mass layoff," not when it ordered the closing or layoff. That argument is forfeited and also incompatible with the WARN Act's text, which turns on an "order" of a closing or layoff. The Unions also assert that an "order" occurs when a company "decides to order" a closing or layoff, but that contention, too, conflicts with the statutory language. The Unions last advance a smattering of arguments, including that Third Circuit precedent established two tests; an entity that has not filed for bankruptcy must be an "employer"; and Yellow continued to perform ordinary operations even on July 30. These assertions are unsupported by case law, however, and are ultimately just a means for the Unions to challenge the bankruptcy court's factual finding that Yellow was engaged in winddown activities on July 30—which was not erroneous, much less clearly erroneous.

**II.** Even if Yellow is subject to the WARN Act, it is not liable because it established two defenses that the Act provides: the faltering company and unforeseeable business circumstances defenses. Yellow satisfied the faltering company defense because it was actively seeking capital as of May 31, 60 days before it ordered the layoffs. The Unions argue that Yellow abandoned these efforts

and it was a "near impossibility" that Yellow could obtain financing any later, but that assertion finds no support in the record or case law. Yellow also satisfied the unforeseeable business circumstances defense because it was not probable on May 31 that Yellow would shut down—an event prompted by the Unions' unanticipated strike notice on July 23 and the precipitous decline in business that immediately followed.

The bankruptcy court properly held that Yellow substantively satisfied these two defenses; however, it erred in concluding that Yellow could not avail itself of them because its WARN notice to the union employees was purportedly insufficient. First, the notice itself contained the required "brief statement" why the notification period was reduced. Second, Yellow sent numerous other communications to union employees regarding the company's perilous circumstances, which were widely publicized. Under Third Circuit precedent, which requires a "practical and realistic appraisal of the information" received by affected employees, those communications demonstrate that the employees were informed about the reasons for the unexpected shutdown. Third, as even the bankruptcy court found, any violation was at worst a "technical" one given the circumstances here, and courts have routinely held that such violations do not give rise to WARN Act liability.

**III.** If Yellow is subject to WARN Act liability, the bankruptcy court correctly held that Yellow satisfies the Act's good-faith provision, which requires both

subjective intent to comply with the Act and objective reasonableness in the employer's application of the Act. The Unions do not even challenge the bankruptcy court's finding that Yellow established subjective intent. To challenge objective reasonableness, the Unions advance an opaque theory that is uniformly meritless in every respect. They appear to contend that a company must establish an affirmative defense to satisfy the good-faith provision, which conflicts with the statutory text and common sense. They erroneously recharacterize Yellow's purported violation of the Act from a failure to provide sufficient facts to justify reduced notice (as the bankruptcy court found) to a failure specifically to mention the strike notice in its WARN notice. They argue that it was objectively unreasonable for Yellow not to mention the strike notice, but rely principally on the unsupported proposition that Yellow's counsel had to testify that it reviewed applicable law—all while ignoring that the union employees were unquestionably aware of the strike notice as prompting the company's downturn. And after unsuccessfully claiming that Yellow cannot even substantively establish the faltering company defense, they nitpick the WARN notice's language regarding that defense, none of which shows that Yellow's actions were objectively unreasonable.

**IV.** Although the bankruptcy court correctly held that Yellow satisfied the good-faith provision (assuming any liability by Yellow in the first place), it erred in reducing Yellow's liability only to 14 days, rather than to the only appropriate

amount of liability supported by the evidence—zero.  The bankruptcy court's own findings make clear that this is the archetypal case where zero liability is appropriate.  The court did not impose that judgment, however, because it thought it had to impose "some liability" for a WARN Act violation.  That was legal error, as courts have repeatedly reduced liability to zero for "technical" violations under precisely the circumstances here.  But even if the bankruptcy court had to impose some liability, it offered no explanation for imposing 14 days' worth—nearly 25% of Yellow's total liability—and that amount cannot be justified by the evidence or even the bankruptcy court's own findings.

**V.**  Finally, the bankruptcy court erred in holding that Yellow is an "employer" under the New Jersey WARN Act.  In the court's view, because that act defines an "employer" as a "business entity," not a "business enterprise" like the federal act, a company is still an "employer" even when it has turned to shutdown activities.  But Third Circuit precedent and Department of Labor regulations make clear that the key word in both statutes is "business"—not "entity" versus "enterprise."  And under that reading, which is applicable when interpreting the New Jersey Act, because Yellow was winding down on July 30, it is not an "employer" under the New Jersey Act.

# ARGUMENT ON APPEAL

I.    **The Bankruptcy Court Correctly Held That Yellow Was Not An "Employer" Under The WARN Act When It Ordered The Union Employees Laid Off.**

   A.    **Yellow Was Not An "Employer" Under the WARN Act When It Ordered the Union Employees Laid Off on July 30, 2023.**

The WARN Act provides that only "employers" are subject to its requirements: "An *employer* shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. §2102(a) (emphasis added). An "employer" is defined as a "business enterprise" that employs 100 or more employees. *Id.* §2101(a)(1).

Under Third Circuit precedent, an entity can cease becoming a "business enterprise," and thus is no longer an "employer," depending on whether it "was operating as an ongoing business enterprise, or whether it was merely engaged in the liquidation of assets." *In re United Healthcare Sys., Inc.*, 200 F.3d 170, 177 (3d Cir. 1999). Specifically, "[t]he more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer,'" while "the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* at 178. If an entity has "ceased operating its business as a going concern" and is "simply preparing itself for liquidation," the entity is no longer a "business enterprise" and thus no longer an employer. *Id.* at 179. That remains true even if

some employees "continue to work on a daily basis," provided those employees are "performing tasks solely designed to prepare [an entity] for liquidation." *Id.* at 178. Although the Third Circuit has never used the phrase, subsequent courts have referred to this inquiry as the "liquidating fiduciary" exception. *See, e.g.*, *In re Start Man Furniture, LLC*, 647 B.R. 116, 128-29 (D. Del. 2022).

As the bankruptcy court correctly concluded, the evidence establishes that, when Yellow ordered the union layoffs on July 30, 2023, it was "winding up its affairs" and "preparing itself for liquidation." *United Healthcare*, 200 F.3d at 178-79. The court found that Yellow made its "last delivery" on July 29 at 11:30 pm. A0623; *see also* A0609-610; SA0304.173:1-2; SA0314.26:1-3. From then on, the "only" tasks that remained for certain employees to undertake were in service of the impending shutdown—such as "stag[ing] freight for customer pick-up," "ensur[ing] all equipment was inside the gates," and providing "security" at terminals for any remaining freight and equipment—and "prepar[ing] the properties for an eventual sale." A0610; A0618.

As of July 30, therefore, Yellow's activities were no longer of "a business operating as a going concern" but a "business winding up its affairs." *United Healthcare*, 200 F.3d at 178; *compare In re Start Man*, 647 B.R. at 130 (holding that entity remained "employer" where it "continued conducting retail sales which had been, and remained, precisely the commercial business they had always engaged

in—and for the same purpose—to generate cash revenue"). Accordingly, Yellow was "no longer subject to the WARN Act" and not required to issue notices to the union employees when it ordered them laid off on July 30. *United Healthcare*, 200 F.3d at 179.

## B. The Unions' Counterarguments Are Meritless.

The Unions do not dispute that an entity no longer an "employer" is not subject to the WARN Act. And they have acknowledged that they bear the burden of proving that Yellow was an "employer." A0611; *see also Easom v. US Well Servs., Inc.,* 37 F.4th 238, 241 (5th Cir. 2022). Most significant, they do not challenge the bankruptcy court's factual finding that Yellow made its last delivery on July 29 at 11:30 pm—the issue on which the bankruptcy court deemed a trial necessary to determine whether Yellow was an "employer" when it ordered the union employees laid off on July 30. *See* A0503-504.

Instead, having lost on that critical factual dispute, the Unions advance an array of legal arguments in an effort to subject Yellow to WARN Act liability. Each of their assertions is meritless.

**1.** The Unions first contend that "whether an employer is covered by the WARN Act should be measured when it knew of a likely plant closing or mass layoff, not when it ordered the plant closing or mass layoff." Br.19 (capitalization altered). At the outset, this argument is both waived and forfeited because not only did the

Unions not raise it below, they made a *completely contrary* argument. In the *very first sentence* of their post-trial brief, the Unions asserted: "Whether Yellow was covered by WARN or was a liquidating fiduciary *should be measured when it ordered the plant closing*, i.e., the shutdown of its terminals." SA0107 (emphasis added). Now, the Unions argue that an entity's "employer" status "*should be measured* when it knew of a likely plant closing or mass layoff, *not when it ordered the plant closing or mass layoff*." Br.19 (emphases added).

The Unions' new argument, "if not strictly incompatible with" their argument before the bankruptcy court, "is at least at odds with it." *Tri-Arc Fin. Servs., Inc. v. Evanston Ins. Co.*, 725 F.App'x 97, 100 (3d Cir. 2018). The Unions' contradictory position suggests "a conscious or tactical choice" not to raise this argument below, constituting waiver. *Id.* Even if not waived, the argument was not raised below and is thus forfeited. *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001) (noting that "arguments asserted for the first time on appeal … are not susceptible of review … absent exceptional circumstances"); *In re Energy Future Holdings Corp.*, 585 B.R. 341, 356 (D. Del. 2018).[3]

_____

[3] The "closest [the Unions] come[] to such an argument" below, *Tri-Arc*, 725 F.App'x at 101 n.6, is one sentence in their post-trial brief: "The Third Circuit has similarly recognized that WARN liability is triggered when an employer knew of a closing, not when the employer announced the closing to its employees." SA0110. Beyond that passing remark, however, the Unions never developed this argument. *In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (parties forfeit arguments "they fail to develop"). Furthermore, that statement was part of the Unions' argument that a

Regardless, the Unions are wrong on the merits, because their argument cannot be squared with the WARN Act's text. Statutory analysis "begins with the language of the statute," and "where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). The WARN Act provides that "[a]n employer shall not *order* a plant closing or mass layoff until" 60 days after it provides the required notice. 29 U.S.C. §2102(a) (emphasis added). And it imposes liability on "[a]ny employer who *orders* a plant closing or mass layoff in violation of section 2102." *Id.* §2104(a)(1) (emphasis added).

The statutory text is thus clear in premising potential liability on the "order" of a plant closing or mass layoff, which is irreconcilable with the Unions' argument that the inquiry turns on when an employer "knew of a likely plant closing or mass layoff," and "*not* when it ordered the plant closing or mass layoff." Br.19 (emphasis added). Indeed, the Unions' argument reads the word "order" completely out of the statute; the Unions propose that the statute "imposes liability upon an employer … *long before* it orders" a plant closing or mass layoff. *Id.* at 21 (emphasis added). And it replaces that key word with language ("knew of" and "likely") that appears

---

layoff is "ordered" when an entity "giv[es] the command that led to" a layoff or "start[s] performing work to implement" the layoff—an entirely different argument the Unions separately make elsewhere in their briefing here. *See* Br.23-28.

nowhere in the WARN Act. Because the Unions' interpretation is plainly "at war with the text of the statute," it must be rejected. *Carter v. United States*, 530 U.S. 255, 272 (2000).[4]

The Unions' resort to case law is unavailing. They principally rely on *United Healthcare*, in which, they claim, the Third Circuit explained that "if an employer knew of a closing and failed to notify its employees, the WARN Act would apply." Br.19 (quoting 200 F.3d at 178). The Unions appear to be referring to a passage in *United Healthcare* where the Third Circuit quoted another decision, *Hotel Employees and Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3d Cir. 1999), which stated: "It would appear, therefore, that if an employer knew of a government-ordered closing and failed to notify its employees, the WARN Act would apply." *Id.* at 182. This passing observation does not help the Unions here, however. First, *Hotel Employees* was addressing the specific question of whether the WARN Act applied to "government-ordered"

---

[4] Recognizing that their interpretation renders "order" a nullity, the Unions argue that "[t]he date that the employer orders the plant closing or mass layoff is only used to determine the date when the employer should have issued 60 days advanced notice to its employees." Br.21. By contrast, the Unions argue, "an employer's liability arises when it knew of" the likely closing or layoff, even if it precedes the actual "order." *Id.* But nothing in the statute gives rise to an employer's potential liability *separate* from (or before) the "order" that the statutory text (twice) references. The very provisions that require an "order" create the employer's potential liability in the first place. Accordingly, the Unions cannot divorce "liability" from an "order."

closings, which is not relevant here. *Hotel Employees* never addressed whether an entity can cease being an "employer" under the WARN Act, so the Third Circuit's remark has no precedential effect here, particularly to support a plainly atextual interpretation of the statute. *See Cooper Indus. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

Second, *United Healthcare* quoted *Hotel Employees* solely in the course of refuting the proposition that an entity cannot be "liquidating" if it filed a petition for chapter 11 bankruptcy. 200 F.3d at 178. And even then, *United Healthcare* went on to note that "there is no evidence United Healthcare knew in advance that it would be forced to close but concealed that knowledge from its employees." *Id.* Instead, "the record demonstrates that United Healthcare made repeated and intensive good-faith efforts to remain financially viable and to ensure its employees would keep their jobs." *Id.* at 178-79. As the bankruptcy court found, "all of that is equally true in this case." A0621. The court stated: "Absolutely nothing in the trial record suggests" that Yellow engaged in a "scheme to conduct an end run around the WARN Act." *Id*. Particularly given the Unions' burden to satisfy the "employer" element, that finding is fatal to their already-meritless argument.

The Unions' argument is also inconsistent with *United Healthcare*'s reasoning and holding. There, the company's board voted to "close the hospital" on February 16. 200 F.3d at 173. Unquestionably, then, the company "knew of a likely" closing or layoff at that time—which, under the Unions' theory, means the company was "liable under WARN," having not yet notified its employees. Br.22. But the Third Circuit did not look to the events of February 16 in determining whether the company was an "employer," and it ultimately held that the company was *not* an employer, and thus *not* liable under WARN, after concluding that the activities at the time of the layoffs (on March 6) "more closely … resemble[d] those of a business winding up its affairs." 200 F.3d at 178. Accordingly, the Unions' assertion that the "binding teaching" of *United Healthcare* is that "an employer is liable under WARN when it knows of a closing, yet failed to notify its employees," Br.22, is quite wrong. Moreover, contrary to the Unions' inquiry turning on what a company "knew of," *United Healthcare* "look[ed] objectively" at a company's activities, "not its thoughts, plans, or intentions." *In re Start Man*, 647 B.R. at 130. Because Yellow's activities at the time of the union layoffs here "more closely … resemble[d] those of

a business winding up its affairs," *United Healthcare*, 200 F.3d at 178, Yellow is not subject to the WARN Act.[5]

**2.** The Unions next argue that "[e]ven if Yellow's liability arose … when it ordered a plant closing or mass layoff," that "order" occurred on July 26, 2023, when Yellow "decid[ed] that it would shut down its terminals." Br.23. As an initial matter, this is another example of the Unions' shape-shifting theories. At summary judgment below, the Unions argued that "[w]hether an entity is a liquidating fiduciary is measured on the date it decides to *lay off its workforce*," SA0021 (emphasis added), not when it decides to "shut down its terminals." At trial, however, the Unions offered *no* evidence about "the date [Yellow] decide[d] to lay off its workforce." Indeed, the bankruptcy court subsequently found that "there is nothing in the record to indicate that a decision as to when particular employees would be terminated was made or communicated to anyone on any date prior to the date on which the WARN notices were given." A0623. And because the Unions bore the burden of proof, that "absence of any evidence" was "fatal to their contention." *Id.*

---

[5] The Unions also cite *In re AE Liquidation, Inc.*, 866 F.3d 515 (3d Cir. 2017), but that case addressed the "unforeseeable business circumstances" defense, not the "employer" question.

Recognizing the complete absence of trial evidence to support their "decision to lay off" theory, the Unions shifted in their post-trial briefing to the argument they now make: the decision to "shut down the terminals" (not "lay off its workforce") was an "order" for purposes of the WARN Act. And because such a "decision" occurred on July 26, 2023, according to the Unions, it preceded the point at which Yellow was in winddown (July 29 at 11:30 pm), so Yellow was an "employer" at that time and thus subject to the WARN Act.

Even if this metamorphosing argument has been preserved, it is meritless, as its late-breaking emergence suggests. According to the Unions, a "plant closing is ordered" when it is "decided upon and directed, meaning the decision to close is communicated to those responsible for implementing the decision." Br.23; *see also id.* at 25 (contending that "the order for a plant closing" was "Yellow's communication of its plan to shut down the terminals by July 30, 2023 to those responsible for implementing its plan"); *id.* at 27 (asserting that "a plant closing or mass layoff is ordered when the employer communicates the decision to management personnel responsible for implementing the decision"). Again, however, none of that language is found in WARN Act, which simply provides that an "employer shall not *order* a plant closing or mass layoff until" 60 days after it provides the required notice, and imposes liability on "[a]ny employer who *orders* a plant closing or mass layoff in violation of section 2102." 29 U.S.C. §§2102(a),

2104(a)(1) (emphases added). As the bankruptcy court correctly observed, the Unions "would have the Court re-write the statute so that it provided that an 'employer shall not *decide to order*' a plant closing or a mass shutdown without having given the requisite notice." A0620. But "that is not what the statute actually says." *Id.*

Neither of the Unions' cited cases supports their argument. The cited portion of *Hotel Employees* was addressing whether government-ordered shutdowns are subject to the WARN Act. That case has nothing to do with whether "order" means "decide to order." Nor does *Fleming v. Bayou Steel BD Holdings II L.L.C.*, 83 F.4th 278 (5th Cir. 2023), where the question was whether defendants, who did not employ plaintiffs, could nonetheless be considered an "employer" under the WARN Act under a "single employer theory." *Id.* at 294. These cases do not remotely stand for the Unions' novel, atextual construction of the WARN Act equating "order" with "decide to order" or "communicate[] the decision to management personnel responsible for implementing the decision." And the Unions' argument is again inconsistent with *United Healthcare*. There, the board decided to close the hospital on February 16, and within three days, it was implementing this plan by surrendering the hospital's certificates of need. 200 F.3d at 173. Under the Unions' theory, the board's "decision" and "implementation" should have constituted "orders" of plant closings or mass layoffs, nullifying the company's subsequent winddown activities.

But the Third Circuit nevertheless looked to those subsequent winddown activities to hold that the company was not an "employer."

The Unions alternatively argue that "the terminations of Yellow's union and non-union employees combined to form a single mass layoff" that occurred on July 28, the date the non-union employees were laid off. Br.25. Once again, the Unions did not raise this argument below, so it is forfeited. It is also wrong. Nothing in the statute supports the notion of combining two mass layoffs, ordered on different dates, into a "single mass layoff." Nor do the Unions explain why the date for that "single mass layoff" should be the earlier July 28 date—when the supposed "single mass layoff" was not even complete—as opposed to July 30, when it was.

The Unions also contend that because the union and non-union employees were "affected by the same plant closing and mass layoff," it is "inconsistent with the WARN Act" to conclude that the statute's protections apply to the non-union employees but not the union employees. *Id.* at 26-27. But the "same plant closing" is irrelevant, because what matters is that the non-union employees were "ordered" laid off before the union employees (not, as noted, in a "single mass layoff"). And the differences in dates for the layoff orders was explained by the trial evidence. For one, non-union employees received their notices as part of a severance agreement offering severance pay in exchange for a release of claims, which could be delivered electronically on July 28. A0468-469. For another, there were only approximately

3,500 non-union employees as opposed to 22,000 union employees. Given the magnitude of the union layoffs, Yellow had concerns about inflamed emotions and even violence, counseling in favor of a Sunday, July 30 layoff. *See* SA0299.138:17-19. In short, there were legitimate reasons for the differences in layoff dates, which in turn explains the difference in WARN Act treatment: When the non-union employees were ordered laid off, Yellow was still "operating as a going concern"; when the union employees were ordered laid off, it was not. *United Healthcare*, 200 F.3d at 178.

**3.** Finally, the Unions assert a convoluted theory with the following features: (i) *United Healthcare* "recognized the liquidating fiduciary test and the business enterprise tests as separate tests"; (ii) an entity that has not filed for bankruptcy cannot be a "liquidating fiduciary," so only the "business enterprise test" is applicable here; and (iii) under the "business enterprise test," activities "that do not generate revenue" are relevant, and here, "as part of its liquidation," Yellow "continued to perform the everyday business functions of a trucking company by moving freight between terminals." Br.28-33. This "dog's breakfast of murky and unsupported arguments," *Does 1-5 v. Obiano*, ___ F.4th ___, 2025 WL 1522993, at *4 (5th Cir. May 29, 2025), is meritless across the board.

First, *United Healthcare* did not recognize a separate "liquidating fiduciary test" and "business enterprise test." The Third Circuit articulated one test for

determining whether an entity is an "employer" under the WARN Act: "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." 200 F.3d at 178. That is the test the Third Circuit applied to the entity in *United Healthcare* in determining that it was not an "employer," and it is the test the bankruptcy court applied to Yellow in determining that Yellow was not an "employer." Contrary to the Unions' argument, the Third Circuit did not "first analyze[] whether United Healthcare was a business enterprise, but found the test to be inconclusive," with the implication that the court went on to develop a separate "test." Br.29. Rather, the court observed that the WARN Act does not define "business enterprise," so it proceeded to address how to determine when an entity is no longer a "business enterprise," resulting in the single test articulated above. 200 F.3d at 176-78. Indeed, *United Healthcare* does not even use the phrase "liquidating fiduciary."

Second, an entity need not be in bankruptcy to be a non-"employer" under the *United Healthcare* test. Although that case and others have addressed liquidation efforts after the filing of a bankruptcy petition, nothing in the WARN Act ties an entity's status as an "employer" to a bankruptcy filing, nor does *United Healthcare* suggest that an entity cannot commence liquidation activities before formally filing

for bankruptcy relief. As the bankruptcy court correctly observed, and the Unions do not dispute, "[i]t is of course true that companies can and commonly do wind down their affairs and liquidate outside of bankruptcy." A0499. Furthermore, *United Healthcare* recognized that the Department of Labor's regulations describing an "employer" indicate that "whether an entity (*bankrupt or otherwise*) is an 'employer' under the WARN Act depends in part on the nature of the entity's activities." 200 F.3d at 177 (emphases added). And as *United Healthcare* also noted, an entity can be engaging in liquidation activities and no longer be an "employer" even if it filed for chapter 11 bankruptcy, which is typically used to reorganize rather than liquidate. *Id.* at 178.

Accordingly, the filing or timing of a bankruptcy case is "neither a necessary nor sufficient condition" to establish that an entity is no longer an "employer" for WARN Act purposes. A0499. Instead, as the Unions' own cases confirm, the gravamen of the test is whether the company is "operating its business as a going concern" or "preparing itself for liquidation." *United Healthcare*, 200 F.3d at 179; *see In re Start Man*, 647 B.R. at 129 ("[A] liquidating company remains an 'employer' if the methods it uses to benefit creditors include[] the continuation of operations in the normal commercial sense."); *In re World Mktg. Chi., LLC*, 564 B.R. 587, 602-03 (Bankr. N.D. Ill. 2017) (debtor still an "employer" under WARN Act because it "acted in a manner inconsistent with liquidation"); *Law v. Am. Cap.*

*Strategies, Ltd.*, 2007 WL 221671, at \*15-17 (M.D. Tenn. Jan. 26, 2007) (acknowledging that "the Third Circuit framed the issue as whether United Healthcare was an 'employer' under the WARN Act" and "consider[ed] whether the entity was engaged in business during the time prior to" the layoffs).[6]

Third, the Unions' assertion that the Court, applying the "business enterprise test," should take into account "[a]ctivities that do not generate revenue" and thus consider Yellow's "everyday business functions" in the hours leading up to the July 30 layoffs, is simply a veiled attempt to circumvent the bankruptcy court's finding that Yellow was engaged in winddown activities after making its final delivery on July 29, 11:30 pm. The bankruptcy court found that, after that last delivery, the "only" tasks that remained were in service of the impending shutdown—such as "stag[ing] freight for customer pick-up," "ensur[ing] all equipment was inside the gates," and providing "security" at terminals for any remaining freight and equipment—and "prepar[ing] the properties for an eventual sale." A0610; A0618.

---

[6] The Unions emphasize the word "fiduciary" in various authorities, as if suggesting that only an entity in bankruptcy can be a fiduciary. Br.30. But it is entirely unclear why a company not in bankruptcy cannot also be a fiduciary; directors and officers, after all, have fiduciary duties when running a company. The word "fiduciary" in the cited authorities—and in "liquidating fiduciary"—likely appears because the authorities were addressing bankruptcy matters, where distinguishing between a "fiduciary" and other entities like a "former employer" is occasionally necessary. But that does not mean that a non-bankrupt entity cannot be a fiduciary, or that the *United Healthcare* test cannot apply if that entity has begun liquidation activities.

The Unions resist these findings by pointing to testimony they claim shows that, on July 30, Yellow drivers "mov[ed] freight between terminals." Br.32. But even if true, that does not render the bankruptcy court's findings erroneous, much less clearly erroneous. As one of the witnesses testified, those final transports between terminals were "part of the wind-down," and even if it were "possible" those transports contained freight, the freight was not being delivered to customers—Yellow's business when it was a "going concern," *United Healthcare*, 200 F.3d at 179—but being brought to terminals for customer pickup since the company was shutting down. A0563.

In short, Yellow was not an "employer" when it ordered the union employees laid off on July 30. Accordingly, it is not subject to the WARN Act. This Court need go no further to affirm the judgment.

## II. Alternatively, Yellow Is Not Liable Under the WARN Act Because It Satisfies Both The "Faltering Company" And "Unforeseeable Business Circumstances" Defenses.

Even if Yellow is subject to the WARN Act, it is not liable based on two defenses that excuse lack of 60 days' notice under the WARN Act: the "faltering company" and "unforeseeable business circumstances" (UBC) defenses. Although the bankruptcy court correctly held on summary judgment that Yellow substantively satisfied both of these defenses, A0479; A0483, it erred in concluding that Yellow

could not avail itself of them because its WARN notice to the union employees was insufficient. A0485.[7]

### A. Yellow Met the Substantive Qualifications for the Faltering Company and UBC Defenses.

**1.** The faltering company defense excuses the WARN Act's 60-day notice requirement if, at the time notice would have been required, the employer was "actively seeking capital or business" that would have "enabled the employer to avoid or postpone the shutdown," and the employer "reasonably and in good faith believed" that providing a WARN notice "would have precluded the employer from obtaining the needed capital or business." 29 U.S.C. §2102(b)(1). As the bankruptcy court correctly held, Yellow was a faltering company at the time notice was required. A0479. Because Yellow laid off Union employees on July 30, 2023, Yellow was required to have been seeking capital as of May 31, 2023. A0476. It is undisputed that at that time, Yellow was working with its investment banker, Ducera, both to

---

[7] The Unions suggest that because Yellow "has not cross-appealed" the bankruptcy court's ruling that the faltering company and UBC defenses "are unavailable to it," Yellow cannot challenge that ruling here. Br.33. That is incorrect. An appellee may "rely on alternative arguments which had been raised in the district court supporting the judgment without filing a cross-appeal, so long as he or she is not seeking to expand his or her rights under the judgment or limit another's rights." *United States v. Avila*, 88 F.3d 229, 236 n.7 (3d Cir. 1996); *see also Jennings v. Stephens*, 574 U.S. 271, 276 (2015). Yellow's arguments on these defenses are alternative arguments supporting the bankruptcy court's judgment of no liability. Should Yellow prevail on them, a judgment of no liability would remain, neither "expand[ing] [its] rights under the judgment or limit[ing] [the Unions'] rights."

refine existing debt and to attract new capital. A0477; *see also, e.g.*, A0934.14:22-24; A0941.42:24-43:9. Yellow was thus "actively seeking capital" within the 60-day period, 29 U.S.C. §2102(b)(1), thereby qualifying for the defense, even if those efforts "were ultimately successful," A0477.

The Unions principally argue that this defense is unavailable because of "a gap in time" between Yellow's efforts to obtain capital and when it began WARN preparations, and that by July 23, 2023, it was a "near impossibility" that Yellow could obtain additional financing. Br.3, 35. To begin with, this argument is forfeited. Below, the Unions only argued that Yellow was not "actively seeking capital" on May 31 and did not "reasonably and in good faith believe" that issuing a WARN notice would preclude obtaining that capital—not that there was a "gap" from May to July, at which point financing was a "near impossibility." SA0023-29; SA0054-61; SA0083-90; A0475-479.

Regardless, this argument is wrong. The Unions identify no authority establishing a "near impossibility" standard as relevant to the faltering company defense; indeed, their lead case, *In re AE Liquidation*, did not even address the faltering company defense. And it cannot be the case that the "near impossibility" of obtaining financing just before shutdown forecloses the faltering company defense, because every company that shuts down presumably did so because of its

ultimate inability to obtain additional financing just before making the decision to shut down.

Perhaps for that reason, the Unions quickly shift to arguing that Yellow was not actually "actively seeking capital" on May 31, and that none of its efforts to obtain capital through July 23 are relevant. Br.36-37. But the bankruptcy court found that "the summary judgment record clearly indicates" that Yellow's May 2023 efforts "to explore options either to refinance existing indebtedness or to attract new capital was sufficient to fall within the faltering company exception." A0477.

The Unions fight this factual finding by arguing that "the preponderance of evidence shows Yellow abandoned" the May 26 proposals Ducera made for additional financing. Br.37-38. But the Unions' assertion does not demonstrate error, much less clear error, in the bankruptcy court's finding. The Unions' evidence all concerns post-May activity, so it cannot show that Yellow was not "actively seeking capital" on May 31, as the statute requires and the bankruptcy court found. Indeed, the bankruptcy court acknowledged that "if there were record evidence that [Yellow's] proposal was rejected on May 27, 2023" and Yellow "thereafter abandoned [its] efforts to raise capital, that would be another matter." A0478. But "that is not at all what the record suggests," *id.*; in fact, Yellow continued to seek capital until just before its July 26 decision to shut down. *See, e.g.*, A0950.78:11-20

36

(referencing Ducera's "frequent" conversations with outside private-equity fund between July 18 and July 24, "like multiple times a day").

**2.** Yellow also substantively satisfies the UBC defense, which provides that an "employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. §2102(b)(2)(A). An "employer may validly assert the UBC exception unless closing is foreseeable 60 days in advance and within a 14-day window." *Hotel Employees*, 173 F.2d at 185. To be "foreseeable," a mass layoff or plant closing must be "probable"—that is, "more likely than not," and not just "possible." *In re AE Liquidation*, 866 F.3d at 528-30.

As the bankruptcy court held, the evidentiary record "makes clear that [Yellow's] shut down was caused by an unforeseeable business event," as it was not "probable" 60 days beforehand. A0480-481. Given the "history of brinksmanship" between Yellow and the IBT, Yellow had no reason to think the IBT would resort to the drastic measure of issuing a strike notice. A0481. Indeed, several times before 2023, Yellow and the IBT engaged in negotiations down to the wire and, "in the end, always reached an agreement." A0482; *see, e.g.*, SA0273.42:5-9. And even if the strike notice itself were "probable," it is undisputed that the dramatic consequences of the strike notice were not. The IBT itself "had not anticipated that its strike notice

would have the consequences it did"; even its own president testified that he "did not" expect Yellow to "go out of business as a result of the the strike notice." A0481-482. Any argument to the contrary would contradict the record and "reflect a paradigmatic case of hindsight bias." A0481.

## B. Yellow Conveyed Sufficient Information to the Union Employees to Avail Itself of the Faltering Company and UBC Defenses, Contrary to the Bankruptcy Court's Decision.

**1.** Yellow also provided sufficient information to the union employees to avail itself of both WARN Act defenses. The Act provides that "[a]n employer relying on" the faltering company or UBC defenses "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. §2102(b)(3). In evaluating whether an employer has satisfied this provision, the Third Circuit requires "a practical and realistic appraisal of the information given to affected employees." *Kalwaytis v. Preferred Meal Sys., Inc.*, 78 F.3d 117, 121-22 (3d Cir. 1996). That is because "the purpose of the notification requirement of the WARN Act is to ensure that workers 'will have transition time to adjust to their respective loss of employment.'" *Schmelzer v. Off. of Compliance*, 155 F.3d 1364, 1369 (Fed. Cir. 1998).

Thus, even a "technically deficient WARN Act notice[]" does not result in a WARN Act violation if the notice simply failed to provide information "already known by the employee." *Id.* at 1369-70 (citing *Kalwaytis*, 78 F.3d at 121); *see also*

*Saxion v. Titan-C-Mfg., Inc.*, 86 F.3d 553, 561 (6th Cir. 1996) ("That the notice was deficient in other respects does not change the fact that … the affected employees clearly knew that [the plant] was going to be closed."); *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1287 n.19 (5th Cir. 1994) (rejecting proposition that "defective notice is automatically to be treated as though no notice had been provided at all"); *Easom v. US Well Servs., LLC* 2023 WL 6279359, at *12 (S.D. Tex. Sep. 26, 2023) (finding no violation given "other information besides" WARN notice that "employees received," which "must be considered in determining whether the WARN Act's notice requirement was met"). If a WARN notice's defects "did not cause harm to the Plaintiffs," then "liability should not be imposed." *Marques v. Telles Ranch, Inc.*, 867 F.Supp. 1438, 1446 (N.D. Cal. 1994), *aff'd*, 133 F.3d 928 (9th Cir. 1997); *see also Messer v. Bristol Compressors Int'l, LLC*, 2020 WL 4548125, at *3 (W.D. Va. Aug. 6, 2020) (no violation despite "technical violations" because employees did not "suffer[] any prejudice from the lack of additional notice").

Given the foregoing principles, Yellow may rely on the faltering company and UBC defenses. The WARN notice sent to the Unions' employees stated, *inter alia*:

> The Company was not able to provide earlier notice of the Shut Down as it qualifies under the "unforeseeable business circumstances," "faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act. The Company expects all layoffs and location closures relating to the Shut Down to be permanent. The Company had hoped to complete one or more transactions and secure funds and business to

> prevent the closing of these locations but was unable to do so. These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated.

SA0224; A0971; SA0225; SA0227. The notice references both unforeseeable circumstances and Yellow's unsuccessful efforts to obtain financing that would have saved the company, leading to the closings and layoffs—in particular, that Yellow "had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so." An employee reading the notice would plainly understand, at a minimum, that he or she was receiving the notice on a shortened period because the company's efforts to obtain financing necessary to survive failed. That alone is sufficient to satisfy the WARN Act.

That conclusion is reinforced by the multitude of communications the union employees received both before and after the WARN notice making clear the reasons for the shutdown, including those not explicitly referenced in the WARN notice. Throughout June and July 2023, Yellow sent numerous written communications to employees explaining the perilous circumstances facing the company and informing them of the status of negotiations with the IBT. *See* A1070; A1073; SA0221; A1077; A1078. These communications described the importance of the One Yellow initiative, the IBT's intransigence, and the loss of all jobs that would result if One Yellow were not executed. In one email to employees following the strike notice, Yellow's CEO Hawkins even attached the letters containing the negotiations

between Yellow and the IBT. A1078. Yellow sent these communications to ensure that employees "were informed of the events as they were playing out." SA0274.43:8-14. The communications were sent to all employees with "@yellow" email addresses, printed out and posted on bulletin boards, and publicized by employees posting them on trucking boards and social media. SA0281-282.59:25-60:3; SA0292-293.111:22-112:1.

Yellow also issued several press releases regarding the dire situation. On July 19, 2023, after the strike notice, Yellow stated that "it is the Unions' leadership who has failed the 22,000 Teamsters employed by Yellow." SA0316. On July 22, 2023, Yellow remarked that a court overseeing litigation between Yellow and the IBT had "recogniz[ed] a strike would likely kill the company, resulting in the loss of 30,000 jobs." *Id.* And on August 7, 2023, in announcing its chapter 11 filing, Yellow stated: "IBT leaders announced a strike against Yellow's then-significantly wounded company. Customers fled and business was not recoverable." SA0229. Yellow had avoided directly blaming the IBT before the union layoffs, and avoided referencing the strike notice in the WARN notice, to avoid "potentially inflam[ing] the situation" or "adding fuel to the fire," especially given "concerns for physical violence." SA0288.70:9-19; SA0295.128:20-25; SA0299.138:15-19. But even before the shutdown, the Unions and their employees were well aware that Yellow attributed its demise to the IBT's strike notice. *See, e.g.*, SA0131 (July 27, 2023 memorandum

from John Murphy to local unions stating, "Yellow has sought to blame the Local Unions' 72-hour strike notice as the cause of its financial problems"); SA0280.56-14-17 ("Q. [D]id you believe that employees were aware of the strike notice's impact on the company? A. Absolutely."). And the dramatic consequences of the strike notice were plainly apparent to Yellow employees. *See, e.g.*, SA0253.86:1-87:2 (describing how "all the operations stuff was declining rapidly within that week").

Under these circumstances, and utilizing "a practical and realistic appraisal of the information given to affected employees," *Kalwaytis*, 78 F.3d at 121-22, the Unions' employees received sufficient information to apprise them of the reasons for the abrupt shutdown and why they were receiving the WARN notice on a "reduc[ed]" timetable. 29 U.S.C. §2102(b)(3). While the WARN notice was itself sufficient, the additional information conveyed to the employees, and of which they were aware, removed any doubt about why Yellow did not provide earlier notice to the employees. At worst, Yellow's WARN notice failed to provide information "already known by the employee[s]," rendering it "technically deficient." *Schmelzer*, 155 F.3d at 1369-70. Because any defects in the WARN notice "did not cause harm to the" union employees, given the "other information" they had received, the WARN Act's defenses are available, and "liability should not be imposed." *Marques*, 867 F.Supp. at 1446; *Easom,* 2023 WL 6279359, at *13.

**2.** The bankruptcy court repeatedly acknowledged that it is a "close" question whether the WARN notice was sufficient. A0492; A0626. And it expressed skepticism that the union employees "would have been materially better off" if Yellow had provided even "a few additional words" in the notice. A0492. Nevertheless, it held that Yellow could not avail itself of the faltering company or UBC defenses because the WARN notice "did not contain enough facts." A0485. Respectfully, that ruling is misguided for several reasons.

First, the bankruptcy court erred in concluding that the WARN notice, on its face, was insufficient. The court reasoned that employers must "provide *some* language specific to the company's circumstances in its notice." A0492. But the notice did so: it explained in particular that Yellow "had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so." SA0224; A0971; SA0225; SA0227. The information in the notice thus satisfied the statutory text's requirement of "a brief statement of the basis for reducing the notification period." 29 U.S.C. §2102(b)(3).

Second, the bankruptcy court declined to consider any other Yellow communications to employees, or evidence showing employees' knowledge, bearing on why Yellow did not send a WARN notice within the 60-day period. The court conceded that "a case could be made that these [communications] served some of the same purposes that Congress had in mind when it required employers to provide

notice in advance of a mass layoff." A0495. And it admitted that invoking the "widely publicized" information about the reasons for Yellow's circumstances has "commonsense appeal." *Id.* Indeed, the court acknowledged that "much of the information that the company was supposed to have provided in the notice[] was in fact communicated to the employees in separate correspondence." A0516. It refused to consider any other communications or information, however, because it construed the Third Circuit's *Kalwaytis* decision as allowing review only of formal WARN notices. A0494.

But while only WARN notices were at issue in *Kalwaytis*, nothing in that decision precludes looking to other information that a company conveyed to employees. To the contrary, *Kalwaytis* held that the inquiry requires "a practical and realistic appraisal of the information given to affected employees." 78 F.3d at 121-22. That directive endorses precisely the "commonsense" sentiment the bankruptcy court admitted was present here, A0495, and it plainly encompasses information and material transmitted to employees beyond just a formal WARN notice. Accordingly, the bankruptcy court's concern that the formal WARN notice "did not mention the strike notice, or even the wider dispute with the Teamsters, in any way," A0487, should be no concern at all, because, as the evidence showed, the union employees were aware of those circumstances.

Third, despite acknowledging that any notice violation here was "a technical one," A0517, the bankruptcy court concluded that the WARN Act does not contemplate "a form of harmless error," A0496. But numerous courts have held that a "technically deficient" notice does not result in a violation if the information is "already known by the employee," as here. *Schmelzer*, 155 F.3d at 1369-70 (citing *Kalwaytis*, 78 F.3d at 121); *see also Carpenters*, 15 F.3d at 1287 n.19; *Easom,* 2023 WL 6279359, at *13; *Marques*, 867 F.Supp. at 1446.

The bankruptcy court cited *Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276 (11th Cir. 2013), but that case is readily distinguishable. There, the employer did not provide *any* WARN notice *or* other communications to employees regarding its shutdown. *Id.* at 1280. Instead, to claim sufficient notice, it pointed only to its own website and to messages on interstate billboards providing the reasons for its closure. *Id.* The Eleventh Circuit held that this did not satisfy the requirement that "*some* notice be given" to employees. *Id.* at 1284. And it held that the company's efforts did not show that "affected employee[s] actually *received* notice." *Id.* at 1285. By contrast, here, Yellow provided not only a WARN notice but numerous communications directly to employees conveying the reasons for the company's demise. Thus, at least "*some* notice" was "actually *received*" by the employees. *Sides* provides no support for the bankruptcy court's restrictive view.

**III.    Even If Yellow Violated The WARN Act, The Bankruptcy Court Correctly Held That Yellow Satisfied The Act's Good-Faith Provision.**

The WARN Act provides that "[i]f an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section." 29 U.S.C. §2104(a)(4). To satisfy this provision, there must be "proof of the employer's subjective intent to comply with the Act, as well as evidence of objective reasonableness in the employer's application of the Act." *Frymire v. Ampex Corp.*, 61 F.3d 757, 767-68 (10th Cir. 1995); *accord Castro v. Chi. Hous. Auth.*, 360 F.3d 721, 731 (7th Cir. 2004). Although the Court need not address this issue given the various grounds for holding Yellow not liable, the evidence at trial satisfied these requirements regardless. The Unions' arguments to the contrary are unavailing.

**A.    Yellow Satisfied the Subjective Prong of the Good-Faith Provision.**

The Unions do not challenge the bankruptcy court's determination that Yellow established subjective intent to comply with the Act. For good reason: The evidence supports several factors that courts routinely consider when evaluating this prong.

First, Yellow "was aware of the WARN Act and was cautious to not violate its requirements." *In re Old Electroalloy Corp.*, 162 B.R. 121, 126 (Bankr. W.D. Pa.

1993). Hawkins testified that WARN "frequently" came up between July 26-30, while the company was preparing for liquidation. A0534.80:13-18. To prepare the WARN notices, Yellow used the same process as in prior layoffs, albeit on a "very compressed timeline." SA0315.64:7-8; SA0296.135:8-18; SA0297-298.136:2-137:1. Yellow also consulted extensively with in-house and outside counsel in drafting the notices. SA0297.136:1-7; *see also, e.g.*, *Frymire*, 61 F.3d at 768 (subjective intent "include[s] proof that the employer worked with legal counsel to determine whether the company was in compliance with WARN"). Yellow was thus "concerned with meeting its obligations under the WARN Act." A0515.

Second, Yellow did send WARN notices, underscoring its intent to comply with the Act. *See* A0971; SA0225; SA0227. In fact, Yellow went to enormous lengths to ensure notification: Each notice was "individually mailed" to "every single Union employee" laid off—over 20,000 people—which required a third-party vendor. *See* SA0312-313.23:21-24:6.

Third, Yellow "had its employees' welfare in mind." *Frymire*, 61 F.3d at 768. Yellow planned its closing for Sunday, July 30, to minimize the potential for violence, and it sought to wind down while "be[ing] respectful in every way we could to all the people involved." SA0286.67:5-13; *see also* SA0283.61:5-7 (Hawkins explaining that "[w]e didn't want to endanger any of our employees"). As the bankruptcy court found, Yellow did not want to "take a very difficult situation

and make it worse." A0609. Yellow also helped "develop a portal" for employees to find other employment. SA0287.69:13-18. These efforts reflected Yellow's "desire to treat its employees with dignity during the layoffs." A0629.

Finally, Yellow "sought to keep its employees apprised of" the company's situation as circumstances developed. A0626; *see Easom,* 2023 WL 6279359, at *15 (subjective intent "supported by evidence that [company] tried to keep employees informed of its decisions"). As noted, Yellow repeatedly informed employees about the state of the company and the reasons for its precarious position, up to and including the WARN notice itself. Hawkins testified that the purpose of these communications to its employees was "to make sure that everyone had accurate information." SA0274.43:7-14.

## B. Yellow Satisfied the Objective Prong of the Good-Faith Provision.

The evidence also established that Yellow readily satisfied the "objective" prong of the good-faith provision. Doing so requires "evidence of objective reasonableness in the employer's application of the Act." *Frymire*, 61 F.3d at 767-68. Here, that evidence was substantial. As the bankruptcy court found, Yellow was faced with "uniquely challenging circumstances." A0629. Yellow had serious liquidity issues and had retained outside professionals to secure additional financing. It was attempting to implement a massive operational reorganization that was essential to its turnaround (and to additional financing) and that required the Unions'

48

and make it worse." A0609. Yellow also helped "develop a portal" for employees to find other employment. SA0287.69:13-18. These efforts reflected Yellow's "desire to treat its employees with dignity during the layoffs." A0629.

Finally, Yellow "sought to keep its employees apprised of" the company's situation as circumstances developed. A0626; *see Easom,* 2023 WL 6279359, at *15 (subjective intent "supported by evidence that [company] tried to keep employees informed of its decisions"). As noted, Yellow repeatedly informed employees about the state of the company and the reasons for its precarious position, up to and including the WARN notice itself. Hawkins testified that the purpose of these communications to its employees was "to make sure that everyone had accurate information." SA0274.43:7-14.

## B. Yellow Satisfied the Objective Prong of the Good-Faith Provision.

The evidence also established that Yellow readily satisfied the "objective" prong of the good-faith provision. Doing so requires "evidence of objective reasonableness in the employer's application of the Act." *Frymire*, 61 F.3d at 767-68. Here, that evidence was substantial. As the bankruptcy court found, Yellow was faced with "uniquely challenging circumstances." A0629. Yellow had serious liquidity issues and had retained outside professionals to secure additional financing. It was attempting to implement a massive operational reorganization that was essential to its turnaround (and to additional financing) and that required the Unions'

48

agreement. When the Unions declined, Yellow's liquidity problems forced it to defer a contribution payment, which prompted the Unions to issue a strike notice on July 17. That notice came as a complete "shock" to Yellow and its customers and triggered a "precipitous decline" in Yellow's business that neither Yellow nor the Unions anticipated. A0604. Although the strike was ultimately called off, the damage was irreversible, resulting in Yellow's decision to liquidate on July 26 and shutdown of the company on July 31.

Despite this series of spiraling events, culminating in a frantic two-week period in which Yellow went from a going concern to a company in shutdown—all while navigating numerous herculean tasks regarding operations, finances, and employee relations, among others—Yellow nevertheless managed to issue WARN notices to over 20,000 union employees. And while the bankruptcy court deemed these notices insufficient, it repeatedly acknowledged that the question was "close" and including just a "few additional words" would have resolved its concerns. A0492. Even then, the court conceded, that would "probably not" have made a difference given Yellow's other communications to union employees and how "widely publicized" the circumstances prompting the shutdown were. A0461; A0628.

Based on these findings, it was not erroneous for the bankruptcy court to determine that Yellow's "efforts to comply with the WARN Act's notice

requirements were objectively reasonable." A0627; *see also, e.g.*, *United Auto. Aerospace & Agr. Implement Workers of Am., Loc. 1077 v. Shadyside Stamping Corp.*, 1991 WL 230841, *3 (6th Cir. Nov. 8, 1991) (finding good faith where employer's "circumstances were rapidly evolving"); *Butler v. Fluor Corp.*, 511 F.Supp.3d 688, 719 n.33 (D.S.C. 2021) (finding good faith given "unique and unprecedented challenges"), *aff'd sub nom. Pennington v. Fluor Corp.*, 19 F.4th 589 (4th Cir. 2021). Indeed, even the bankruptcy court concluded that if Yellow violated the WARN Act, its violation "was a purely technical one." A0461; *see also* A0517. And while that finding warrants a determination that the faltering company and UBC defenses should apply, *see* pp.38-45, *supra*, at a minimum, it strongly supports that Yellow satisfies the objective reasonableness prong and, in turn, the good-faith provision. *See, e.g.*, *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Gen. Dynamics Corp.*, 821 F.Supp. 1306, 1312 (E.D. Mo. 1993) (holding that "technical violation" of WARN Act satisfies good-faith provision).

### C. The Unions' Arguments that Yellow Did Not Satisfy the Objective Prong of the Good-Faith Provision are Meritless.

To challenge the bankruptcy court's conclusion that Yellow was objectively reasonable, the Unions do not contend that any of the bankruptcy court's findings underlying that determination were clearly erroneous. Instead, to evade the uncontroverted evidentiary record, they advance a tortuous series of arguments. Br.34-50. The Unions' theory is far from clear, but it appears best summed up by

the Unions' following assertion: "Because the faltering company defense cannot provide Yellow with a complete defense to WARN liability, its failure to mention the strike notice in its WARN notice, which made the UBC defense unavailable, is an intrinsic part of Yellow's acts or omissions that violated the WARN Act." *Id.* at 36. Although this Gordian knot is not so easily cut, the Unions' arguments are uniformly unavailing.

At the outset, the Unions' argument appears to rest on the premise that a company must establish one of the WARN Act's §2102(b) affirmative defenses to satisfy the good-faith provision of §2104(a)(4). *See* Br.38 ("Because the faltering company defense cannot be relied upon to excuse Yellow's failure to prepare WARN notices for its employees through July 27, 2023, Yellow's inability to invoke the UBC defense, caused by its failure to mention the strike notice in its WARN notices, is an intrinsic part of its acts and omissions that violated the WARN Act."). But nothing in the text of §2104(a)(4) contains such a requirement, nor would that make any sense, since qualifying for an affirmative defense eliminates the need to invoke the good-faith provision.

Further, nothing in the WARN Act supports the Unions' proposition that Yellow's "failure to mention the strike notice" in its WARN notice was an "intrinsic part of its acts and omissions that violated the WARN Act." The good-faith provision addresses "the act or omission that violated this chapter," not "intrinsic part[s]" of

that act or omission. 29 U.S.C. §2104(a)(4). Here, "the act or omission that violated" the WARN Act, according to the bankruptcy court, was that Yellow's notice "did not contain enough facts adequately to justify the reduced notice." A0485. To be sure, the court suggested that one way to "set forth the facts supporting the [UBC] defense" would have been to mention the strike notice. *Id.* But that does not mean that the failure to mention that particular fact was "the act or omission" giving rise to a WARN Act violation.

Regardless, the absence of an explicit reference to the strike notice in the WARN notice was not objectively unreasonable. The Unions argue that "a reasonable employer in Yellow's position should know that to provide adequate notice for the UBC defense, its WARN notice must identify the business circumstance that caused it to shorten the notice period." Br.39. Therefore, Yellow "should have realized that any WARN notices it issued must mention the strike notice." *Id.* at 40. But the uncontradicted evidence shows that Yellow's employees already knew that the IBT's strike notice had unleashed extraordinary—and unanticipated—"[c]haos." SA0279.51:7-22; *see also* SA0279.51:24-25 (Hawkins noting "[t]here was tremendous coverage on this event"); *see also* SA0129; SA0131; SA0138; SA0142; SA0166; SA0219; SA0220 (press releases and social media posts discussing strike notice and resulting fallout). Although the Unions argue that none of Yellow's emails to employees specifically mentions the strike notice, they

concede that many other Yellow communications did.  Br.46.  The Unions' only answer is that those other communications do not constitute "reasonable methods for delivering WARN notices."  *Id.*  The relevant question, however, is not the sufficiency of Yellow's "delivering WARN notices," but whether union employees were aware of the strike notice as prompting the company's rapid downturn.  As the bankruptcy court found, they were; the strike notice and its effects were "widely publicized at the time."  A0461.

The Unions argue that the failure to mention the strike notice is objectively unreasonable because "[t]here is no evidence showing that any of Yellow's counsel took even a cursory glance at either the statutes or the caselaw to evaluate whether the WARN notices must mention the strike notice as the business circumstance that caused Yellow to shorten the notice period."  Br.41; *see also id.* at 45.  But the Union's cited authority, *Castro*, does not remotely support such a remarkably granular (and arguably privilege-destroying) obligation.  For one, *Castro* was only addressing the subjective, not objective, component of the good-faith test.  *See* 360 F.3d at 733.  For another, in that case, the WARN Act "was only brought up by an opposing union representative," the law was "nothing but an afterthought to" the

company, and "the ultimate decisionmakers showed no interest in the conclusions of their legal counsel." *Id.* at 731. Nothing of the sort is present here.[8]

Even assuming *arguendo* that it was objectively unreasonable for Yellow not to mention the strike notice in the WARN notice, the Unions' theory still suffers from a fundamental defect. The Unions' argument regarding the failure to mention the strike notice is premised entirely on the notion that Yellow could not substantively establish the faltering company defense. *See* Br.34-38; *see also id.* at 36 ("Because the faltering company defense cannot provide Yellow with a complete defense to WARN liability, its failure to mention the strike notice … is an intrinsic part of Yellow's acts or omissions that violated the WARN Act."). The Unions invoke this premise presumably because, in their view, they would rather try to show the objective unreasonableness of the failure to mention the strike notice (which pertains only to the UBC defense) than the objective unreasonableness of any insufficient wording regarding the faltering company defense. The problem, however, is that, as explained, there is absolutely no basis for concluding that Yellow has not

---

[8] *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896 (3d Cir. 1991), does not aid the Unions. In that Fair Labor Standards Act case, the court found that the company "did not do any analysis or conduct any inquiry to determine whether the subject employees qualified for an exemption," and "admitted a lack of diligence in determining the applicability of the Act's requirements," instead merely following industry custom. *Id.* at 909 (brackets omitted). Those circumstances are not remotely similar to the facts here.

substantively satisfied the faltering company defense, and the Unions' arguments to the contrary are wholly meritless. *See* pp.34-37, *supra*.

The Unions are thus left to argue that "Yellow's WARN notice on the faltering company defense was not *per se* objectively reasonable." Br.47 (capitalization altered); *see id.* at 47-50. It is entirely unclear what the Unions mean by "*per se*" objectively unreasonable—a phrase that appears nowhere in the WARN Act, the decisions below, or the rest of the Unions' brief—and its invocation by the Unions is an immediate red flag that their argument lacks merit. The Unions argue that Yellow "did not present any evidence at trial to explain why it believed its notice for the faltering company defense was sufficient." Br.47. But the statute does not require a company to prove "why it believed" a notice for a particular defense was sufficient; it requires only that the employer show it has "reasonable grounds for believing" that "the act or omission that violated this chapter" was "not a violation." 29 U.S.C. §2104(a)(4). As noted, Yellow amply showed at trial why it thought its WARN notice was sufficient given the notice's language, Yellow's many other communications, and the undisputed awareness of the situation due to the well-publicized circumstances. The bankruptcy court credited this evidence in concluding that Yellow satisfied the objective reasonableness prong.

The Unions then nitpick the WARN notice relating to the faltering company defense, which stated: "The Company had hoped to complete one or more

transactions and secure funds and business to prevent the closing of these locations but was unable to do so."  The Unions first assert that this language "affirmatively misl[ed]" employees because the record does not show Yellow tried to "secure business" to prevent the shutdown.  Br.47.  The Unions cite no evidence that any employee was misled by this language, and the claim is not credible regardless.  The language referred to securing "funds and business" readily encompasses not just the financing that Yellow was seeking but also the One Yellow initiative that Yellow was trying to undertake to enhance its business operations (and was the initiative that triggered the Unions' initial opposition, ultimately culminating in the strike notice and shutdown).

The Unions next argue that the language did not "contain reasonably specific facts that explain [Yellow's] reasons for shortening the notice period" and that "[m]erely parroting the language of the statute" is "insufficient."  Br.48.  But these are arguments that Yellow purportedly did not provide a sufficient WARN notice under §2102(b)(3)—not that Yellow's belief that it did not violate the statute was objectively unreasonable under §2104(a)(4).  As explained, under the circumstances here, even those arguments do not establish that Yellow is not entitled to avail itself of affirmative defenses.  But they certainly have no bearing on the good-faith inquiry.

Finally, the Unions contend that a "legally compliant notice" should have informed the employees not only that the company had actively sought funds or

business but also that providing earlier notice would have precluded the employer from doing so, and that Yellow's language "would have confused the reader." Br.48-49. The Unions cite no evidence of any confusion, but regardless, this is an argument again directed to whether Yellow provided a sufficient notice, not whether Yellow satisfied the good-faith provision, as the Unions' authority makes clear. *See Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389-92 (9th Cir. 1994).[9]

## ARGUMENT ON CROSS-APPEAL

## I.    The Bankruptcy Court Erred When It Determined That, Even If Yellow Satisfies the Good-Faith Provision, It Is Still Liable For 14 Days Of Back Pay And Benefits Per Affected Employee, Rather Than Zero Liability.

Although it was appropriate for the bankruptcy court to conclude that Yellow satisfied the good-faith provision, the court erred in nevertheless imposing liability on Yellow of "14 days of backpay and benefits per affected employee," A0629—nearly 25% of Yellow's total possible liability. Under the circumstances of this case, assuming Yellow is subject to any liability despite not being an "employer" and despite satisfying the faltering company and UBC defenses, the bankruptcy court should have exercised its discretion under 29 U.S.C. §2104(a)(4) to reduce the

_____

[9] The Unions do not argue that, if Yellow satisfied the good-faith provision, the bankruptcy court should have imposed more than 14 days of liability. Accordingly, they cannot raise this argument on reply. *See In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003).

Unions' liability to the only appropriate amount supported by the evidence—zero. The bankruptcy court's contrary determination rested on two errors.

*First*, the court erred as a matter of law in concluding that it could not "eliminate the company's WARN Act liability on good faith grounds" because a company that has "violated the WARN Act … should bear some liability." A0628. Neither of the court's cited cases supports that proposition; both merely addressed whether a WARN Act plaintiff is entitled to a jury trial. *See Roberts v. Genting New York LLC*, 68 F.4th 81, 92 n.11 (2d Cir. 2023); *Bledsoe v. Emery Worldwide Airlines*, 635 F.3d 836, 842-43 (6th Cir. 2011). By contrast, numerous courts have held that even where a company has violated the WARN Act, its liability should nonetheless be reduced to zero under 29 U.S.C. §2104(a)(4).

For example, in several cases imposing zero liability, the court concluded that there was no evidence of harm from the violation. *See, e.g.*, *Kildea v. Electro Wire Prods., Inc.*, 60 F.Supp.2d 710, 714 (E.D. Mich. 1999) (finding that "complete reduction of damages is appropriate" where no plaintiff "was deprived of actual notice of the plant closing in such a way that actual damages resulted"), *aff'd*, 2000 WL 1909383, at *3 (6th Cir. 2000) (affirming because "plaintiffs failed to produce any evidence of actual damages" from violation); *Gen. Dynamics Corp.*, 821 F.Supp. at 1313 (no liability where plaintiff "could not identify any harm that befell the affected employees" from "technical violation" of statute). Zero liability has also

been imposed where employees "had ample access to the information" purportedly missing from the WARN notice, including in "two extensive articles" appearing in local newspapers. *Kildea*, 60 F.Supp.2d at 714. And courts have reduced liability to zero in "unique and unprecedented" situations or where a company's "circumstances were rapidly evolving" and it "was facing unforeseen developments." *Shadyside Stamping*, 1991 WL 230841, at *3.

All of these circumstances are present here. Indeed, the bankruptcy court *acknowledged* these points and more, finding:

- Yellow drafted the WARN notice amid "unforeseen and uniquely challenging circumstances." A0629.

- Yellow's employees "had been made aware of the company's efforts to stabilize its precarious financial position." A0629.

- Yellow's failure to mention the strike notice in the WARN notice "was motivated … by a desire to avoid exacerbating a potentially volatile (and perhaps even dangerous) situation." A0629.

- Just *one* additional sentence—indeed, even a "few additional words"— would have rendered Yellow's WARN notice sufficient. A0492; A0628.

- Any additional language would "probably not" have "made a difference to the employees," given Yellow's "extensive communications with them about its status and the widespread publicity of the company's travails." A0628.

- Yellow's violation of the WARN Act was a "technical one." A0517.

- Yellow's argument for zero liability had "common sense." A0628.

These numerous unchallenged findings make this the archetypal case where imposing zero liability is appropriate. The bankruptcy court's failure to do so was

the result of its belief that it *had* to impose "some liability," A0628, but that is incorrect as a matter of law. In order to make clear that a trial court is free to impose zero liability even after finding a WARN Act violation, this court—if it concludes that Yellow was an "employer," cannot avail itself of the two affirmative defenses, yet satisfies the good-faith provision—should reverse and enter judgment of zero liability.

*Second*, even if a court *must* impose "some liability" following a WARN Act violation, the bankruptcy court still erred in imposing 14 days of back pay and benefits per affected employee. That number—nearly 25% of Yellow's total potential liability—bears no relationship to the evidence or even the bankruptcy court's own findings, which deemed Yellow's violation amidst "unforeseen and uniquely challenging" circumstances a one-sentence "technical" violation that did not harm a single union employee. Indeed, the bankruptcy court offered no explanation whatsoever for choosing 14 days; it merely observed that "the Court finds that to the extent there is any WARN Act liability, it is appropriate to limit the damages to 14 days of backpay and benefits per affected employee." A0629. Because the bankruptcy court "failed to explain its grounds" for choosing 14 days, and "its reasons for doing so are not otherwise apparent from the record," this Court "need not defer" to its exercise of discretion and instead reviews that determination *de novo*. *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 181 (3d Cir. 2000). Whichever

standard of review this Court applies, the 14-day determination cannot stand.  If this Court even reaches the question, it should impose the only amount of liability consistent with the case law and the record—zero.

## II.     The Bankruptcy Court Erred In Holding That Yellow Is An "Employer" Under The New Jersey WARN Act.

The court granted summary judgment to the Unions on Yellow's liability under the New Jersey WARN Act because, in its view, Yellow is an "employer" under the New Jersey Act.  A0517-519.  That ruling is incorrect.

The court reasoned that while the federal WARN Act defines "employer" as a "business enterprise," the New Jersey Act defines "employer" as a "business entity." A0518 (citing N.J. Stat. Ann. §34:21-1).  That difference is "slight, but meaningful," the court stated, because "entity" means a "legally recognized organization" while "*enterprise* requires some ongoing commercial activity."  A0518-519.  In the court's view, the Third Circuit's "liquidating fiduciary exception grew out of the fact that a business *enterprise* must, by definition, be engaged in some commercial activity." A0519.

That reasoning is erroneous because the Third Circuit's *United Healthcare* decision—where that court first held that a company is not an "employer" under the WARN Act if it is "preparing itself for liquidation," 200 F.3d at 179—did not turn on the word "enterprise" but on the term "*business* enterprise."  *See id.* at 177 ("The question for us to resolve is whether United Healthcare … was operating as an

ongoing business enterprise, or whether it was merely engaged in the liquidation of assets."). In construing that term, the court did not focus on the word "enterprise" but on the word "business." For example, the rule that the court established was "[t]he more closely the entity's activities resemble those of a *business* operating as a going concern, the more likely it is that the entity is an 'employer,'" while "the more closely the activities resemble those of a *business* winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* at 178 (emphases added).

Similarly, the court quoted the Department of Labor's comments to the regulations implementing the WARN Act as follows:

> [T]he term "employer" includes public and quasi-public entities which *engage in business* (i.e., take part in a commercial or industrial enterprise, supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).

*Id.* (quoting 20 C.F.R. §639.3(a)(1)(ii) and 54 Fed. Reg. 16042, 16065 (1989)) (court's emphasis). Not only did the court emphasize "engage in business," but the comments describe *how* an entity can "engage in business," which *includes* but does not *require* "tak[ing] part in a commercial or industrial enterprise." The comment thus distinguishes between "business" and "enterprise" and makes clear that there are other ways to engage in "business" without an "enterprise."

The Third Circuit's (and Department of Labor's) focus on the "business" aspect of "business enterprise" matters because the New Jersey Act does not define "employer" as just an "entity" but a *business* entity." The bankruptcy court overlooked that critical aspect of the New Jersey Act's text. And because no New Jersey court has addressed the term "business" in the New Jersey Act, it must be given the same meaning and import as in the federal WARN Act and federal cases interpreting that statute. *See DeRosa v. Accredited Home Lenders, Inc.,* 22 A.3d 27, 36, 36 (N.J. App. Div. 2011) (holding that "in the absence of case law interpreting the Act, we look to federal WARN Act regulations and case law for guidance in interpreting the New Jersey WARN Act."); *Heinz v. Dubell Lumber Co.*, 2020 WL 6938351, at *3 (D.N.J. Nov. 25, 2020).

Accordingly, the New Jersey Act's use of the term "business entity" rather than "business enterprise" is of no moment. What matters is that both statutes use the term "business" when defining "employer." Like the federal WARN Act, therefore, the New Jersey Act does not apply when a "business entity" has "ceased operating its business as a going concern and [is] simply preparing itself for liquidation." *United Healthcare*, 200 F.3d at 179. At that point, the "business entity" is no longer an "employer" and not subject to the state act. For the same reasons Yellow is not an "employer" under the federal WARN Act, therefore, it also is not an "employer" under the New Jersey Act.

## CONCLUSION

This Court should affirm the bankruptcy court's judgment that Yellow was not an "employer" under the federal WARN Act when it ordered the union employees laid off on July 30, 2023. If the Court reverses that judgment, it should affirm the bankruptcy court's judgment of no liability on the alternative ground that Yellow satisfied the faltering company and UBC defenses and was entitled to avail itself of those defenses. If the Court nevertheless holds that Yellow cannot rely on those defenses, it should affirm the bankruptcy court's decision that any WARN Act liability is mitigated by the good-faith provision, but reduce that liability to zero rather than 14 days' worth. Finally, the Court should reverse the judgment that Yellow is an "employer" under the New Jersey WARN Act.

Dated:   June 20, 2025          /s/ Laura Davis Jones
Wilmington, Delaware            Laura Davis Jones (No. 2436)
                                Timothy P. Cairns (No. 4228)
                                Peter J. Keane (No. 5503)
                                Edward Corma (No. 6718)
                                PACHULSKI STANG ZIEHL & JONES LLP
                                919 North Market Street, 17th floor
                                P.O. Box 8705
                                Wilmington, DE 19899-8705 (Courier 19801)
                                Telephone:  (302) 652-4100
                                Facsimile:   (302) 652-4400l
                                Email:       jones@pszjlaw.com
                                             tcairns@pszjlaw.com
                                             pkeane@pszjlaw.com
                                             ecorma@pszjlaw.com

                                George W. Hicks, Jr. (*admitted pro hac vice*)
                                KIRKLAND & ELLIS LLP
                                1301 Pennsylvania Avenue NW
                                Washington, DC 20004
                                Telephone:  (202) 389-5000
                                Facsimile:   (202) 389-2500
                                Email:       george.hicks@kirkland.com

                                Patrick J. Nash, P.C. (*admitted pro hac vice*)
                                Allyson B. Smith (admitted *pro hac vice*)
                                KIRKLAND & ELLIS LLP
                                333 West Wolf Point Plaza
                                Chicago, IL 60654
                                Telephone:  (312) 862-2000
                                Facsimile:   (312) 862-2200
                                Email:       patrick.nash@kirkland.com
                                             allyson.smith@kirkland.com

Michael P. Esser (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
555 California, Suite 27
San Francisco, CA 94104
Telephone: (202) 389-5000
Facsimile: (415) 439-1500
Email:      michael.esser@kirkland.com

*Counsel for Appellees/Cross-Appellants*
*Yellow Corporation and Affiliates*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Bankruptcy Procedure 8016(d)(2)(A), the undersigned certifies that this Principal And Response Brief For Appellee/Cross-Appellant (1) complies with the type-volume limitation of Fed. R. Bankr. P. 8016(d)(2)(B)(i) because, excluding the parts of the document exempted by the federal rules, the brief contains 15,278 words; and (2) complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because the Cross-Appellants' Opening Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: June 20, 2025

*/s/ Laura Davis Jones*
Laura Davis Jones

## CERTIFICATE OF SERVICE

HEREBY CERTIFY that on this 20th day of June, 2025, I electronically filed

the foregoing Cross-Appellants' Opening Brief and Appendix via CM/ECF, which

will send notice of the filing to all counsel of record.

Date: June 20, 2025                    */s/ Laura Davis Jones*
                                        Laura Davis Jones

## REPRODUCTION OF STATUTE

Pursuant to Fed. R. Bankr. P. 8014(d), Yellow reproduces herein N.J. Stat. Ann. §34:21-1. All other relevant statutes, rules, regulations, or similar authority are reproduced with the Unions' brief.

New Jersey Statutes Annotated
  Title 34. Labor and Workmen's Compensation
    Chapter 21. Plant Closings, Transfers, Mass Layoffs

N.J.S.A. 34:21-1

34:21-1. Definitions

Currentness

As used in P.L.2007, c. 212 (C.34:21-1 et seq.):

"Commissioner" means the Commissioner of Labor and Workforce Development.

"Department" means the Department of Labor and Workforce Development.

"Employer" means an individual or private business entity which employs the workforce at an establishment.

"Establishment" means a place of employment which has been operated by an employer for a period longer than three years, but shall not include a temporary construction site. "Establishment" may be a single location or a group of locations, including any facilities located in this State.

"Facility" means a building.

"Mass layoff" means a reduction in force which is not the result of a transfer or termination of operations and which results in the termination of employment at an establishment during any 30-day period for 50 or more of the employees at or reporting to the establishment, except that "mass layoff" shall not include a mass layoff made necessary because of a fire, flood, natural disaster, national emergency, act of war, civil disorder or industrial sabotage, decertification from participation in the Medicare and Medicaid programs as provided under Titles XVIII and XIX of the federal "Social Security Act," Pub.L. 74-271 (42 U.S.C. s.1395 et seq.) or license revocation pursuant to P.L.1971, c. 136 (C.26:2H-1 et al.).

"Operating unit" means an organizationally distinct product, operation, or specific work function within or across facilities at a single establishment.

"Response team" means the plant closing response team established pursuant to section 5 of P.L.2007, c. 212 (C.34:21-5).

"Termination of employment" means the layoff of an employee without a commitment to reinstate the employee to his previous employment within six months of the layoff, except that "termination of employment" shall not mean a voluntary departure or retirement or a discharge or suspension for misconduct of the employee connected with the employment or any layoff of a seasonal employee or refer to any situation in which an employer offers to an employee, at a location inside the State and not more than 50 miles from the previous place of employment, the same employment or a position with equivalent status, benefits, pay and other terms and conditions of employment, and, except that a layoff of more than six months which, at its outset, was announced to be a layoff of six months or less, shall not be treated as a termination of employment under P.L.2007, c. 212 (C.34:21-1 et seq.) if the extension beyond six months is caused by business circumstances not reasonably foreseeable at the time of the initial layoff, and notice is given at the time it becomes reasonably foreseeable that the extension beyond six months will be required.

"Termination of operations" means the permanent or temporary shutdown of a single establishment, or of one or more facilities or operating units within a single establishment, except that "termination of operations" shall not include a termination of operations made necessary because of a fire, flood, natural disaster, national emergency, act of war, civil disorder or industrial sabotage, decertification from participation in the Medicare and Medicaid programs as provided under Titles XVIII and XIX of the federal "Social Security Act," Pub.L. 74-271 (42 U.S.C. s.1395 et seq.) or license revocation pursuant to P.L.1971, c. 136 (C.26:2H-1 et al.).

"Transfer of operations" means the permanent or temporary transfer of a single establishment, or one or more facilities or operating units within a single establishment, to another location, inside or outside of this State.

**Credits**

L.2007, c. 212, § 1, eff. Dec. 20, 2007. Amended by L.2019, c. 423, § 1, eff. April 10, 2023; L.2020, c. 22, § 1, eff. April 14, 2020, retroactive to March 9, 2020.

N. J. S. A. 34:21-1, NJ ST 34:21-1
Current with laws through L.2025, c. 49 and J.R. No. 6.

---

                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   2