09:56
But these oligarchs here's the thing. If the Internet was to go down tomorrow, please let it go down. But if the Internet were to go down or the grid were to go down for even an hour, they wouldn't be able to get down from their high rise apartments on the Upper East Side and be able to get a bottle of water before those shelves are empty.

10:21
That's the reality of the situation. So the reason why I support strikes is for the same reason I mentioned. The Amazon economy has made society a little bit weaker. These strikes are supposed to be disruptive.

10:35
They're supposed to be inconvenient. They're supposed to teach a lesson. I think that's something that this country needs. I think it's also something that every now and then I think there's a quote.

10:48
Let's actually look up this quote, because a lot of conservatives love tossing this quote around about liberty and stuff. The tree of liberty. The tree of liberty, it must be refreshed. Something like that.

11:06
Something along those lines. Oh, Thomas Jefferson, he said, quote that the tree of liberty must be refreshed from time to time with the blood of patriots and tyrants. Well, guess what? The same thing applies to the working class.

11:25
Sometimes the tree of profit or whatever word you want to use, or the tree of business. Sometimes the tree of business must be refreshed from time to time with the inconvenience of workers and oligarchs.

11:39
Let's use that. Let's coin that up. That's going to be one of the new phrases that needs to happen, because clearly these people have value. Clearly Ups holds value because if major media outlets are going to say it's going to cost the country the most it ever has in 100 years, that means their labor is worth than what they're currently being paid.

12:02
If it's going to inconvenience you that much, it means it's worth more. Unlike the

technology in the trucking industry and in the automobile industry that they keep developing based on planned obsolescence so they can continue have a continuous stream of revenue without having to market, without actually having to do work.

12:21
But because these companies who've been constantly subsidized and bailed out, they just continue to develop technology. Born to fail. Born to fail, everyone. Born to fail me. Born to fail. Other drivers out there, born to waste our time, they're able to keep developing this garbage technology, charge an astronomical price for it that no one actually agrees with.

12:43
And then all of a sudden when they have to face a minor inconvenience like Ups workers going on strike because they just want maybe air conditioning in their fucking but they hold their hands out like fucking little Timmy, like they had it so fucking hard.

13:01
So I'm always going to cheer for a think. I think people need to go on strike in this country without the teamsters authorizing it. I don't think that needs to happen. And this is where I get because I'm not a huge fan of zoomers because I don't understand them completely yet.

13:18
But I think the zoomers coming into this are helping because this is indicative of what's going on with trucking. I talk about this often how with the Ata and the fake driver shortage narrative, zoomers, along with millennials, are the ones who've witnessed the previous generation do this job.

13:36
Trucking die of chronic disease, develop chronic illness, lose their families, have their wages cut, and the zoomers and millennials are looking at this. And that is why the turnover is so high. And that's why people aren't staying with the job.

13:48
Because for years, society took advantage of these boomers post deregulation who were like, well, Gur, I just got to work hard because that's exactly what I need to do. That's the only way to get ahead.

14:01

And society took advantage of that. And now the time and the clock is starting to run out. Like I said, the tree of business must be refreshed from time to time with the inconvenience of workers and oligarchs.

14:16

So hey, that was breaking News first ever live stream episode where I've been able to break some serious news that probably won't be coming out till tomorrow. Stand strong. Every driver who's over there at Yellow or YRC Lombard here supports you.

14:35

We want you to pull through and make a statement. We want you to inconvenience people. It's unfortunate that the people at Yellow because here's the thing. I could take control of Yellow right now. And with my network of friends, brokers, other businesses, and other people, I'd bring on a team that could raise Yellow from the dead.

14:54

Number one, we changed the name to Lombard. We'd bring back the Lombard green. So we'd do that first. But through everyone I know who's so hungry and fears everybody in the Lost Freight discord, people I know on LinkedIn, so many people that the network I've grown in just these few years, we can make Yellow the fucking, the cream of the crop of the trucking industry like that.

15:20

But that's the thing. When you have these oligarchs who think they are too big to fail, continue to run these businesses to the ground, continue to take advantage of human beings who they treat as less than eventually the clock runs out.

15:37

But that's enough about that. That's a 15 minutes rant right there. Go Yellow. We back the theme series at this show. Um. So we'll keep it going. Next amount of breaking news which has to do with everything.
--- ENDS HERE ---

15:49

Part of my agenda in the good guy agenda is if you remember a couple of episodes ago I had on Miss Desiree Wood, the president of Real Women in Trucking. And if you didn't listen, that episode definitely go back.

16:02

It's a jaw dropping story of how she started that organization, essentially. And it's parallel to everything that we're trying to expose the show is the bad poor training in the industry. And with the poor training has come with it.

16:17

A lot of sexual assault and harassment of women out there, women who just want to have a good job. But through that there was an organization started called Tier. And now tier was the truckers emergency assistance responders group.

16:34

And so what they did, and I'm just reading right from the bottom, is Tier is a 501 C, three serving truck drivers in immediate distress with short term assistance to get them home or to a safe haven, essentially.

16:47

So say for example, I work for a medium sized carrier of 100 trucks and they go bankrupt. And all of a sudden I'm 1500 miles from home and I have no way home because the truck has been seized or what have you.

17:04

Cheer would come in and provide you funding to get home. Now, the other day they came out and tweeted that we are unfortunately out of funding to help anyone at this time. We urge drivers to realize that many companies are close to bankruptcy due to freight rates being low and freight demand being slow.

17:22

Please make a plan to get yourself home should the company suddenly terminate you. You should have enough to rent yourself a U Haul, pay for gas and food to get home. If you're traveling with a pet, have a lot of stuff on the truck, they go on later that day.

17:38

We have had numerous requests. For help from lease purchase operators, people being paid 1099 and w two company drivers who have been left stranded. Unfortunately, this has drained our funds and we cannot help anyone else at this time.

17:53

So we urge drivers to make a plan for themselves. They then go on to post a link. And the link is a GoFundMe link that says abandoned comma broke by employer 1000 miles

**DEBTORS' EX. 094.043**

YELLOW_WARN_138590

from home, organized by Thomas Baker.

18:07
So for the anti union people who are listeners of the show, this is an example of why this industry still needs a form of representation. Whether that be from a union, whether that be from an organization like CDL Drivers Unlimited, whether that be from Oita the Ata doesn't do anything because the Ata actually hates truck drivers.

18:29
They hate you. They want you fat, they want you sick, they want you unhealthy, they want you stranded away from home because they don't care about you. But this is a tragedy right here because these drivers who just want to earn a decent living, get stranded from home at no fault of their own, completely out of their control, and then no one's held accountable for it.

18:52
That's the issue in this industry is that the only people who are held accountable, the only people who have to pay, has become the operator since 1980 t regulation, which we can actually call reregulation.

19:08
All it did was a new process to put regulation and oppression onto America's truck drivers. And it's been a slow, spiraling downhill race to the bottom since. That's all it's done. It's taken time, it's been articulate.

19:24
You can't just do this all at once. That's not how you put an ideology out on the scene. That's not how you infect the population. With something, you have to slowly and gradually do it by removing the autonomy from the driver and taking away everything slowly but surely.

19:49
Even guests of the show. Blythe Brumleaf on her show and on her website, Digital Dispatch can a trucking company leave a driver stranded legally? The answer is yes. It's 100% legal for companies do that and there's no safety net and nothing to do.

20:05
So here's the thing. So when it comes to the Ata agenda, which has the tens of millions of dollars to lobby to Congress, which then influences the FMCSA and their policies, and

**DEBTORS' EX. 094.044**
YELLOW_WARN_138591

they come out with these insane regulations that only screw over honest, decent, hardworking Americans, you will have entities and enterprises try to operate outside of the law of that regulation.

20:33

And I know the libertarian minded people of the show and the freedom people are going to say, oh hell yeah, that's a good thing. Yeah, on paper it's a good thing. It sounds great. It sounds very piratey and patriotic or what have you.

20:49

But the thing is, the only people who are able to get away with operating outside of these regulations, like the use of ELDs and all this sort of stuff, are people who have no skin in the game. And by have no skin in the game, it means that they're able to cut and run at a moment's notice or at their leisure.

21:11

Talking about these Eastern European crime syndicates who operate primarily out of the Chicago market, not just Eastern Europe. These foreign enterprises, stereotypically though they happen to be, from countries surrounding the Balkans as well as Eastern Europe, there's a certain phrase called Chicago based carrier that has a negative connotation for a reason.

21:33

Now, these people. They operate motor carriers where they are able to hack people's electronic locks. They can go in and manipulate your 14 hours clock. Now, like I just previously mentioned, you have a lot of drivers.

21:48

So the wages have been suppressed and slashed in this industry. But you're going to have drivers who want that extra money, who want the money they deserve. So they're going to go out and find places where they can earn that money.

22:02

Hard workers. They want to run an outlaw. They want to do this because they need the money, because they're trying to support their families. Well, they'll get up with some of these carriers who operate outside of the law.

22:14

They end up driving for them. And what ends up happening is these carriers do

CONFIDENTIAL
SA0210

**DEBTORS' EX. 094.045**

YELLOW_WARN_138592

eventually go bankrupt because they don't care about the money going back to the business. They're sending that money back to their enterprises and their crime syndicates back in Eastern Europe to their overlords.

22:30
So they don't care. They're not running their business legitimately. So either that company goes bankrupt or the driver who just wants to earn a good paycheck needs a break, needs a doctor's appointment, does something.

22:41
So they go and stop for a reset somewhere over the road and they'll be 1500 miles home. They'll be sleeping in a motel room. They'll hack the ELD, send one of their fucking cronies or curmudgeons out there and they'll steal the truck and leave people blind.

22:55
If you go back to my episode with my good friend Skippy Skippy's Trucking Show, go back and listen. He was working for one of these crime syndicate enterprises operations and he wasn't being paid. Eventually he got fed up, drove the truck home and the FBI seized the truck.

23:14
These are things that are happening day as I record this show. It's happening right now. And then the fact that we need a nonprofit organization to exist to help fund people from getting home. Let's not even get started on the lease purchase agreements because the lease purchase things are another huge scam because this is how.

23:35
Indentured servitude is happening at our ports is you'll have older immigrants like the guys who got here 10, 15, 20 years ago. They own the carrier. They bring in the new immigrants and then they say we're going to get you a job.

23:48
They're going to sponsor your citizenship or whatever. But they're going to pay them dirt wages, slave wages below a standard. And then they basically hold their immigration status hostage. But also at the same time what they do is they hire them as independent contractors and tell them that they're going to be the owner operators of this truck and that's how they're going to make it.

YELLOW_WARN_138593
**DEBTORS' EX. 094.046**

24:07

They're going to live the American dream. Those people end up stranded too. But we could save that for a whole other episode. But the fact of the matter is that we needed this organization, that we needed this nonprofit to even exist, is fucking outright.

24:21

It should be baffling. That should be on national news, not Ups. Strike will be costliest in US history. No that's not national news. That's just a minor inconvenience. Americans, american workers, American truck drivers being stranded 1500 miles from their home and no way to get back.

24:41

And that being legal. That's a national news headline. But see in this country if it's not Bud Light, Donald Trump or a fucking rainbow flags nobody cares. That's the thing. We're too focused on the culture wars here and we've ignored each other.

24:59

We've ignored each other as neighbors, as friends, as countrymen. We've ignored each other and we're letting them do it. We're letting our enemies do it. We're letting them draw the lines for us. This has been a slow process over time and they've been assisted by the internet.

25:13

They're being assisted by China, they're being assisted by Russia. They're being assisted by all these people to split us apart. But it's unbelievable. And this organization tier not only had to exist but they've now run out of money.

25:28

Unbelievable. And like I said and I haven't listened to one podcast where anybody's talking about it. I don't know. I just think more people should probably care more. But that's why I'm going to keep talking, and that's why I'm going to keep yelling and screaming and doing this until my fucking lungs come out of my chest.

25:48

Next thing, and this will be the last thing, and I was talking about this on Instagram today, is that when Yang went on Rogan a few years ago, the big thing was about how the AI and autonomous was coming for the truckers first.

YELLOW_WARN_138594

26:02

Everybody assumed that the truckers were the first one on the chopping block. They're going to go, they're this unskilled fucking labor and yeah, unskilled. I'd love if that fucking goddamn pillowcase looking motherfucker Elon, or that penis head looking dick face Jeff Bezos.

26:18

I'd love to see them drive this truck here with a twelve foot wide load, 14 foot high, figure out the Met, read a fucking atlas. I'd love to see any of them try and do that and go up the up and down 6% grades and do it now.

26:31

If they consider it unskilled, that's besides the point. So the conversation was that the AI and autonomous has come for the trucks. Look where it is now. Because the war is already here. The AI is already here.

26:41

It's hit Hollywood first. Hollywood is the first hit by AI. So it's here. It's on the scene. And what it's doing is see how it's not taking the jobs up front. Because that's the thing. They thought it was just going to take the jobs and whatever.

26:54

No, what it is is it's Devaluing deskilling. People up front, they have these AI generated scripts and they want to pay writers, they want to slash writers wages to just edit AI generated scripts. It's a huge, long, crazy story.

27:09

I've watched a couple of videos on it. A good friend of the show, also fellow Marine. He's an actor. Couple movies. He was telling me a little bit about it. So the AI is here. So notice who it's hit first.

27:21

It's come after Hollywood and the people who've been saying, oh, it's coming for trucks. It's coming for trucks. Learn to code. Learn to code. It's coming for the people who are coding. This is who it's coming for first.

27:30

It's coming for the photographers. It's coming for the actors. It's coming for all. And it isn't meant to completely take the jobs, but it's meant to devalue and deskill you. Because

YELLOW_WARN_138595

**DEBTORS' EX. 094.048**

this technology is inherently anti human.

27:44
It is against you. It makes you want to do less, think less. It takes away your ability to think and solve problems and to just trust machines to do it. Now, the only industry where I see this making any liquor sets is the medical industry.

28:01
Anything we can do to help sick people? Sure. Anything that can help doctors assess situations, because the doctors aren't going anywhere, and you're never going to cut a doctor's salary. That's not going to happen, especially with big pharma running shit.

28:16
So the only place I see it happening is there. Other than that, I don't see it making sense. Because just like it's been a slow road since Deregulation, that road is going to get shorter and shorter as the technology continues to get better and better.

28:31
So it's going to deskill, cut pay, take away jobs very, very quickly. It will be a very fast snowball effect. And if you think things are going to become cheaper, like I just said a few minutes ago, we don't live in an actual free market capitalist society.

28:48
We live in a crony oligarchy that's a shareholder economy. The goal is profit, profit, profit. Here's the thing. As you continue to cut pay even from other people besides just truck drivers, once you've gone after the graphic designers, when you go after because that's the thing, they're going after jobs with six figure incomes that they're going to slash to $30 to $40,000 incomes when they get those people.

29:17
Where are you going to get your profits when you've eliminated 80% of the population's pay, when you've cut their pay in half? What do you think is going to happen to the profit? Eventually you run out of money.

29:30
And that's where we are. And that's what happens with these oligarchs. Look at what happened with COVID Look at what all these fucking genius fucking billionaire people did when COVID happened and the government was printing all this money.

CONFIDENTIAL
SA0214

**DEBTORS' EX. 094.049**

YELLOW_WARN_138596

29:40
Businesses are like, oh, guess we could take all this money and throw it around and do all this. And then eventually it dried up. This is what's happened with the housing market, all this stuff. So why do people put so much faith in these oligarchs to solve all of our fucking problems?

29:57
It makes no sense. So just a forewarning out there to the people who consistently simp for artificial intelligence and say, you just need to be the person who's using the AI. They're counting on a motherfucking cuck like you to trust the AI and to take their side.

30:14
They need you to they're counting on that ignorance. They are counting on that laziness. They want that because they know that that's the bulk of going to be the bulk of the population because you're the motherfucker.

30:24
They're going to stick in a cell to push their buttons for $10 an hour or a meal. So that way you're not out there starving in the fields with the rest of the playbeans who disavowed the AI. So think about that.

30:40
Wild times. Wild times. So quick recap, breaking news. You heard it here first. Live teamsters are going to authorize a strike for Yellow freight. They're not going down without a fright, down without a fight.

30:54
Good for them. Tier doesn't have any more money. Drivers are stranded across the country. AI is here. The war has begun. And that's where we're at. Appreciate you all riding with me, rocking with me.

31:09
Going to be doing this more. You're going to see me coming up on Here Live, especially as I get news. I would love to just keep dishing it out. Like I mentioned on the last episode going on News Nation did not happen by my own merits alone.

31:23
The only reason I was blessed to have that opportunity is because of the company I keep, the people. The type of people who were so gracious to pass me this news about

**DEBTORS' EX. 094.050**

yellow and the Teamsters who told me tonight and said that.

31:38

So I just want to give a quick shout out to all of those people out there, the good friends of mine, everyone who's supported this show off the jump. That's the reason why it's happened. That's the reason why we're going to keep moving forward.

31:51

We're going to keep getting this message out there. And for those who maybe ask why, because I was thinking about this today after I got done talking on Instagram is why do it? Why talk? Why this? Why trucking?

32:03

Why all this? Well, a lot of it has to do for the same reason why I got my CDL in the first place honor, legacy. Same reason why I got the truck. Honor, legacy, patriotism, things like that. Like I said, I know that I have over a century and a few generations of ancestors looking over my shoulder.

32:24

That's what I truly believe is that when I drive down America's highways, I know that my ancestors, the ones who came before, are watching over me. And I know that that's what I feel, and that's how I act.

32:42

I act as if that's who's watching over my shoulder. And I don't want to disappoint them, and I don't want to let them down. You see, because that's the thing. The original Lombard was a teamster affiliate.

32:53

They were incorporated in 1923. They wouldn't want this to happen. They wouldn't want a driver's pensions to be gutted or to have to self pay into their health benefits with some fake promise that it could be reimbursed later.

33:07

They wouldn't do that. I said this when Rachel Primac came on the show. I've mentioned this on Voice of Gourd about how my grandmother told me she remembers when deregulation happened and my grandfather came home and he was living.

CONFIDENTIAL
SA0216

**DEBTORS' EX. 094.051**

YELLOW_WARN_138598

33:21

He said, they're going to let any motherfucker in this. They're going to let it. And that's what they did. They raised the floor to zero, and now the ramifications are coming to light. And we can almost thank COVID for this because without COVID, this would have all just gone on under the radar without it happening.

33:34

But now, since the economy sucks, we're starting to see kind of like how Lake Mead, some of Lake Mead has gone down. We're starting to see the dead bodies that the Mafias dropped there and these sunken ships that nobody's able to find.

33:50

That's what's happening. The market's drying up, so the criminals are now being exposed, and we're realizing what the true problems are. The most tenured people in the industry, people who I have on this show, people like Gord McGill, are starting to come out with the truth and seeing everything come to light with how this technology isn't necessarily all that good under the guise of safety, is really just here to make people's lives worse and to suppress wages.

34:19

So that's what it took. But that's why, because everything that I'm talking about, it's reflective of everything else going on in our culture and in society today. Everything with the Ata and their lobbying, the same thing is happening with all of our laws regarding Big Pharma, regarding the food industry, the glorification of not staying fit and all this stuff.

34:48

And this is happening everywhere, is all these lobbying firms keep purchasing members of Congress, and members of Congress do this with their just I'm doing it from the corner of trucking and so where logistics isn't sexy.

35:05

That's the main truth of all this, is everything that I've show, it's reflective of other things going on out there in society. What our media talks about me going on news Nation was the first time a major media outlet ever aired that the driver shortage narrative wasn't real.

35:24

And that was something that the Ata has been pushing. Three decades. They've been pushing it for over 30 years, over and over and over again. Now, that's just one issue to

**DEBTORS' EX. 094.052**

keep wages down in one industry.

35:40

Where do you think that that's going on throughout the rest of our country? It's happening everywhere. So that's why I'm doing it, is because at the end of the day, I'm an American. I'm a patriot. And I care about my country, and I care about the people in it.

35:54

And I care about the people who run it, because the people who run it aren't Elon Bezos, Bill Gates, those dickheaded motherfuckers. They don't run shit. And as a matter of fact, AI could take their jobs right now.

36:09

Right now, AI could take their jobs. That's the irony in all this, is that that's who AI can actually eliminate is their jobs. Because who needs their big brains to think anymore? When you have the big all knowing algorithm that can run a billion thoughts a second?

36:25

That's the truth. But at the end of the day, they don't run this country. The motherfuckers who drive the forklifts at the warehouse do. The people who are on America's highways, the people who are and I've mentioned this on the show before, the waitress at the Oasis Travel Plaza off 44 in Missouri, whose husband's dead, who's raising two kids on her own, working over 12 hours, serving America's truck drivers.

36:51

She runs this fucking country. That's who fucking runs it. Not these oligarch dickheads who are fucking crying with their hands out because drivers at Yellow are going to go on strike or because Ups drivers are going to go on strike.

37:06

That's who runs this out in country. That's why I do it. But thank you once again for listening. That'll do it for episode 82. Back to the bench. Bye.

YELLOW_WARN_138600

**DEBTORS' EX. 094.053**



## Yellow Corporation Response to U.S. District Court for the District of Kansas Ruling

July 22, 2023

**Company Intends to Continue Breach of Contract Case Against International Brotherhood of Teamsters in Federal Court**

NASHVILLE, Tenn., July 21, 2023 (GLOBE NEWSWIRE) -- Yellow Corporation (NASDAQ: YELL) regrets that Senior Judge Julie A. Robinson of the U.S. District Court for the District of Kansas denied the Company's motion on jurisdictional grounds. The Company, represented by Marc E. Kasowitz and Ron Rossi, partners at Kasowitz Benson Torres LLP, intends to appeal the ruling.

The court, recognizing a strike would likely kill the company, resulting in the loss of 30,000 jobs, cautioned the Union --that while it won today's battle, it could very well lose the war.

The Company will continue to pursue its breach of contract case where it seeks to recover more than $1.5 billion in lost enterprise value caused by the International Brotherhood of Teamsters.

**About Yellow Corporation**

Yellow operates one of the largest, most comprehensive logistics and less-than-truckload (LTL) networks in North America, providing customers with regional, national, and international shipping services throughout. Backed by a team of nearly 30,000 transportation professionals, Yellow's flexible supply chain solutions and best-in-class expertise ensure the safe, timely delivery of industrial, commercial, and retail goods for customers of all sizes. Yellow's principal office is in Nashville, Tenn., and is the holding company for a portfolio of LTL brands including Holland, New Penn, Reddaway and YRC Freight, as well as the logistics company Yellow Logistics.

To learn more about Yellow and our services, visit myyellow.com.

| | | |
|---|---|---|
| Media Contacts: | Mike Kelley | |
| | 913-696-6121 | |
| | mike.kelley@myyellow.com | |
| | | |
| | Heather Nauert | |
| | heather.nauert@myyellow.com | |
| | | |
| Investor Contact: | Tony Carreño | |
| | 913-696-6108 | |
| | investor@myyellow.com | |



Source: Yellow Corporation

**DEBTORS' EX. 098.001**

## Teamsters demand Yellow's previous $11-per-hour offer

Watch here: https://www.youtube.com/watch?v=GjWsdfR8eSQ

00:00
All righty, guys, thank you for that. We'll talk to you one more time before we're done here on your Wednesday. Right now, we're going to welcome in our next live guest. We've got our editorial director, Rachel Primek, joining us to continue this conversation about Yellow.

00:11
Rachel, thank you for being here this morning. We've got some more developments, but it seems like Yellow isn't necessarily out of the woods yet, right? They've just kind of pushed the problem a little bit down the road.

00:21
What's going on? No, absolutely not. So what's going on right now? Yellow sent out a memo to all of its employees yesterday afternoon around 04:30 p.m., saying that the company actually would need to limit pickups nationwide as they start to grapple with and start to sort of readjust their network following the threat of a strike that came out last.

00:51
That's going that's what the company is saying, that they're limiting pickups nationwide. Some folks in areas including Ohio and Texas and California, they've told me that actually their terminals are stopping all pickups.

01:06
I've also heard from some account executives in the northeast also confirming that in their regions, all pickups are not just limited, but actually completely halted. And it seems like an interesting situation.

01:19
You got the extension for the healthcare stuff that was passed over the weekend, and then at the same time, you would assume that you'd want to continue getting volume shipments to stay in business. But now on the ground, facts are we're stopping it.

CONFIDENTIAL
SA0220

**DEBTORS' EX. 104.001**

YELLOW_WARN_095275

01:33

Does this mean that Yellow thinks their time is up and they're looking, like, at an orderly drawdown? I've never seen a company that's aid on hauling things decide to not haul anything. Right? Yeah, that's definitely one sort of theory or one sort of rumor that's going around among employees.

01:52

It's really not clear for now what exactly is going on. It's certainly a situation that's changing day by day. You know, account executives actually told me that on Monday that they were on a company wide call with their chief commercial officer who told them, yeah, we're back to normal.

02:10

We are business as usual. Tell your customers that everything's back to normal only for one day later for some of those same account executives to be told, you know, stop pickups, don't do anything else.

02:25

So it's certainly a situation that is changing quite a bit day to day. So as of yesterday, the Teamsters sent out a memo to their local group saying, hey, you know what we demanded of Yellow to go back to that $11 per hour wage increase from the baseline as well as increasing the benefits.

02:41

Yellow is saying, you know what? We don't actually know if that's feasible. To make that happen keeps us President Sean O'Brien basically saying make it happen, or that's that we're done. Right. How does this new development now shake out for Yellow?

02:53

Are we looking at them maybe wanting to kind of wrap down and wind down and make it look like it's happening on their own terms and that's why Yellow is trying to drag this out? Yeah, it's an interesting sort of dynamic what's happening right now between Teamsters and Yellow, because previously, what we had been seeing over the past however many months, let's say since March or April of this year, it seemed that Teamsters was playing really hardball.

03:22

They were saying, we're going to do it this way. We're not going to negotiate with you. We're going to make it clear that this is what we want to do and what's best for our members. That kind of changed a little bit last week when Teamsters said that they had

**DEBTORS' EX. 104.002**

personally pressured central State Pensions leadership to give Yellow this 30 day extension.

03:45
It seemed like Teamsters was a little bit interested in helping out Yellow at least somewhat during this process. And now it kind of seems like they are switching back and saying, no, we are. Pushing hard on you guys.

03:59
We want to make this know as we've been discussing, it's just been a really day by day. It seems like things are changing. Certainly day by day. Yellow says that what they want is to make this change of operations, that they really want to meet with Teamsters to make it happen.

04:19
And it's interesting to see how Teamsters is responding to this request for sure. And looking at the structure of Yellow itself. One thing when I was doing some research, it's an amalgamation of carriers that were bought.

04:32
It's kind of like this Russian nesting doll almost. Would there be a situation that maybe the teamsters are thinking, well if maybe Yellow is not looking at it, I got my back pocket, I'm just going to split them all up and the ones that are good enough to survive, they're just going to be like a regional carrier now.

04:48
I mean that is how those companies were organized prior to the early two thousand s and even more recently until Yellow started more aggressively to try to integrate all of those networks. I'm not quite sure how that would work if they were to unbundle these carriers.

05:05
I think especially on the West Coast, the former right away carrier is now pretty closely integrated with Yellow. Holland and New Penn are still somewhat not fully integrated with Yellow. So it's unclear how exactly that would work.

05:25
But that could be something that Teamsters is considering or that the lenders to Yellow are also considering. And of course we have to talk about the people that. These entire

**DEBTORS' EX. 104.003**

YELLOW_WARN_095277

decisions impact the most that's the drivers and the employees of Yellow who are sat here and just kind of waiting to see what happens, they're going to end up ultimately getting the short end of the stick no matter what happens.

05:46
Right? When you're looking at the opportunities that drivers or employees are looking for right now, are people just kind of sitting and waiting to see what happens out of Yellow? Has there been any sort of mass exodus yet?

05:56
Or are people just kind of saying, okay, we're just going to hang out until we're not needing in here anymore? It's a bit of both. I've spoken to folks at terminals who say, yeah, people have been leaving in the last few months.

06:09
People are kind of fed up with this. Others they've already put in their seniority, they have their time at Yellow. They are hoping for some sort of resolution. It certainly differs person to person and terminal to terminal.

06:23
Kind of what the aura, I guess, and the atmosphere of each terminal for sure. I think there are some folks who are hoping that things work out. That Yellow manages to get some sort of raisin, that the pension fund is secure and the health benefits are secure.

06:47
But the number of those people who are feeling particularly positive, that does seem to be winding down. And folks who do have a little bit more who are a bit more hesitant, a little bit more skeptical or negative, their ranks do seem to be.

07:04
Increasing and looking forward to. Got about a minute left here. Potential good negotiation, obviously from the teamsters part, pushing it to the edge, playing hardball. But at the same time, are there any downsides?

07:19
Because it looks increasingly possible that Yellow goes out of business. You lose 30,000. Approximately unionized jobs. Would this potentially be a Pyrrhic victory for the Teamsters? You win one thing with Ups, but you also lose with Yellow.

**DEBTORS' EX. 104.004**

YELLOW_WARN_095278

07:34

How do you convince an Amazon to give you a shot when a large portion of their union membership now just went caput? Yeah. So it's 22,000 teamsters members with yellow. The company overall has about 30,000 employees, and it is interesting to see how that could all play out because Ups is certainly the bigger name.

07:55

Just the general public has been following the Ups negotiations a little bit more closely just because they're wondering, where are my Amazon packages going to show up come August 1? But with Yellow, there hasn't quite been that same sort of intense nationwide sort of focus.

08:16

But I certainly agree with you that it could be sort of a pure victory if Teamsters does manage, as they did yesterday, to avoid a Ups strike, but still get sort of those wins they were looking for. If, on the other hand, Yellow does end up having to shut down or declare bankruptcy as a result of all of these sort of developments over the past 15 years or so that has brought it to its current financial status.

08:46

Reminds me of the old Southern saying, for Yellow, that dog won't hunt. So we'll be keeping an eye on that for sure. Rachel, thank you so much. We're looking forward to watching these developments. Thank you.

08:58

That's going to be a wrap for this segment, but we're going to toss it over to Kaylee Nix for our look at the weather.

---

Message

| | |
|---|---|
| **From**: | From the Desk of Darren Hawkins [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C6F19D0CEDB14945A4C83F967D96B0E6-FROM DARREN] |
| **Sent**: | 6/21/2023 11:09:30 AM |
| **Subject**: | IBT Update and Union Health, Welfare and Pension Funds |

**To:** All Yellow Employees
**From:** The Desk of Darren Hawkins
**Subject:** IBT Update and Union Health, Welfare and Pension Funds

*This communication is Company Confidential Information and should not be copied, downloaded, mailed, faxed, posted or forwarded to anyone or any site outside of Yellow, including personal email accounts. The Company monitors all computer/ fax transmissions in and out of the company to, among other reasons, guard against the unintended or inappropriate distribution of this information that could be used by competitors or others to the detriment of Yellow Corporation.*



June 21, 2023

Fellow truckers,

Yellow is doing everything possible to meet with the International Brotherhood of Teamsters (IBT) to discuss the future of One Yellow and the value of Yellow jobs.

As a consequence of our inability to proceed with One Yellow, combined with the challenging business conditions confronting the entire LTL industry, Yellow has recently been operating at a loss as it continues to serve its customers. Once there is a clearer path forward with the IBT, we can focus on a comprehensive refinancing of its debt that matures in 2024.

The Company began taking significant actions to preserve liquidity beginning in 2022, including reductions to its capital expenditures plan. In addition to working with its lenders to provide financial support in the near term until a broader refinancing is possible, Yellow has also requested a two-month contribution deferral from the health & welfare and pension funds to be repaid with interest immediately upon a refinancing. <u>The Company is NOT requesting either a permanent waiver or an extension of credit, but only a short-term, two-month deferral of contributions.</u>

We are asking the funds that there be no interruption in payments or coverage for our employees. Our beneficiaries should see no impact to the contributions employees receive from the pension funds or the health and welfare funds.

We hope this will provide Yellow with more time to negotiate with the Teamsters, complete the implementation of One Yellow, and secure necessary financing that will put Yellow in a stronger financial position going forward.

Thanks for all you do,

Darren Hawkins

**From:** "Sean O'Brien" <SOBrien@teamster.org>
**Sent:** Sun, 25 Jun 2023 11:22:57 -0400 (EDT)
**To:** "Philip Paturzo" <Philip.Paturzo@grupobimbo.com>; tnations@abf.com; "Salvatore Abate" <TLocal443@msn.com>; "Jeff Padellaro (padellaro@teamsters633.com)" <padellaro@teamsters633.com>; "Jason Paradis (jparadis@twincirclesconsulting.com)" <jparadis@twincirclesconsulting.com>; gbelanger@local59.org; "Christopher Langan (cjlconsultingllc@yahoo.com)" <cjlconsultingllc@yahoo.com>; "Edward Groden" <egroden@nettipf.com>
**Cc:** "Daniel Greene" <DGreene@nettipf.com>; maf@fdb-law.com; "Bordoni, Daniel P." <daniel.bordoni@morganlewis.com>
**Subject:** Re: YRC suspension of contributions request

HELL NO

Get Outlook for iOS

**From:** Edward Groden <egroden@nettipf.com>
**Sent:** Saturday, June 24, 2023 5:17:57 PM
**To:** Christopher Langan (cjlconsultingllc@yahoo.com) <cjlconsultingllc@yahoo.com>; gbelanger@local59.org <gbelanger@local59.org>; Jason Paradis (jparadis@twincirclesconsulting.com) <jparadis@twincirclesconsulting.com>; Jeff Padellaro (padellaro@teamsters633.com) <padellaro@teamsters633.com>; Salvatore Abate <TLocal443@msn.com>; Sean O'Brien <SOBrien@teamster.org>; Tony Nations ('tnations@abf.com') <tnations@abf.com>; Philip Paturzo <Philip.Paturzo@grupobimbo.com>
**Cc:** Bordoni, Daniel P. <daniel.bordoni@morganlewis.com>; maf@fdb-law.com <maf@fdb-law.com>; Daniel Greene <DGreene@nettipf.com>
**Subject:** YRC suspension of contributions request

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

The Fund received the attached letter from YRC, along with other funds around the country, to agree to a suspension of contributions for the months of July and August 2023.

We are happy to stage a conference call to discuss this request. Or, if the Trustees simply want to circulate their sentiments by reply email, the Fund can send along to YRC the consensus view at the appropriate time. Thank you.

Edward F. Groden
Executive Director
New England Teamsters Pension Fund

1 Wall Street, 4th Floor
Burlington, MA 01803
Direct:  781-345-4420
Fax:     781-345-4423
Email:   egroden@nettipf.com

This email, including any attachments, may contain confidential member information belonging to the sender. This information is legally privileged and is intended for the use of the entity or individual named above. The authorized recipient of this information is prohibited from disclosing the information to any other party. If you have received this email in error, please notify the sender by replying to this message and delete this email immediately.

July 30, 2023

**VIA EMAIL**

Mr. Sean O`Brien                                    Mr. John Murphy
General President                                   Freight Director
International Brotherhood of Teamsters              International Brotherhood of Teamsters
25 Louisiana Ave. N.W.                              25 Louisiana Ave. N.W.
Washington, DC 20001                                Washington, DC 20001
sobrien@teamster.org                                jmurphy@teamster.org

         Re:       **WARN Act Notice**

To whom it may concern:

Yellow Corporation and its operating affiliates, YRC Inc. (d/b/a YRC Freight), USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway, Inc. (collectively referred to as the "Company") have made the difficult decision to shut down their regular operations on July 30, 2023, permanently close, and permanently lay off and consequently terminate the employment of employees at all of their locations (the "Shut Down"). The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and applicable similar state laws (collectively, the "WARN Act"). The Company does not admit that such laws apply or that notice is required. If no obligations exist, this notice is being provided to you voluntarily.

The Company was not able to provide earlier notice of the Shut Down as it qualifies under the "unforeseeable business circumstances," "faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act. The Company expects all layoffs and location closures relating to the Shut Down to be permanent. The Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so. These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated.

All affected employees have been notified of the date of their permanent layoff and consequent termination, and that a job bumping system will not be available – that is, Company employees will not be able to displace more junior employees out of their job positions – because all applicable positions will be eliminated as a result of the Shut Down. Furthermore, no other employment opportunities at other locations will be available. Employees have also been notified that, as a result of their loss of employment, they may be eligible to receive unemployment insurance benefits or other assistance with obtaining new employment from their applicable local or state department of labor, dislocated worker units, or their workforce partners upon termination.

At this time, the Company anticipates that the employment of up to approximately 22,000 employees at locations across the Company in the United States will be terminated. All employees will be receiving notice of their permanent layoff in the mail. A list of the job titles of positions that will be affected and the number of affected employees in each job position is available upon request. Should you have any questions regarding this notice, please contact employee.questions@myyellow.com.

Sincerely,

Yellow Corporation

1

CONFIDENTIAL
SA0224

**JOINT EXHIBIT 104.001**

IBT_WARN_033468

Message
_____

**From**:          Faust, Scott A. [faust, scott a.]
**Sent**:          7/30/2023 10:16:06 AM
**To**:            'gschwend@opeiu29.org' [gschwend@opeiu29.org]
**Subject**:       Yellow Corp. - WARN Notice
**Attachments**:   7-30-23 WARN Notice to OPEIU.docx

Ms. Gschwend,

I am writing on behalf of Yellow Corp. to forward via email the enclosed notice under the Worker Adjustment and Retraining Notification Act ("WARN") and to advise that Yellow Corp. and its operating affiliates, YRC Inc. (d/b/a YRC Freight), USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway, Inc. (collectively, the "Company") have ceased all operating activity as of 12:00 noon EDT. All Company facilities are closed. All U.S. union employees will be receiving an individual WARN notice advising of their permanent layoff in the mail. U.S. union employees will also be provided with contact information should they need to make arrangements to retrieve any personal property they may have left at work. The Company appreciates your cooperation at this difficult time.

Scott A. Faust
Proskauer
One International Place
Boston, MA 02110
t: 617.526.9650
m: 617.899.3510
sfaust@proskauer.com

July 30, 2023

**VIA EMAIL**
Ms. Kelly Gschwend
Secretary Treasurer
OPEIU Local 29
7677 Oakport Street, Suite 480
Oakland, California 94621
gschwend@opeiu29.org

       Re:      **WARN Act Notice**

To whom it may concern:

      Yellow Corporation and its operating affiliates, YRC Inc. (d/b/a YRC Freight), USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway, Inc. (collectively referred to as the "Company") have made the difficult decision to shut down their regular operations on July 30, 2023, permanently close, and permanently lay off and consequently terminate the employment of employees at all of their locations (the "Shut Down"). The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and applicable similar state laws (collectively, the "WARN Act"). The Company does not admit that such laws apply or that notice is required. If no obligations exist, this notice is being provided to you voluntarily.

      The Company was not able to provide earlier notice of the Shut Down as it qualifies under the "unforeseeable business circumstances," "faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act. The Company expects all layoffs and location closures relating to the Shut Down to be permanent. The Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so. These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated.

      All affected employees have been notified of the date of their permanent layoff and consequent termination, and that a job bumping system will not be available – that is, Company employees will not be able to displace more junior employees out of their job positions – because all applicable positions will be eliminated as a result of the Shut Down. Furthermore, no other employment opportunities at other locations will be available. Employees have also been notified that, as a result of their loss of employment, they may be eligible to receive unemployment insurance benefits or other assistance with obtaining new employment from their applicable local or state department of labor, dislocated worker units, or their workforce partners upon termination.

      At this time, the Company anticipates that the employment of up to approximately 22,000 employees at locations across the Company in the United States will be terminated. All employees will be receiving notice of their permanent layoff in the mail. A list of the job titles of positions that will be affected and the number of affected employees in each job position is available upon request. Should you have any questions regarding this notice, please contact employee.questions@myyellow.com.

               Sincerely,

               Yellow Corporation

               [ PAGE  \* MERGEFORMAT ]

---

Message

---

**From**: Faust, Scott A. [SFaust@proskauer.com]
on behalf of    /O=PROSKAUER/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SFAUST <SFaust@proskauer.com>
[/o=proskauer/ou=first administrative group/cn=recipients/cn=sfaust <sfaust@proskauer.com>]
**Sent**:    7/30/2023 1:15:38 PM
**To**:    wwalsh5263@aol.com
**Subject**:    Yellow Corp. - WARN Notice
**Attachments**:    7-30-23 WARN Notice to ILA.docx


Mr. Walsh,

I am writing on behalf of Yellow Corp. to forward via email the enclosed notice under the Worker Adjustment and Retraining Notification Act ("WARN") and to advise that Yellow Corp. and its operating affiliates, YRC Inc. (d/b/a YRC Freight), USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway, Inc. (collectively, the "Company") have ceased all operating activity as of 12:00 noon EDT.  All Company facilities are closed.  All U.S. union employees will be receiving an individual WARN notice advising of their permanent layoff in the mail.  U.S. union employees will also be provided with contact information should they need to make arrangements to retrieve any personal property they may have left at work.  The Company appreciates your cooperation at this difficult time.

Scott A. Faust
Proskauer
One International Place
Boston, MA 02110
t: 617.526.9650
m: 617.899.3510
sfaust@proskauer.com

YELLOW_WARN_092364

**JOINT EXHIBIT 107.001**

July 30, 2023

**VIA EMAIL**
Mr. Wayne Walsh
President
ILA Local1730
P.O. Box 61415
Staten Island, NY 10306
wwalsh5263@aol.com

    Re:  **WARN Act Notice**

To whom it may concern:

    Yellow Corporation and its operating affiliates, YRC Inc. (d/b/a YRC Freight), USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway, Inc. (collectively referred to as the "Company") have made the difficult decision to shut down their regular operations on July 30, 2023, permanently close, and permanently lay off and consequently terminate the employment of employees at all of their locations (the "Shut Down"). The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and applicable similar state laws (collectively, the "WARN Act"). The Company does not admit that such laws apply or that notice is required. If no obligations exist, this notice is being provided to you voluntarily.

    The Company was not able to provide earlier notice of the Shut Down as it qualifies under the "unforeseeable business circumstances," "faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act. The Company expects all layoffs and location closures relating to the Shut Down to be permanent. The Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so. These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated.

    All affected employees have been notified of the date of their permanent layoff and consequent termination, and that a job bumping system will not be available – that is, Company employees will not be able to displace more junior employees out of their job positions – because all applicable positions will be eliminated as a result of the Shut Down. Furthermore, no other employment opportunities at other locations will be available. Employees have also been notified that, as a result of their loss of employment, they may be eligible to receive unemployment insurance benefits or other assistance with obtaining new employment from their applicable local or state department of labor, dislocated worker units, or their workforce partners upon termination.

    At this time, the Company anticipates that the employment of up to approximately 22,000 employees at locations across the Company in the United States will be terminated. All employees will be receiving notice of their permanent layoff in the mail. A list of the job titles of positions that will be affected and the number of affected employees in each job position is available upon request. Should you have any questions regarding this notice, please contact employee.questions@myyellow.com.

      Sincerely,

      Yellow Corporation

          [ PAGE  \* MERGEFORMAT ]

CONFIDENTIAL
SA0228

**JOINT EXHIBIT 107.002**

YELLOW_WARN_092365



## Yellow Corporation Files Voluntary Chapter 11 Petitions

August 7, 2023

**International Brotherhood of Teamsters Drives Nearly 100-Year-Old Company Out of Business**

**30,000 American Jobs Lost**

NASHVILLE, Tenn., Aug. 06, 2023 (GLOBE NEWSWIRE) -- Yellow Corporation (NASDAQ: YELL) and certain of its direct and indirect subsidiaries (collectively, the "*Company*" or "*Yellow*") filed voluntary petitions for relief under Chapter 11 (the "*Chapter 11 Cases*") of the U.S. Bankruptcy Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") for the Company's planned operational wind-down.

To facilitate this process, the Company expects to enter into an agreement, setting forth the terms and conditions of a debtor-in-possession financing facility (the "*DIP Facility*"). Upon approval by the Bankruptcy Court and the satisfaction of the conditions set forth in the agreement, the DIP Facility will provide the Company with needed liquidity which will be used to support the businesses throughout the marketing and sale process, including payment of certain prepetition wages.

The Company and its subsidiaries continue to manage their businesses and properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. The Company filed a number of motions with the Bankruptcy Court designed to facilitate the Company's orderly wind-down of the businesses. Certain of these motions seek authority from the Bankruptcy Court for the Company to make payments upon, or otherwise honor, certain obligations that arose prior to the filed voluntary petitions, including obligations related to employee wages, salaries and benefits, taxes, and certain vendors and other providers of goods and services essential to the Company's businesses. The Company expects that the Bankruptcy Court will approve the relief sought in these motions on an interim basis.

"It is with profound disappointment that Yellow announces that it is closing after nearly 100 years in business," said Yellow's Chief Executive Officer, Darren Hawkins. "Today, it is not common for someone to work at one company for 20, 30, or even 40 years, yet many at Yellow did. For generations, Yellow provided hundreds of thousands of Americans with solid, good-paying jobs and fulfilling careers."

Yellow employees took great pride in servicing customers from big box stores to small family businesses across America. Its 30,000 freight professionals, both union and non-union employees, were the unsung heroes throughout the pandemic, delivering goods to every state, ensuring that our supply chain kept moving and our economy remained strong.

"All workers and employers should take note of our experience with the International Brotherhood of Teamsters ("*IBT*") and worry," said Hawkins. "We faced nine months of union intransigence, bullying and deliberately destructive tactics. A company has the right to manage its own operations, but as we have experienced, IBT leadership was able to halt our business plan, literally driving our company out of business, despite every effort to work with them."

Several years ago, Yellow recognized that it needed to modernize operations to compete with non-union carriers that increasingly dominated the industry. Yellow developed the common-sense "*One Yellow*" business plan to make Yellow more competitive while strengthening jobs and improving customer service. One Yellow called for raising employees' pay and creating more jobs, while providing stability for all stakeholders. One Yellow aimed to put Yellow on the right path, fixing legacy issues created long ago, making Yellow the industry-dominant company it once was.

The operational changes necessary to implement One Yellow required approval from *IBT* leadership. In August 2022, IBT leadership approved the first phase of One Yellow in the western U.S. and the plan was a success: redundancies were reduced, freight departed terminals earlier and customer service improved. Unfortunately, despite Phase One's approval and success, IBT leadership implemented a nine-month blockade, halting the remainder of Yellow's business plan. This caused Yellow irreparable harm.

In the spring, while their blockade of One Yellow was ongoing, IBT leaders demanded that Yellow open its contract nearly one year early, and Yellow agreed, yet its goodwill was met with hostility. Instead of negotiating a contract, Yellow faced months of public insult from IBT, including a social media post depicting a tombstone with Yellow's name on it along with the dates 1924-2023. This ruthless campaign included repeated public taunts calling for Yellow's demise and was intended to put Yellow out of business. At the same time, IBT leadership spread false claims that Yellow was trying to exact "concessions" from its union employees. Nothing was further from the truth. Combined with months of refusals to negotiate, IBT leaders' campaign against Yellow caused grave concern among investors, drove away customers, and put 30,000 jobs at risk.

By summer, Yellow's losses from the delay in implementing One Yellow had reached more than $137 million in adjusted EBITDA. On June 26, 2023, Yellow filed a lawsuit against IBT citing breach of contract and loss of enterprise value. The lawsuit is pending, and the damages have grown since. For more information, please visit https://investors.myyellow.com/news-releases/news-release-details/yellow-corporation-files-137-million-lawsuit-against.

As the IBT continued to stonewall and publicly disparage Yellow, Yellow management kept employees informed that the situation was increasingly dire. Yellow made it clear to IBT leadership that their blockade of One Yellow severely constrained Yellow's cash flow and its ability to refinance debt. Yellow was forced to take measures to preserve liquidity to give IBT leaders more time to finally engage. Instead, IBT leaders announced a strike against Yellow's then-significantly wounded company. Customers fled and business was not recoverable.

"While IBT leaders may believe they won a battle against Yellow, it's our employees and their families who have lost," said Hawkins. "We tried everything to work with IBT leadership and did all we could to save employees' jobs. We are crushed by today's announcement, yet we are grateful to

**JOINT EXHIBIT 118.001**

our tens of thousands of employees who took care of our customers until the end. Our employees are professionals who, despite heavy hearts, worked diligently to clear the docks, deliver remaining freight, and close our terminal doors one last time. It is with this same professionalism that we intend to wind down our business, maximize recoveries for creditors and pay back the CARES Act loan in full."

Yellow is committed to helping its employees find new work. Yellow has partnered with the American Trucking Associations (**ATA**) to launch its first searchable job database, specifically for Yellow employees. This initiative intends to streamline job placement while giving ATA member companies the ability to connect with thousands of skilled freight and operations professionals, mechanics, logisticians and more. For information on the initiative, please visit https://www.trucking.org/jobseeker.

For more information about Yellow Corporation's Chapter 11 case, please visit  https://dm.epiq11.com/YellowCorporation or contact Epiq, the Company's noticing and claims agent, at (866) 641-1076 (Toll Free), +1 (503) 461-4134 (International) or by e-mail at YellowCorporationInfo@epiqglobal.com.

**Legal Counsel**

Kirkland & Ellis LLP is serving as the Company's restructuring counsel,  Pachulski Stang Ziehl & Jones LLP is serving as the Company's  Delaware local counsel, Kasowitz, Benson and Torres LLP is serving as special litigation counsel, Goodmans LLP is serving as the Company's special Canadian counsel, Ducera Partners LLC is serving as the Company's investment banker, and Alvarez and Marsal is serving as the Company's financial advisor.

**Cautionary Statement Regarding Forward-Looking Information**

This press release contains certain "forward-looking statements." All statements other than statements of historical fact are "forward-looking" statements for purposes of the U.S. federal and state securities laws. These statements may be identified by the use of forward-looking terminology such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "our vision," "plan," "potential," "preliminary," "predict," "should," "will," or "would" or the negative thereof or other variations thereof or comparable terminology. These forward-looking statements are subject to a number of factors and uncertainties that could cause the Company's actual results to differ materially from those expressed in or contemplated by the forward-looking statements. Such factors include, but are not limited to: risks attendant to the bankruptcy process, including the Company's ability to obtain court approval from the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court throughout the course of the Chapter 11 Cases, including with respect the DIP Facility; the effects of the Chapter 11 Cases, including increased legal and other professional costs necessary to execute the Company's liquidation, on the Company's liquidity (including the availability of operating capital during the pendency of the Chapter 11 Cases), results of operations or business prospects; the effects of the Chapter 11 Cases on the interests of various constituents and financial stakeholders; the length of time that the Company will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Cases; objections to the Company's restructuring process, DIP Facility, or other pleadings filed that could protract the Chapter 11 Cases; risks associated with third-party motions in the Chapter 11 Cases; Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the Chapter 11 Cases in general; the Company's ability to comply with the restrictions imposed by the terms and conditions of the DIP Facility and other financing arrangements; employee attrition and the Company's ability to retain senior management and other key personnel due to the distractions and uncertainties; the Company's ability to maintain relationships with suppliers, customers, employees and other third parties and regulatory authorities as a result of the Chapter 11 Cases; the impact and timing of any cost-savings measures and related local law requirements in various jurisdictions; finalization of the Company's annual and quarterly financial statements (including finalization of the Company's impairment tests), completion of standard annual and quarterly-close processes; risks relating to the delisting of the Common Stock from Nasdaq and future quotation of the Common Stock; the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, and the potential for additional material weaknesses in the Company's internal controls over financial reporting or other potential weaknesses of which the Company is not currently aware or which have not been detected; the impact of litigation and regulatory proceedings; the impact and timing of any cost-savings measures; and other factors discussed in the Company's Annual Report on Form 10-K and subsequent quarterly reports on Form 10-Q filed with the SEC. These risks and uncertainties may cause the Company's actual results, performance, liquidity or achievements to differ materially from any future results, performance, liquidity or achievements expressed or implied by these forward-looking statements. For a further list and description of such risks and uncertainties, please refer to the Company's filings with the  SEC that are available at www.sec.gov.  The Company cautions you that the list of important factors included in the Company's  SEC filings may not contain all of the material factors that are important to you. In addition, in light of these risks and uncertainties, the matters referred to in the forward-looking statements contained in this report may not in fact occur. The Company undertakes no obligation to publicly update or revise any forward-looking statement, including the Projections, as a result of new information, future events or otherwise, except as otherwise required by law.

**About the Company**

Yellow is one of the largest, most comprehensive logistics and less-than-truckload ("**LTL**") networks in North America, providing customers with regional, national, and international shipping services throughout. Yellow's principal office is located in Nashville, Tenn., and is the holding company for a portfolio of LTL brands including Holland, New Penn, Reddaway and YRC Freight, as well as the logistics company, Yellow Logistics.

| Media Contact: | media@myyellow.com |
|---|---|
| Investor Contact: | investor@myyellow.com |



Source: Yellow Corporation

**JOINT EXHIBIT 118.002**

# Yellow BK Litigation – Dep Exhibits

## *Torres, Vidal (Moore)(WARN)*

### *8/23/2024*

**Condensed Transcript with Endnotes**

**Issue Filter: Yellow Affirmative, Union & Moore Obj to Yellow Counter, Yellow Obj to Counter, Unions Counter, Yellow Counter Px Affirmative, Moore Counter, Yellow Objection, Yellow Counter, Union Affirmative, Moore Affirmative, Coughlen Affirmative, Coughlen Counter**

**Prepared by:**

Ashlyn Gallagher
Kirkland & Ellis

Sunday, January 19, 2025

Page 1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4   CIVIL ACTION NO. 23-11069 (CTG)
 5   CHAPTER 11
 6
 7   IN RE:
 8   YELLOW CORPORATION, et al.,
 9         Debtors.
10
11
12
13
14        REMOTE VIDEO DEPOSITION OF
15              VIDAL TORRES
16             August 23, 2024
17
18
19
20
21   REPORTED BY:  Laura H. Nichols
22         Certified Realtime Reporter,
23         Registered Professional
24         Reporter and Notary Public
25
```

Page 2

```
 1          A P P E A R A N C E S
 2
 3   FOR THE MOORE CLASS and DEPONENT VIDAL TORRES:
 4       Mr. Mary Olsen
 5       Attorney at Law
 6       The Gardner Firm, P.C.
 7       Post Office Drawer 3103
 8       Mobile, Alabama 36652
 9       (251) 433-8100
10       molsen@thegardnerfirm.com
11   -and-
12       Mr. Jack A. Raisner
13       Ms. Ren  S. Roupinian
14       Attorneys at Law
15       Raisner Roupinian LLP
16       270 Madison Avenue
17       Suite 1801
18       New York, New York 10016
19       (212) 221-1747
20       jar@raisnerroupinian.com
21       rsr@raisnerroupinian.com
22
23
24
25
```

Page 3

```
 1        A P P E A R A N C E S (Continuing)
 2
 3   FOR THE COUGHLEN PLAINTIFFS:
 4       Mr. Ryan Carreon
 5       Attorney at Law
 6       Morris James LLP
 7       500 Delaware Avenue
 8       Suite 1500
 9       Wilmington, Delaware 19801
10       (302) 888-6800
11       rcarreon@morrisjames.com
12
13   FOR THE UCC:
14       Ms. Rebecca L. Kanner
15       Attorney at Law
16       Akin Gump Strauss Hauer & Feld LLP
17       One Bryant Park
18       Bank of America Tower
19       New York, New York 10036-6745
20       (212) 872-1000
21       rkanner@akingump.com
22
23
24
25
```

Page 4

```
 1        A P P E A R A N C E S (Continuing)
 2
 3   FOR THE DEBTOR, YELLOW CORPORATION:
 4       Ms. Neha Nigam
 5       Attorney at Law
 6       Kirkland & Ellis LLP
 7       333 West Wolf Point Plaza
 8       Chicago, Illinois 60654
 9       (312) 862-2000
10       neha.nigam@kirkland.com
11   -and-
12       Ms. Orla O'Callaghan
13       Attorney at Law
14       Kirkland & Ellis LLP
15       609 Main Street
16       Houston, Texas 77002
17       (713) 836-3600
18       orla.ocallaghan@kirkland.com
19
20
21
22
23
24
25
```

Page 5

1        A P P E A R A N C E S  (Continuing)
2
3   ALSO FOR THE DEBTOR, YELLOW CORPORATION:
4        Ms. Ashton Hupman
5        Mr. Eduardo Reyes Ch vez
6        Attorneys at Law
7        Littler Mendelson P.C.
8        815 Connecticut Avenue Northwest
9        Suite 400
10       Washington, DC 20006
11       (202) 842-3400
12       ahupman@littler.com
13       ereyeschavez@littler.com
14
15   OTHERS PRESENT:
16       Mr. Jeremy Young, Trial Technologist
17       Kirkland & Ellis LLP
18
19       Mr. Brandon Leventhal, Videographer
20       Veritext Legal Solutions
21
22       Mr. Peter Curran, Concierge
23       CMI Production Services
24       pcdepositions@gmail.com
25

Page 6

1              INDEX OF EXAMINATION
2
3                        Page:
4   DEPONENT:  VIDAL TORRES          10
5   EXAMINATION BY MS. NIGAM         10
6
7
8              INDEX OF EXHIBITS
9
10                       Page:
11   Exhibit 1                    28
12       Second Amended Class Action
13   Adversary Proceeding Complaint
14   Exhibit 2                    44
15       Email, beginning with Bates Number
16   YELLOW_WARN_138483
17   Exhibit 3                    54
18       Email, beginning with Bates Number
19   IBT_WARN_021629
20   Exhibit 4                    62
21       Email, beginning with Bates Number
22   YELLOW_WARN_118079
23   Exhibit 5                    65
24       Email, beginning with Bates Number
25   YELLOW_WARN_098349

Page 7

1              INDEX OF EXHIBITS (Continuing)
2
3                        Page:
4   Exhibit 6                    74
5       Letter, beginning with Bates Number
6   IBT_Yellow_047329
7   Exhibit 7                    75
8       Email, beginning with Bates Number
9   YELLOW_WARN_117816
10   Exhibit 8                    87
11       Notice of Separation & General
12   Release of Claims, beginning with Bates
13   Number YELLOW_WARN_133536
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1              S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED, by and
3   between the parties, through their respective
4   counsel, that the deposition of VIDAL TORRES may be
5   taken before Laura H. Nichols, Commissioner,
6   Certified Realtime Reporter, Registered
7   Professional Reporter and Notary Public;
8        That the signature to and reading of
9   the deposition by the witness is waived, the
10   deposition to have the same force and effect as if
11   full compliance had been had with all laws and
12   rules of Court relating to the taking of
13   depositions;
14        That it shall not be necessary for
15   any objections to be made by counsel to any
16   questions, except as to form or leading questions,
17   and that counsel for the parties may make
18   objections and assign grounds at the time of trial,
19   or at the time said deposition is offered in
20   evidence, or prior thereto.
21
22
23
24
25

Page 9

1    I, Laura H. Nichols, a Certified
2  Realtime Reporter and Registered Professional
3  Reporter of Birmingham, Alabama, and a Notary
4  Public for the State of Alabama at Large, acting as
5  Commissioner, certify that on this date, as
6  provided by the Federal Rules of Civil Procedure of
7  the United States District Court, and the foregoing
8  stipulation of counsel, there came before me
9  remotely via Zoom, on August 23, 2024, commencing
10  at 9:07 a.m. PDT, VIDAL TORRES, witness in the
11  above cause, for oral examination, whereupon the
12  following proceedings were had:
13
14              *    *    *
15         THE VIDEOGRAPHER:  Good morning.  We
16  are going on the record at 9:07 a.m. on
17  August 23rd, 2024.  Please note that this
18  deposition is being conducted virtually.  Quality
19  of recording depends on the quality of camera and
20  internet connection of participants.  What is seen
21  from the witness and heard on screen is what will
22  be recorded.  Audio and video recording will
23  continue to take place unless all parties agree to
24  go off the record.
25         This is Media Unit Number 1 of the

Page 10

1  video-recorded deposition of Vidal Torres in the
2  matter of In Re:  Yellow Corporation, et al., filed
3  in the United States Bankruptcy Court for the
4  District of Delaware, Adversary Proceeding Number
5  23-50457 (CTG).
6         This deposition is being conducted
7  remotely using virtual technology.  My name is
8  Brandon Leventhal representing Veritext.  I'm the
9  videographer.  The court reporter is Laura Nichols
10  from Veritext.  I'm not authorized to administer an
11  oath.  I am not related to any party in this
12  action, nor am I financially interested in the
13  outcome.  Counsel will appear on the stenographic
14  record.  Will the court reporter please swear in
15  the witness.
16         VIDAL TORRES,
17  having been first duly sworn, was examined and
18  testified as follows:
19
20         THE REPORTER:  Ready.
21
22  EXAMINATION BY MS. NIGAM:
23    Q.    Good morning, Mr. Torres.
24    A.    Good morning.
1  25    Q.    My name is Neha Nigam, and I

Page 11

1  represent Yellow in this matter.  And could you
2  please state your full name for the record?
3    A.    Sure.  It is Vidal Torres.
4    Q.    Mr. Torres, do you go by any other
5  nicknames?
6    A.    No.
7    Q.    Have you ever had your deposition
8  taken before?
9    A.    No.
10    Q.    Have you ever testified at trial?
11    A.    No.
12    Q.    Have you ever testified at a court
13  hearing?
14    A.    No.
15    Q.    Have you ever testified under oath at
16  any proceeding?
17    A.    No.
18    Q.    Do you understand that you are under
19  oath today for your deposition?
20    A.    Yes.
21    Q.    And do you understand that that means
22  your answers here will be treated the same as if
23  you were answering them under oath in a court?
24    A.    Yes.
25    Q.    And do you understand that it is your

Page 12

1  responsibility to answer as truthfully and
2  completely as possible?
3    A.    Yeah.
4    Q.    And will you agree to give me as
5  complete and accurate answers as you can, to the
6  best of your knowledge?
7    A.    To the best of my ability,
8  absolutely.
9    Q.    Sure.  So since this is your first
10  deposition, I am going to go over a couple of
11  ground rules.
12    A.    Sure.
13    Q.    Please let me know at any point if
14  you have any questions or need clarification on
15  anything.
16         So the first thing is it is a virtual
17  deposition through Zoom, which means there are
18  potential additional technical challenges.  In
19  order to make sure we have a clear record of
20  everything you and I and your counsel are saying,
21  you have to respond audibly to my questions.  And
22  please --
23    A.    Yeah.
24    Q.    -- refrain from nodding or shaking
25  your head.

Page 13

1    A.    Copy that. Yeah, I got you.
2    Q.    Yeah. It is hard to get rid of that
3 instinct. But yeah, please make verbal answers if
4 you can.
5    A.    Understood.
6    Q.    Now, if I ask you a question that you
7 don't understand, will you please let me know and I
8 can rephrase it for you?
9    A.    Absolutely.
10    Q.    And if ask you a question and you
11 answer it without asking me to rephrase, is it fair
12 to say that I can assume you understood the
13 question?
14    A.    Probably reasonable.
15    Q.    And if you have to take a break for
16 any reason, that is no problem. Please just let me
17 know. The only clarification to that is if there
18 is a question pending, please go ahead and finish
19 your answer and then we can take a break. Does
20 that make sense?
21    A.    Yeah, sort of. So like if I wanted
22 to take a break but you had just asked me
23 something, answer and then we take a break?
24    Q.    Exactly. That is right.
25    A.    Gotcha. Okay.

Page 14

1    Q.    And generally I will try to take a
2 break every hour for around five or ten minutes.
3    A.    Sure.
4    Q.    I might forget.
5    A.    I understand. The sooner we can
6 finish the better, right?
7    Q.    Sure. Sure. So -- and we will get
8 through this as quickly as we can.
9    Mr. Torres, where are you located
10 right now?
11    A.    California.
12    Q.    And are you in your home?
13    A.    Yes.
14    Q.    Is there anybody else in the room
15 with you, dogs included?
16    A.    No. No dogs, no.
17    Q.    Anybody else in your house?
18    A.    My partner and my -- her grandmother
19 are here.
20    Q.    Okay. But they are not in the room
21 with you?
22    A.    They are not in the room. I am in a
23 closed room, closed door.
24    Q.    Okay. As I said, please let us know
25 if you have any tech issues such as internet

Page 15

1 issues.
2    A.    Sure.
3    Q.    If I am getting frozen or you aren't
4 able to see a document, we can take a break and
5 then get those issues fixed. Does that work?
6    A.    That sounds good.
7    Q.    And I would also ask that you please
8 turn off all your email and other notifications on
9 your computer and phone. Is that possible?
10    A.    I think they all are. I might get --
11 I think I have turned them all off.
12    Q.    Okay. And please also refrain from
13 using any internet applications on like your
14 computer while we are in the deposition. Is that
15 fair?
16    A.    Sure.
17    Q.    Mr. Torres, are there any
18 circumstances that would affect your ability to
19 testify completely and truthfully today?
20    A.    What kind of circumstances?
21    Q.    So, for instance, are there any --
22 are you taking any medications that could impact
23 your ability to remember or to testify truthfully?
24    A.    No.
25    Q.    Okay. Mr. Torres, what did you do to

Page 16

1 prepare for today's deposition?
2    A.    I spoke with Mary.
3    MS. OLSEN: Before Mr. Torres
4 answers, I object to the form to the extent that it
5 seeks information that would be covered by the
6 attorney-client privilege. So I will instruct you,
7 Mr. Torres, to be very careful in your answer not
8 to divulge any conversations that you had with
9 counsel.
10    Q.    (BY MS. NIGAM:) You can answer,
11 Mr. Torres, if it doesn't go into privileged
12 information.
13    A.    Sure. We talked on the phone, and
14 she just kind of gave me a brief idea of what --
15    MS. OLSEN: So we can't -- so just to
16 be careful, Mr. Torres, nothing about substance.
17 But you can say that a phone call occurred, and
18 that is it.
19    A.    Yeah. She just said that you would
20 be asking me questions today, asked me if I had
21 ever had a deposition.
22    Q.    (BY MS. NIGAM:) Sure. And Mary has
23 a good point. I don't want to know anything that
24 you substantively discussed with your counsel.
25    A.    Sure.

Page 17

1    Q.    I am just looking to understand --
2    A.    Yeah.  Yeah.
3    Q.    -- the steps you took to prepare for
4 today's deposition.
5    A.    Totally.
6    Q.    So it sounds like you had a phone
7 call with counsel; is that correct?
8    A.    Yes.
9    Q.    Was it just one phone call, or were
10 there multiple phone calls?
11    A.    It was one.
12    Q.    And about how long was that phone
13 call?
14    A.    Fifteen, twenty minutes.
15    Q.    Was that recently or a while ago?
16    A.    It was yesterday.
17    Q.    Have you discussed your deposition
18 with anybody other than your counsel?
19    A.    No.
20    Q.    Have you met with any -- or spoke on
21 the phone with any counsel other than your own, so
22 other than Mary and her firm?
23    A.    No.
24        MS. OLSEN:  Object to the form.  I
25 mean there -- he is a class representative, and

Page 18

1 there are other class counsel, just to make that
2 clear for the record.
3    Q.    (BY MS. NIGAM:)  Have you discussed
4 this deposition with any counsel other than those
5 representing you in this lawsuit?
6    A.    Not to my knowledge, no.
7    Q.    Have you reviewed any documents to
8 refresh your recollection regarding anticipated
9 testimony today?
10    A.    No.
11    Q.    So you haven't reviewed any documents
12 related to this lawsuit in preparation for the
13 deposition?
14    A.    In preparation for the deposition?
15    Q.    Uh-huh.
16    A.    No.
17    Q.    Have you brought any documents with
18 you today or have them projected on your screen to
19 help you testify?
20    A.    Just the stuff that is going to be in
21 Veritext.  Is that --
22    Q.    You just mean Exhibit Share?  Is that
23 what you are referring to?
24    A.    Yeah.  I don't have any papers, or
25 I'm not -- yeah, I have two tabs open.

Page 19

1    Q.    Okay.  So the only tabs open on your
2 computer are the Exhibit Share and this Zoom
3 deposition; is that right?
4    A.    The Zoom and then the Veritext one.
5    Q.    Got it.  So no internet browser open
6 on your computer?
7    A.    Well, I am doing it through Google,
8 but yeah.
9    Q.    Okay.  Mr. Torres, can you please
10 walk me through your educational history?
11    A.    Sure.  I graduated high school in
12 2012.  That is about it.
13    Q.    Okay.  And what is your professional
14 history from the time you finished high school
15 until the time you joined Yellow?
16    A.    General warehouse labor.
17    Q.    And what other jobs did you hold
18 before you joined Yellow?
19    A.    I worked at a restaurant.  And the
20 year before COVID in 2019, I was apprenticing under
21 a mechanic.
22    Q.    Do you have any social media
23 accounts?
24    A.    Yes.
25    Q.    Which ones?

Page 20

1    A.    Facebook, Instagram, Twitter, TikTok.
2    Q.    Have you posted anything on social
3 media regarding your lawsuit?
4    A.    No.
5    Q.    Have you posted anything on social
6 media regarding Yellow's shutdown?
7    A.    No, not to my knowledge.
8    Q.    Have you posted anything about the
9 strike notice?
10    A.    No.
11    Q.    Or the layoffs that occurred?
12    A.    Not to my knowledge.
13    Q.    Have you ever deleted anything off of
14 social media since initiating this lawsuit?
15    A.    No.
16    Q.    So you mentioned a couple of social
17 media accounts, Facebook, TikTok, Twitter, which is
18 now X, correct?
19    A.    Oh, yeah.  Sorry.
20    Q.    Yeah.  No problem.  Do you follow IBT
21 on any of those social media platforms?
22    A.    No.
23    Q.    Do you follow Sean O'Brien on any of
24 those social media platforms?
25    A.    No.

Page 21

1    Q.    Have you ever been involved in any
2  other lawsuits other than your current lawsuit?
3    A.    Not to my knowledge.
4    Q.    So you have never initiated a lawsuit
5  against anyone or any company, correct?
6    A.    No.  No, I have not.
7    Q.    And you have never been a defendant
8  in a lawsuit?
9    A.    No.  I have been in jury duty.  That
10 is about it.
11   Q.    Sure.  So Mr. Torres, I am going to
12 ask you a few questions about your employment at
13 Yellow, specifically.
14   A.    Sure.
15   Q.    How did you learn about the job
16 opening at Yellow?
17   A.    There was an offer on Indeed.  I got
18 sent an email.  I applied, and it worked out.  I
19 got a phone call scheduling an interview.
20   Q.    And the notification you got from
21 Indeed, was that an auto notification or a
22 notification from email from someone at Yellow?
23   A.    I believe it was just an auto, like
24 hey, we are interested in your resume.  And then
25 there was a link to the actual website.

Page 22

1    Q.    What was the position you were
2  applying for?
3    A.    Operations supervisor.
4    Q.    And you ultimately got the job,
5  correct?
6    A.    I did, yeah.
7    Q.    When did you start working at Yellow
8  as an operations supervisor?
9    A.    November 7th, 2022, was my first day.
10   Q.    And what was your understanding of
11 your job responsibilities as an operations
12 supervisor?
13   A.    It was carrying out the operation of
14 the warehouse as a whole, our terminal -- I believe
15 it was 813 -- just carrying out the
16 inbound/outbound, just the day-to-day operations,
17 what was coming in, what was going out.
18   Q.    That warehouse you are referring to,
19 is that in California?
20   A.    Yes.
21   Q.    Did you have a Yellow company email
22 while you were working at Yellow?
23   A.    Yes.
24   Q.    Did you check that email?
25   A.    I did not.

Page 23

1    Q.    And so you never logged into your
2  Yellow company email account?
3    A.    I logged in one time, and then it
4  kind of just stayed open.  I didn't have -- there
5  was a system thing, so I wasn't able to
6  consistently log onto it.
7    Q.    Did you have access to that email
8  while you were working?
9    A.    Yes.
10   Q.    How did you conduct your day-to-day
11 business without email?
12   A.    It just wasn't really necessary for
13 the operation.
14   Q.    So was it more just, you know, calls
15 and talking to your colleagues in the warehouse in
16 person?
17   A.    It was strictly on-the-floor
18 operations.  We were advised by our general
19 operations manager at the time to leave the emails
20 to the shift operations manager.
21   Q.    Mr. Torres, you -- have you ever been
22 part of a union?
23   A.    Yes.
24   Q.    In what context?
25   A.    I worked for Safeway for two -- close

Page 24

1  to two years before I was at Yellow.  And that was
2  a union.
3    Q.    You did not join the union at Yellow,
4  correct?
5    A.    No.
6    Q.    Why not?
7    A.    I don't understand.
8    Q.    Sure.  So did you -- you were in a
9  union while you were at Safeway but decided not to,
10 you know, be part of the union while at Yellow.  I
11 am trying to understand the reason behind that.
12   A.    Yeah.  So I got hired on at Safeway,
13 and that was just like an entry level position that
14 you had to pay your union dues after I think it was
15 thirty days.  You were in if you passed like a
16 probationary period.
17         Yellow, I don't believe any
18 management, to my knowledge, was union.  So there
19 was no option as far as I am aware.
20   Q.    So operations supervisor was
21 considered a management role at Yellow?
22   A.    That's correct.
23   Q.    Are you familiar with the Oracle
24 employee portal?
25   A.    Minutely but yeah.

Page 25

1    Q.    Have you used the portal before?
2    A.    Yes.
3    Q.    Do you recall what you used the
4  portal for?
5    A.    I would try to use it.  It was
6  very -- it is a very -- to my recollection, it is a
7  very glitchy system.  So I remember I would try to
8  use it to submit time off or check my PTO balance
9  or vacation hours and all that.
10        And eventually, I was submitting,
11  letting people know and there was -- it wasn't
12  going through.  So it ended up about two, three
13  months in, I want to say, I was just telling my
14  manager, my general operations, hey, I need these
15  days off, and he was doing it.
16    Q.    Do you have any understanding of why
17  those notifications weren't going through?
18    A.    It happened for everybody.  It wasn't
19  just a me thing.
20    Q.    Is it your understanding that was a
21  technical glitch or something else was going on?
22    A.    Yeah.  I mean I don't work in IT, so
23  I really have no idea.
24    Q.    Was Oracle -- were those glitches
25  ultimately figured out?

Page 26

1    A.    What do you mean by "figured out"?
2    Q.    Were they resolved?
3    A.    What do you mean "resolved"?  Like
4  did they ever stop?
5    Q.    Yeah.  Were you able to use Oracle
6  again to send those notifications?
7    A.    I was able to log into Oracle, but I
8  wasn't able to use like Oracle consistently.
9    Q.    And I want to go now to your lawsuit
10  here.
11    A.    Sure.
12    Q.    When did you first realize that you
13  might have claims against Yellow?
14    A.    I don't understand the question.
15    Q.    Sure.  Do you recall when you first
16  realized that you might have legal action against
17  Yellow?
18    A.    I mean I was feeling sour about the
19  whole thing, very depressed.
20    Q.    So was it shortly after you were let
21  go, or was it, you know, further down the line?
22    A.    No.  Probably -- I mean I was feeling
23  depressed pretty much as soon as I was let go --
24  laid off, yeah.
25    Q.    And so right after you were let go,

Page 27

1  you felt that you might have claims against Yellow;
2  is that right?
3    A.    That is fair to say.
4    Q.    Did you know what claims you might be
5  able to bring against Yellow at that time?
6        MS. OLSEN:  Object to form to the
7  extent that it seeks communications with counsel.
8    Q.    (BY MS. NIGAM:)  You can answer.
9    A.    Can you repeat the question, please?
10    Q.    Sure.  So right after you were let go
11  and you testified that you felt you might have
12  claims against Yellow, did you know what claims you
13  might have been able to bring?
14    A.    I felt unsure about the entire way
15  that the layoff was carried out.
16    Q.    Did you -- I don't want to go into
17  the substance, but did you reach out to a lawyer,
18  or did a lawyer reach out to you?
19    A.    I did not reach out.  Well, I
20  received an email regarding, and I -- Yellow, and I
21  reached back out for more information or to
22  discuss.
23    Q.    So before the discussions, you had an
24  idea that you might have claims but weren't exactly
25  sure which.  Is that fair to say?

Page 28

1    A.    Can you rephrase that?
2    Q.    Sure.  So just trying to put together
3  your testimony, is it fair to say that before your
4  discussions with the lawyers, you had an idea that
5  you might have some legal action against Yellow,
6  you just didn't know what kind?
7    A.    I think it is more fair to say that I
8  was curious if I could pursue legal action.
9        MS. NIGAM:  Can we -- Peter, can we
10  put Tab 2 up and mark that as Exhibit 1?
11    A.    Am I switching tabs?
12    Q.    (BY MS. NIGAM:)  No.  Peter will put
13  it up on the screen so you can see it.
14    A.    Okay.  Perfect.
15        THE CONCIERGE:  One moment.
16        (Pause.)
17        THE CONCIERGE:  Exhibit 1 has been
18  introduced, screen sharing it now.
19        (Exhibit 1 was marked for
20        identification.)
21    Q.    (BY MS. NIGAM:)  Mr. Torres, this is
22  a copy of your complaint in this adversary
23  proceeding; is that right?
24    A.    Yes.  Can you guys hear me?
25        MS. OLSEN:  Yes, we can hear you.

Page 29

1    A.    Okay.  Sorry.  There was like dead
2  silence.  Yes.
3    Q.    (BY MS. NIGAM:)  Have you seen this
4  document before?
5    A.    Yes.
6    Q.    And this is a copy of the complaint
7  that you filed against Yellow Corporation?
8    A.    Yes.
9    Q.    Did you have an opportunity to review
10 this complaint before it was filed?
11   A.    Yes.
12   Q.    And do you understand that in this
13 complaint you bring several claims against Yellow
14 Corporation?
15   A.    Yes.
16   Q.    Mr. Torres, have you been asked to
17 come to trial?
18   A.    I don't speak legal.  Can you
19 explain?
20        MS. OLSEN:  Object -- let me just
21 object for the record to the extent that you are
22 seeking communications that Mr. Torres has had with
23 counsel.
24        So Mr. Torres, if anybody other than
25 your lawyers have asked you whether you will come

Page 30

1  to trial, then you can answer that.
2    Q.    (BY MS. NIGAM:)  Okay.  I will
3  rephrase my question.  Mr. Torres, would you come
4  to trial in your case if you were asked to?
5    A.    What does that entail exactly?
6  Sorry.  I don't know the -- like I don't know what
7  that means.
8    Q.    Sure.  So Mr. Torres, you understand
9  that you are a plaintiff in this action?
10   A.    Yes.
11   Q.    And do you understand that there's a
12 possibility that if we don't resolve the claims,
13 this will go to trial?
14   A.    Yes.
15   Q.    And would you come to testify at that
16 trial if you were asked?
17   A.    To the best of my ability, yes.
18   Q.    To the best of your ability, you
19 would come to trial if you were asked?
20   A.    Yes.
21   Q.    Okay.  Mr. Torres, what is your
22 understanding of the claims that you bring against
23 Yellow in this complaint?
24   A.    That Yellow was in violation of the
25 WARN Act.

Page 31

1    Q.    And what is your understanding of the
2  WARN Act?
3        MS. OLSEN:  Object to the form.
4  Calls for a legal conclusion.  And object to the
5  extent that it seeks information that Mr. Torres
6  has gleaned from conversations with counsel.
7    A.    I don't have a very great
8  understanding of the WARN Act, which is kind of why
9  that is up to my attorneys.
10   Q.    (BY MS. NIGAM:)  So is it fair to say
11 you don't have a strong understanding of the WARN
12 Act independent from your conversations with
13 attorneys?
14   A.    Yes.
15   Q.    Do you have any understanding of the
16 purpose of the WARN Act?
17   A.    I'm sorry.  You cut out there.  Can
18 you repeat the question?
19   Q.    Sure.  Do you have any understanding
20 of the purpose of the WARN Act?
21   A.    It is to protect -- to my knowledge,
22 it is to protect individuals.
23   Q.    Do you have any understanding, any
24 further understanding of the purpose of the
25 WARN Act?

Page 32

1    A.    Other than protection, not
2  particularly.
3    Q.    Are you aware of exceptions to the
4  WARN Act?
5        MS. OLSEN:  Object to the form.
6  Calls for a legal conclusion.
7    A.    I -- what I am aware of in the
8  WARN Act is just kind of like what I have gathered.
9    Q.    (BY MS. NIGAM:)  And what have you
10 gathered?
11   A.    Just -- can you be more specific?
12   Q.    Sure.  I am just looking to
13 understand fully what your awareness and knowledge
14 of the WARN Act is.
15   A.    Okay.  At this point, I guess I would
16 say that I understand that the WARN Act is meant to
17 protect employers from companies that shut down.
18 That is probably the extent of my knowledge.
19   Q.    Okay.  So is it fair to say that you
20 are not aware of exceptions to the WARN Act?
21   A.    Sure.
22        MS. OLSEN:  Object to the form.
23   Q.    (BY MS. NIGAM:)  Mr. Torres, do
24 you -- when you were working at Yellow, did you
25 interact with any Yellow union members?                    10

Page 33

1    A.    Yes.  I mean all the warehouse
2  associates were union workers.
3    Q.    So as an operations supervisor, you
4  were supervising union employees, correct?
5    A.    That's correct.
6    Q.    Did you work with them on a
7  day-to-day basis, being in the same warehouse?
8    A.    Yes.
9    Q.    Did you discuss -- well, let me step
10 back, actually.  Are you aware of One Yellow, do
11 you have any familiarity with what that is?
12    A.    The merging of all of the kind of
13 like Holloway [sic], Reddaway, all that type of --
14 that whole deal.
15    Q.    Did you discuss One Yellow with any
16 of your coworkers?
17    A.    It was a topic for our preshifts and
18 our, you know, our safety topics.  We would bring
19 it up.  So, yeah, definitely.
20    Q.    Do you recall what those discussions
21 entailed?
22    A.    Are you looking -- I mean like --
23    Q.    Sure.  I can rephrase my question.
24 Do you recall what you discussed in those preshift
25 meetings about One Yellow?

Page 34

1    A.    Just about that the company -- I mean
2  when I was hired, I am pretty sure it was kind of
3  mostly already merged because I think the merger
4  took place like a couple of months before I
5  started.  But it was kind of just speaking about
6  the culture they were trying to cultivate.
7    Q.    In what sense?
8    A.    Just that Reddaway -- I remember
9  Reddaway specifically.  There was another one.  I
10 can't remember the name.  And then Yellow or YRC
11 were just merging to the point where everyone would
12 be united under one corporation or sect, if you
13 will.
14    Q.    I think the words you used earlier,
15 "the culture they were trying to cultivate," what
16 kind of culture did you think One Yellow was
17 intending to cultivate?
18    A.    One of success.
19    Q.    Do you recall what any of your
20 coworkers said to you about One Yellow?
21    A.    Coworkers being the warehouse
22 associates or coworkers being management as well?
23    Q.    Sure.  Thanks for that clarification.
24       Anybody that you spoke with.
25    A.    It was a mixed bag.  There were some

Page 35

1  people there that worked longer than I have been
2  alive, you know.  And so change scares people.  So
3  there was some apprehension from some, and there
4  was excitement from others.
5    Q.    Do you recall discussing specifically
6  the negotiations between the union and Yellow with
7  any of your coworkers?
8    A.    Discussing the what?  I'm sorry.
9    Q.    The negotiations between the union
10 and Yellow.
11    A.    No.  There was --
12    Q.    Did you ever --
13    A.    Go ahead.  No.  No.  Go ahead.
14 Sorry.
15    Q.    So you never discussed the
16 negotiations between IBT and Yellow with any of
17 your coworkers?
18    A.    No.
19    Q.    Have you heard of any discussions
20 with any of your coworkers about the negotiations?
21    A.    Everyone talks.  It is like high
22 school, you know.  But people mostly -- nobody knew
23 anything.  Everything was rumors, so --
24    Q.    When you say everybody talks, what do
25 you mean by that?  What were they talking about?

Page 36

1    A.    Every -- there was rumors and
2  speculation about people would get this, people
3  would get more time off, people would get less time
4  off, people would get raises.  There was, you know,
5  various -- I would say -- if I heard that, I would
6  say I don't have my tinfoil hat on for the day.
7  Because it just all sounded like, you know,
8  conspiracyish.  So just kind of -- just guys talk
9  and, you know, who am I to determine whether that
10 is true or not.
11    Q.    Do you recall any -- in those
12 conversations, do you recall anything about
13 potential layoffs coming up?
14    A.    No.
15    Q.    Do you recall any discussions about
16 people being concerned for their jobs?
17    A.    In -- just for clarification, are you
18 asking when I first started?
19    Q.    I am asking in the context of the
20 discussions, you mentioned hearing about the
21 negotiations between IBT and Yellow, whenever those
22 occurred.
23    A.    No.
24    Q.    When were those conversations or
25 those rumors that you recall hearing about?

Page 37

1    A.    It was never consistent.  It was a
2  bird here and there, so to speak.
3    Q.    Was this towards the beginning of
4  your time at Yellow or more towards the end?
5    A.    I would say scattered.
6    Q.    So scattered throughout between
7  November 2022 through July 2023; does that sound
8  right?
9    A.    I would say everybody talked everyday
10 about a wide variety of topics, you know.
11    Q.    Including the status of negotiations
12 between --
13    A.    Including that, yes.
14    Q.    Mr. Torres, have you discussed your
15 lawsuit with any Yellow or former Yellow employees?
16    A.    No.
17    Q.    Have you personally had any
18 interactions with IBT's president, Sean O'Brien?
19    A.    No.
20    Q.    Do you have any knowledge of union
21 meetings?
22    A.    No.
23    Q.    Have you discussed union meetings
24 with any of your unionized employees?
25    A.    Have I discussed any union meetings?

Page 38

1    Q.    Sure.  In the context of, you know,
2  discussions with your -- with employees that you
3  were working with that were unionized, did the
4  union meetings ever come up?
5    A.    Since I am under oath, I feel
6  obligated to say that there was probably a time in
7  which a union member was like: Hey, do you know
8  when the union meetings are?  And I was like: You
9  would have to talk to the union steward.  But that
10 is the extent of any type of meetings.
11    Q.    So no one ever asked you or informed
12 you about anything that happened in a union
13 meeting, for instance?
14    A.    No.
15    Q.    Do you recall having any discussions
16 with anyone, whether unionized or not, about
17 whether the negotiations would go through between
18 IBT and Yellow?
19    A.    The discussions of what?
20    Q.    Do you recall having any discussions
21 with either other management or the people you were
22 supervising about the possibility of a successful
23 negotiation between union and Yellow?
24    A.    Maybe.
25    Q.    By "maybe," do you mean you don't

Page 39

1  recall a specific instance?
2    A.    I don't recall -- if you could like
3  specify, I might be able to --
4    Q.    Specify the -- like the types of
5  discussions, is that what you are asking about?
6    A.    Yeah, sure.
7    Q.    Do you recall having any discussions
8  about specifically whether the negotiations would
9  actually go through between union and Yellow?
10    A.    Not to my knowledge.  I can't recall
11 at this moment.
12    Q.    Do you recall having any discussions
13 about whether the negotiations would collapse?
14    MS. OLSEN:  Sorry about that.
15    A.    No worries.  Possibly.
16    Q.    (BY MS. NIGAM:)  Do you recall any
17 further specifics about that conversation?
18    A.    If I am being honest, the only time I
19 recall anything about unions and discussions and
20 going through or whatever have you was the
21 possibility of a strike.  And that was in June or
22 July of 2023.
23    Q.    And was that conversation with some
24 of your management or --
25    A.    That was with the management team of

Page 40

1  813.
2    Q.    What do you recall about those
3  discussions?
4    A.    Just that there was a threat of a
5  strike, specifically in the Midwest somewhere.
6    Q.    Do you have any further understanding
7  of when that was?  I think you said June or July.
8    A.    Yeah.  I was actually moving in June,
9  so that month is kind of fuzzy.  But I remember
10 towards July, it was -- the operations manager, the
11 terminal manager, myself and the team had meetings
12 of just management every morning regarding the
13 status of the possibility of strike and how we
14 would approach that if it took place.
15    Q.    And what did you discuss about the --
16 in those meetings, those daily meetings?
17    A.    The way we would carry out the
18 operation, should that come to pass, what that
19 looked like.
20    Q.    Any discussion on whether the strike
21 should go forward at all?
22    A.    What do you mean?
23    Q.    Sure.  Did you -- you testified that
24 you had these meetings every morning regarding the
25 status of the possibility of the strike.

Page 41

24
1    In the context of those meetings, did
2 anybody discuss whether there should be a strike
3 notice?
25
4    A.    No one in management wanted a strike
5 to happen.  I can tell you that.
6    Q.    Why was that?  Do you have an
7 understanding of why that was?
8    A.    It would not be profitable for the
9 company.
10    Q.    And when you say no one in
11 management, does that include yourself?
12    A.    Yes.
13    Q.    So you did not want the strike notice
14 to go forward?
15    A.    I did not want a strike to happen,
16 no.
17    Q.    Because it would not be profitable
18 for the company or for any other reason?
19    A.    I mean a strike would be detrimental
20 for the company was their words, the verbatim with
21 them.
22    Q.    Did you have any concern for your job
23 if a strike notice were to occur?
24    A.    Was I scared?  Yeah, I was scared.
25    Q.    I think you testified earlier that at

Page 42

1 these meetings you discussed how we would approach
2 that, meaning the strike, if a strike took place.
3    What did you discuss specifically as
4 to how that approach should pan out?
5    A.    In terms of what?
26
6    Q.    What was the approach that you were
7 discussing with management?
8    A.    Well, we were mainly discussing how
9 we would carry out the day-to-day operations, if
10 that occurred, if we would be even able to stay
11 afloat, afloat being like if the hub would stay
12 open.
13    Q.    The hub meaning the warehouse?
14    A.    The terminal, yes.
27
15    Q.    The terminal?  When you say "other
16 management," can you remind me again who that would
17 have been, those meetings about the approach to the
18 strike notice?
19    A.    Sure.  It would have been the general
20 operations manager, the terminal manager, the shift
21 operations manager, myself and one to two other
22 supervisors.
28
23    Q.    Going back to the timing briefly, I
24 know you said that you were a little fuzzy.  So is
25 it fair to say it was likely June or early July; is

Page 43

1 that correct?
2    MS. OLSEN:  Object to form.
3    A.    I --
4    MS. OLSEN:  Vague.  Lacks foundation.
29
5    A.    I would say July is what I remember
6 the most.
7    Q.    (BY MS. NIGAM:)  Do you know when in
8 July?
9    A.    I don't have a date for you.  I just
10 remember it was July.
11    Q.    Do you believe that it would have
12 been in early July or closer to mid to late July?
13    MS. OLSEN:  Object to form.  Vague.
14 Lacks foundation.
15    A.    July is really -- I know for certain
16 it was in July.
17    Q.    (BY MS. NIGAM:)  So you don't know --
18 you don't have any idea whether it was towards the
19 beginning of July or towards the later end of July?
20    MS. OLSEN:  Object to form.
21    A.    I would probably say that it is
22 towards the -- yeah, I really can't say.  Towards
23 the later end, if I have to make a decision.
24    MS. NIGAM:  Okay.  Can we please put
25 up Tab 3, which we will mark as Exhibit 2?

Page 44

1    (Exhibit 2 was marked for
2    identification.)
3    THE CONCIERGE:  Yes, ma'am.  One
4 moment.
5    A.    Am I doing anything, or is this all
6 getting shared?
7    MS. NIGAM:  No.  Peter is going to
8 put it up.
9    A.    Okay.  Perfect.  Just let me know
10 when I am clicking.
11    Q.    (BY MS. NIGAM:)  Okay.  So
12 Mr. Torres, this is a June 8th, 2003 [sic] email
13 from Darren Hawkins addressed to all Yellow
14 employees; do you see that?
15    A.    Yes.
16    Q.    And this email is addressed to all
17 Yellow employees.  Do you have any reason to doubt
18 that you received this email?
30
19    A.    No, but whoever -- can they scroll
20 down so that -- yeah, thank you.
31
21    Q.    Yeah, take your time to read whatever
22 you want.  Just let Peter know where you want to
23 focus on, and then when you are ready, I can ask
24 you some questions.
25    A.    Okay.  One moment.

Page 45

1      (Pause.)
2      A.    Okay.  Is that all of it?  Oh,
3 thanks.
4      (Pause.)
5      A.    Can you scroll down, please?
6      (Pause.)
7      A.    Is that all of it?  Okay.  Thank you.
8 What was the question?
9      Q.    (BY MS. NIGAM:)  Sure.  So
10 Mr. Torres, if you look in the first paragraph,
11 Mr. Hawkins starts out with:  For several years we
12 have highlighted One Yellow and why it's important
13 to our jobs and the future of our company.
14           Do you see that?
15      A.    I do, yes.
16      Q.    He also states a little further on,
17 if you scroll down a little bit -- yeah, just at
18 the top of the next page:  For months, we've made a
19 good faith effort to work with IBT leadership.
20 We've been consistent in our outreach, offering
21 meeting after meeting, many of which the IBT has
22 ignored.
23           Do you see that?  Does this jog your
24 memory as to any conversations you may have had
25 about the negotiations between IBT and Yellow

Page 46

1 around June of 2023?
2           MS. OLSEN:  Object to form.  Lacks
3 foundation.
4      Q.    (BY MS. NIGAM:)  I think you are
5 muted, Mr. Torres, or we are not able to hear you.
6      A.    Yeah.  Thank you.  Thank you.  Is
7 there any way that you -- like I feel like I can
8 answer your question if it is a little bit more
9 specific.  Can you specify, I guess, like what we
10 were discussing?  Like --
11 [32]    Q.    Sure.  So if you -- scroll back up.
12 I can start with the first sentence I highlighted:
13 For several years, we've highlighted One Yellow and
14 why it's important to our jobs and the future of
15 our company.
16           Do you recall any discussions
17 specifically in June with anybody about the
18 importance of One Yellow to people's jobs?
19      A.    I would say that One Yellow was
20 something that we were really committed to, just
21 like from an operational standpoint.  And then I
22 would say that our general operations manager and
23 our terminal manager were discussing -- would
24 mention that there was discussions about -- with
25 the IBT.  That is about -- I mean that is the best

Page 47

1 I can remember, to my knowledge.
2      Q.    Any discussion about -- actually
3 strike that.  I want to move on to the next
4 sentence that I highlighted.
5      A.    Sure.
6      Q.    We can scroll back to -- so when
7 Mr. Hawkins says:  For months, we've made a good
8 faith effort to work with IBT leadership.  We've
9 been consistent in our outreach, offering meeting
10 after meeting, many of which the IBT has ignored.
11           Did you discuss anything related to,
12 you know, whether Mr. Hawkins was sincere in his
13 negotiations with the union with any of your
14 coworkers?
15           MS. OLSEN:  Object to the form.
16      A.    It is hard to say.  I can't -- I mean
17 [33] I would say never -- I didn't speak with anybody,
18 management or union workers, about the contract or
19 the discussions or what they needed to reach
20 agreements on.  There was never specifics.
21 [34]    Q.    (BY MS. NIGAM:)  Were you ever
22 concerned about what would happen if the
23 negotiations failed?
24      A.    Yes.
25 [35]    Q.    When were you concerned?  Or let me

Page 48

1 rephrase that.
2 [36]           When did you become concerned about
3 what would happen if the negotiations failed?
4      A.    I can't really recall.  I know July I
5 was concerned.  For lack of a better word, I was
6 very stressed in July.
7      Q.    If you scroll a little bit further
8 down, right in the middle of this bold paragraph,
9 Mr. Hawkins states:  The reality is that until the
10 IBT leadership stops the posturing and deals with
11 the reality of the current situation, he,
12 Mr. O'Brien, is leading you down a road to ruin.
13           Do you see that?
14      A.    I do, yes.
15      Q.    Do you recall being concerned at all
16 about the possibility of Mr. O'Brien leading the
17 company down a road to ruin?
18      A.    There was really like kind of two
19 camps, right, in the -- that kind of just started
20 to formulate.  It was either you are either with
21 Yellow or you're with the IBT, so to speak.
22           I kind of believe myself to be a
23 really impartial person.  So I was more so -- I
24 didn't really think much of it.  Everyone is
25 accountable for anything, especially if there's

Page 49

1  some type of deal that can be made, I guess, was
2  kind of my take on it.
3      Q.    Do you recall being -- thinking at
4  all at this time that there's a possibility that
5  the negotiations would actually collapse?
6      A.    No.
7      Q.    So at this point on June 8th, 2023,
8  you still felt there was no possibility that the
9  negotiations wouldn't go through; is that correct?
10         MS. OLSEN: Object to form.
11     A.    I will say that in the morning
12  meetings, the terminal manager and the general
13  operations manager repeatedly assured us that we
14  would not lose our jobs.
15     Q.    (BY MS. NIGAM:)  And is that why you
16  believed at this time in June 2023 that there was
17  still a possibility of the negotiations being
18  successful?
19     A.    Yes.
20     Q.    If you scroll further down, the last
21  sentence on this page, he says:  We are committed
22  to working with the union to get this done, but for
23  that to occur, both parties must work together to
24  reach a solution immediately.
25         Do you see that?

Page 50

1      A.    Yes.
2      Q.    And then he says:  I will do
3  everything in my power to strengthen this company
4  and to preserve jobs.
5          Do you see that?
6      A.    Yes.
7      Q.    So reading this email, did you have
8  any concern as to whether your job actually would
9  be preserved in June of 2023?
10         MS. OLSEN:  Object to the form.
11  Lacks foundation.
12     A.    Can you rephrase, or do I have to
13  answer?
14     Q.    (BY MS. NIGAM:)  Sure.  I can
15  rephrase.
16         So starting from the first sentence I
17  highlighted:  We are committed to working with the
18  union to get this done, but for that to occur, both
19  parties must work together to reach a solution
20  immediately.
21         This reference to immediately, did
22  that suggest to you that it was critical for the
23  negotiations to be successful for the future of the
24  company?
25         MS. OLSEN:  Object to form.

Page 51

1  Lacks foundation.
2      A.    I understood the discussion was
3  important and needed to reach an agreement
4  relatively soon because it would benefit the
5  company if there was an agreement made.
6      Q.    (BY MS. NIGAM:)  When you say that
7  you understood the discussion was important and
8  needed to reach an agreement relatively soon, do
9  you have an understanding as to why that needed to
10  happen?
11         MS. OLSEN:  Object to form.
12     A.    One second -- sorry.  One second.  I
13  am going to -- can I switch rooms real quick?  I am
14  just going to --
15     Q.    (BY MS. NIGAM:)  Sure.  We can go off
16  the record for five minutes if that works.
17     A.    Sure.
18         THE VIDEOGRAPHER:  The time is 10:01
19  a.m.  This is the end of Media Unit Number 1.
20         (Whereupon, a break was had from
21         10:01 a.m. until 10:12 a.m. PDT)
22         THE VIDEOGRAPHER:  The time is 10:12
23  a.m.  This is the beginning of Media Unit Number 2.
24     Q.    (BY MS. NIGAM:)  So Mr. Torres, we
25  were just speaking about Exhibit 2.  Could we put

Page 52

1  that exhibit back up, please?  So Mr. Torres, you
2  recall before the break, we were talking about this
3  document?
4      A.    Yes.
5      Q.    And you testified that you understood
6  the discussion was important and needed to reach an
7  agreement relatively soon.  My question was what is
8  your understanding of why that agreement needed to
9  happen relatively soon?
10     A.    To my understanding, there was a time
11  frame on when the discussions needed to -- needed
12  to take place.
13     Q.    (BY MS. NIGAM:)  So I am not -- I am
14  not sure if that is exactly an answer to my
15  question.  But I will rephrase.
16         So what I am looking for is you
17  testified that you understood that the discussions
18  between IBT and Yellow were important.
19     A.    Yes.
20     Q.    What caused you to think that that
21  was important?
22     A.    Again, because, to my knowledge, it
23  was my understanding that there was a time frame on
24  when the discussion needed to reach an agreement.
25     Q.    So is it important because if the

Page 53

1 time frame expires, then there's no agreement
2 between IBT and Yellow; is that the concern?
3    A.    I wasn't really -- I'm not well
4 versed in like how that kind of takes -- like what
5 that constitutes.  But I under -- I knew that there
6 was a deadline, and I didn't know if the discussion
7 and agreement would be -- would like reach a
8 conclusion by that deadline.
9    Q.    And what is your understanding of
10 what would happen if that deadline was past?
11    A.    If the discussion and agreement was
12 past the deadline.
13    Q.    If they didn't reach an agreement by
14 the deadline.
15    A.    I didn't know what -- I guess a fear
16 of the unknown, you could say, but I knew it
17 wouldn't be beneficial for One Yellow.
18    Q.    And for you, right?
19    A.    Yes, because I worked there.
20    Q.    Let's go ahead -- well, one last
21 question, Mr. Torres.
22    A.    Sure.
23    Q.    At this time, in June 2023, did you
24 believe that Yellow and IBT needed to negotiate to
25 ensure the survival of Yellow?

Page 54

1    A.    Can you be more -- what do you mean
2 survival?
3    Q.    That the company -- to keep the
4 company afloat.
5    A.    In June, I didn't have any reason to
6 believe that it wasn't afloat, I guess you could
7 say.
8       MS. NIGAM:  Let's go ahead with Tab
9 4, please, if we could mark that as Exhibit 3.
10       (Exhibit 3 was marked for
11       identification.)
12    Q.    (BY MS. NIGAM)  So Mr. Torres, this
13 is a June 13th, 2023, email from Mr. Hawkins, again
14 addressed to all Yellow employees.  Do you see
15 that?
16    A.    Yes.
17    Q.    And I will again represent to you
18 that this was, in fact, sent to all Yellow
19 employees.  Do you have any reason to doubt that
20 you received this email?
21       MS. OLSEN:  Object to the form.
22    A.    No.
23    Q.    (BY MS. NIGAM)  If you scroll down
24 to the first paragraph, Mr. Hawkins notes:  There
25 has been a lot of noise the past few days about the

Page 55

1 IBT's recent refusal to consider a new proposal we
2 shared with them to execute the next phase of our
3 One Yellow transformation.
4       Do you see that?
5    A.    Yes.
6    Q.    Were you aware of this refusal that
7 Mr. Hawkins is referring to?
8    A.    Can you be more specific?
9    Q.    Sure.  You may not remember, but I am
10 just wondering if you have any knowledge of IBT's
11 recent refusal to consider a new proposal that
12 Mr. Hawkins was mentioning.
13       MS. OLSEN:  Object to the form.
14 Lacks foundation.
15    A.    Are there any -- do you have any --
16 how do I -- is there anything specific about like
17 that would have been brought up that maybe --
18    Q.    (BY MS. NIGAM)  Sure.  So let me
19 step back a bit.
20    A.    Sure.  Sure.
21    Q.    You testified you are generally aware
22 of One Yellow, correct?
23    A.    Yes.
24    Q.    And do you understand the -- the
25 discussions or the negotiations that IBT and Yellow

Page 56

1 were engaging in had something to do with One
2 Yellow?
3    A.    The way that I understood it was that
4 IBT -- that IBT was contracted by Yellow,
5 essentially.  Is that -- am I kind of correct there
6 or sort of?
7    Q.    Sure.  So you are aware that there
8 were negotiations between the union, IBT and
9 Yellow?
10    A.    Yes.  And I believe what -- from my
11 understanding, it was about how they were going to
12 continue to proceed to partnership with One Yellow
13 and with the IBT and like what that looked like for
14 the next X amount of whatever allotment of time
15 that would have been.
16    Q.    Right.  And so here, my question is,
17 it looks like they are discussing the most recent
18 round of negotiations in which IBT, according to
19 Mr. Hawkins's email, refused to consider a new
20 proposal from Yellow on One Yellow?
21    A.    Yes.
22    Q.    So my question is if you have any
23 understanding about what that refusal was?
24    A.    I -- like what -- what the proposal
25 was that was refused?

Page 57

1    Q.    What the proposal that was refused or
2 the refusal itself.
3    A.    No.
4    Q.    Do you recall having any discussions
5 with anybody about IBT's refusal to consider a new
6 proposal?
7    A.    No.
8    Q.    If you go further down to the page
9 ending in 1630, so Mr. Hawkins states:  Sean
10 O'Brien -- it is the second to last paragraph -- or
11 second to last --
12    A.    Yeah.  Yeah.  Okay.
13    Q.    He is going to put it up.
14        So Sean O'Brien's baseless attacks
15 are irresponsible when we have the jobs, lives and
16 families of so many Teamsters and other employees
17 on the line.
18        Did you see that?  Do you see that?
19    A.    Yes.  Yes.
20    Q.    Did this note in June of 2023 about
21 the jobs, lives and families being on the line
22 concern you at all?
23        MS. OLSEN:  Object to the form.
24    A.    Does it concern me now or did it
25 concern me at the time or --

Page 58

1    Q.    (BY MS. NIGAM:)  At the time, did it
2 concern you in June 2023 that Mr. Hawkins is
3 stating that there are jobs, lives and families on
4 the line?
5    A.    This would have been, what, five days
6 after that other email?
7    Q.    I think that this might have been --
8    A.    The other one was the 8th, right?
9    Q.    Yep, it is five days.  You are right.
10    A.    No -- I wasn't -- again, the
11 advisement of the terminal hub manager and the
12 general operations manager and the shift operations
13 manager was all very much that Hawkins isn't
14 concerned about it; we shouldn't be either.  It
15 will -- this will get done.
16    Q.    Were you concerned at all that, as
17 you are saying, the general operations manager said
18 not to be concerned about it, yet these emails are
19 suggesting that there was something more on the
20 line, people's jobs?
21    A.    I will say that like personally, I
22 have friends that were employed there as truckers
23 or warehouse associates, part of the union.  I was
24 concerned for them.
25    Q.    Why were you concerned for them?

Page 59

1    A.    Because, to my knowledge, if there
2 was no agreement, then the IBT would not be working
3 with One Yellow.
4    Q.    And they wouldn't -- there's a
5 possibility they wouldn't have their jobs, correct?
6    A.    I am unsure.  But I do know a lot of
7 them were talking about quitting.
8    Q.    When do you recall them saying
9 something about quitting?
10    A.    My friends?
11    Q.    Your friends.
12    A.    They had mentioned it a handful of
13 times.
14    Q.    What did they say about why they
15 wanted to quit?
16    A.    Most of it was because the job wasn't
17 worth it, just things like that.
18    Q.    Any discussions with your friends or
19 other union employees about being worried for their
20 jobs if the negotiations didn't complete?
21    A.    If my memory serves me correctly, I
22 recall that a lot -- especially the older people
23 that worked there, older as in well seasoned and
24 had been there like for the longevity of their
25 jobs, like thirty plus -- like again, I am

Page 60

1 twenty-nine, and they were there like thirty-five
2 years, like crazy.  A lot of those gentlemen were
3 very adamant that it was going to get done because
4 it always got done, and there was -- how do I
5 phrase it, that this was a common occurrence.
6    Q.    Any discussions with any of your
7 friends about whether they were worried about their
8 jobs if IBT and Yellow couldn't come to an
9 agreement?
10    A.    Not -- I can't recall at this time.
11    Q.    Did anybody express to you that they
12 were concerned whether they would still have a job
13 if the negotiations were not successful?
14    A.    If I were -- me specifically?
15    Q.    Or anybody you are aware of.
16        MS. OLSEN:  Object to the form.
17    A.    Nobody said -- nobody came up to me
18 at work on a Tuesday during shift and said:  Hey, I
19 am scared I am going to lose my job because of the
20 IBT and because of the things.
21        That never occurred for me.
22    Q.    (BY MS. NIGAM:)  Are you aware of
23 anybody expressing concern over whether they would
24 have a job at all?
25        MS. OLSEN:  Object to the form.

Page 61

1    A.    I think at that time it was really
2 uneasy for everybody.  There was some concern about
3 just the future in general.  But whether that was
4 specifically because there was a refusal of the IBT
5 and One Yellow, I can't really say.
6    Q.    (BY MS. NIGAM:)  When you say "at
7 that time," are you referring to the June --
8    A.    I am referring to -- sorry.  I didn't
9 mean to cut you off.  Go ahead.
10    Q.    The June 2023 timeline?
11    A.    I am referring to whenever this email
12 was sent.
13    Q.    Okay.
14    A.    And probably after.
15    Q.    The email was sent in June -- on June
16 13th, 2023.
17    A.    I can say that no management seemed
18 to be concerned about whether they were going to
19 lose their jobs.
20    Q.    But other employees did seem
21 concerned?
22    A.    I would say that concerned about the
23 future was probably more of an accurate portrayal.
24    Q.    Okay.
25        MS. NIGAM:  Let's put up Tab 5, which

Page 62

1 we will mark as Exhibit 4.
2        (Exhibit 4 was marked for
3        identification.)
4    Q.    (BY MS. NIGAM:)  So this is a June
5 21st, 2023, email from Hawkins, again addressed to
6 all Yellow employees.
7    A.    Correct.
8    Q.    Do you see the email?
9    A.    The 6/21, yeah.
10    Q.    And I will again represent to you
11 that this email was, in fact, sent to all Yellow
12 employees.
13        Do you have any reason to doubt that
14 you received this email?
15    A.    No.
16    Q.    So in the second paragraph,
17 Mr. Hawkins states:  As a consequence of our
18 inability to proceed with One Yellow, combined with
19 the challenging business conditions confronting the
20 entire LTL industry, Yellow has recently been
21 operating at a loss, as it continues to serve its
22 customers.
23        Do you see that?
24    A.    Yes.
25    Q.    Were you concerned at all in late

Page 63

1 June 2023 to hear that Yellow was operating at a
2 loss?
3    A.    No.
4    Q.    So you weren't concerned that the
5 company was operating at a loss at this time?
6    A.    There was an over -- a pretty
7 strong -- like again the terminal hub manager, the
8 general operations manager, all of my boss's bosses
9 were very adamant that it would be met and that
10 this was merely like part of the process to get
11 this deal done.
12    Q.    So if you go a little -- to the next
13 paragraph, in the middle, Mr. Hawkins states:
14 Yellow has requested a two-month contribution
15 deferral from the health and welfare and pension
16 funds to be repaid with interest immediately upon a
17 refinancing.
18        Do you see that?
19    A.    Yes.
20    Q.    Any concern to hear that they were
21 deferring contributions as well?
22    A.    At that time, I don't believe so.
23    Q.    Did you view the contribution
24 deferral and the statement about operating at a
25 loss as any sort of indicator that the company was

Page 64

1 not performing well financially?
2        MS. OLSEN:  Object to the form,
3 foundation.
4    A.    I understood that in the past Yellow
5 had struggled with certain like financing issues
6 during COVID, I believe, and some other times, but
7 that they were able to move out of it and be
8 successful.  And again, that was kind of the
9 mentality that the upper management was pushing
10 towards us like, hey, this is just something that
11 has happened in the past and we will be fine.
12    Q.    (BY MS. NIGAM:)  But one of the
13 things you testified about earlier on was about
14 some of your friends that were unionized saying
15 that they wanted to quit their jobs.  Any sense as
16 to whether they wanted to quit their jobs before
17 their jobs could be at risk through termination?
18        MS. OLSEN:  Object to the form.
19 Mischaracterizes former testimony.
20    A.    Can you rephrase the question?
21    Q.    (BY MS. NIGAM:)  Sure.  So you
22 testified earlier that some of your friends that
23 were unionized said that they wanted to quit their
24 jobs.
25        Do you have any understanding of

Page 65

1  whether part of that was to quit rather than face a
2  potential layoff?
3       MS. OLSEN:  Same objection.
4    A.   I -- I don't understand the question.
5  I guess --
6    Q.   (BY MS. NIGAM:)  Did any of the union
7  employees that you were talking about that said
8  that they wanted to quit -- do you have any
9  understanding of whether they wanted to quit before
10 the company could terminate them?
11      MS. OLSEN:  Object to the form.
12   A.   I will say no, I don't think that was
13 the case.
14   Q.   (BY MS. NIGAM:)  So no one
15 necessarily told you or you didn't have a
16 discussion with anybody who said, you know, there
17 is --
18   A.   I am quitting before they can fire
19 me?  Yeah -- no, that wasn't said.
20   Q.   Let's go back to -- actually, let's
21 bring up Tab 6, please, which we will mark as
22 Exhibit 5.
23      (Exhibit 5 was marked for
24      identification.)
25   Q.   (BY MS. NIGAM:)  So this is a June

Page 66

1  27th, 2023, email from Mr. Hawkins to all Yellow
2  employees.
3       Again, any reason to doubt that you
4  received this email?
5    A.   No.
6    Q.   Do you see the subject is:  Yellow
7  Files Legal Claim Against IBT?
8    A.   Uh-huh.
9    Q.   If you go to the first paragraph,
10 Mr. Hawkins notes:  As of today, IBT refuses to
11 meet immediately to negotiate a change of
12 operations, a letter of agreement or full contract
13 negotiations.  This has gone on for too long and
14 has regrettably left Yellow with no choice but to
15 file a lawsuit in the U.S. District Court in the
16 District of Kansas against the IBT.  We do not take
17 this action lightly.
18      Do you see that paragraph?
19   A.   Yes.
20   Q.   Any concern at this time about Yellow
21 filing a lawsuit against the union?
22      MS. OLSEN:  Object to the form.
23   A.   If my memory serves, I don't think
24 that there was still much concern.  I think it was
25 more so that it would actually -- that might have

Page 67

1  benefited because there could not be any type of
2  lengthening of this discussion anymore as it was
3  going to go through this process.
4    Q.   (BY MS. NIGAM:)  So when you say that
5  they "might have benefited because there could not
6  be any type of lengthening of discussion anymore,"
7  do you mean that you believed that that would force
8  the parties to come together at the negotiating
9  table?
10      MS. OLSEN:  Object to the form.
11   A.   There was spoken to me by my terminal
12 hub manager to the management team that this would
13 essentially -- there would be no more dancing,
14 right; like they needed to sit down and have a
15 discussion, and an outside source would have made
16 that possible through legal means.
17   Q.   (BY MS. NIGAM:)  So is it fair to say
18 that you thought now there's a firm deadline that
19 the parties need to stick to.  Is that fair?
20   A.   I honestly thought the deadline was
21 still the same.  I just -- so I can't actually
22 remember at this time what the deadline was.
23   Q.   Were you at all worried about the
24 company's future, given that by June of 2023
25 negotiations had not been successful, end of June

Page 68

1  2023?
2    A.   I was -- I -- I had a lot on my plate
3  in June.  I had moved.  I had moved recently.  Me
4  and my partner had just got our own place, so we
5  had just finished moving in.  So I was kind of
6  thinking about it, but it wasn't at the front of my
7  mind.  I was mainly thinking of going to work, and
8  that is pretty much it.
9    Q.   So having now, you know, at the end
10 of June 2023 received multiple emails about the
11 negotiations and seeing the lawsuit, any concern
12 now or any -- I apologize, let me restate that.
13   A.   Sure.
14   Q.   Coming at the end of June 2023, the
15 date of this email, now seeing multiple emails
16 about the negotiations not being fruitful and now a
17 lawsuit against the union, did you have any concern
18 about the possibility that you and others would be
19 terminated?
20   A.   No.
21   Q.   Any concern about the ability of the
22 company to stay afloat after seeing these emails
23 and the lawsuit?
24   A.   Any apprehension or concern that
25 might have existed at that time was -- I don't -- I

61

Page 69

1 can only think of using the word "downplayed."  But
2 it was mitigated as best as it could by the hub
3 manager and everyone else.  By everyone else, I
4 mean the general operations manager, so excuse me.
5           The hub manager, the terminal hub
6 manager and general operations manager mitigated
7 any of that concern by saying like -- by saying
8 we're fine.
9      Q.    But there was apprehension that
10 you're aware of?
11           MS. OLSEN:  Object to the form.
12 Already asked and answered.
13      A.    There was rumors and talks amongst
14 both union and management team that I'm sure may
15 have expressed some concern.
16      Q.    (BY MS. NIGAM:)  Rumors about what
17 exactly?  Are these the rumors you were referring
18 to earlier in your testimony or separate?
19      A.    Yeah.  Earlier and as well as, I
20 guess, just about -- because from my understanding,
21 too, like I'm relatively -- Sean O'Brien, that's
22 his name, the IBT guy?
23      Q.    Yeah.
24      A.    I -- they -- they being the union
25 employees and associates were discussing a lot

Page 70

1 about what he was posting on Twitter.  I didn't see
2 it.  I never saw it or heard directly of it.  I
3 didn't look it up.
4           But I -- my understanding at the time
5 was that he was chirping -- sorry, he was
6 expressing some things on Twitter that was -- or
7 not the best.  So --
8      Q.    So the coworkers you were talking to
9 that said it was not the best, they were referring
10 to Sean O'Brien's tweets?
11      A.    Yes.
12      Q.    Anything else you recall about what
13 they said about those tweets?
14      A.    A handful of vulgar language that I
15 probably won't disclose, but, no, nothing that is
16 probably pertinent.  I just remember that that was
17 kind of the main -- if you were to look, like put
18 it on a board, it would be like we were -- reading
19 those emails is great too because I didn't have
20 access to my emails -- I mean marginally so.
21           I'm sure if I was getting them, I
22 probably would have been a little bit more
23 concerned if I was seeing them consistently.  But I
24 kind of was just taking my terminal manager and my
25 general operations manager at their word.

Page 71

1      Q.    So going back to the tweets, is it
2 fair to say that the colleagues you were talking to
3 didn't have a high opinion of those tweets?
4      A.    It seemed -- some of them seemed to
5 be advocating for them because they were union,
6 obviously, so that's their guy.  I get it.
7           Some of them were very frustrated
8 that a deal couldn't be made, obviously, and some
9 of them just said it was all tabloids and noise and
10 they didn't pay any mind to it.
11      Q.    So hearing about those tweets, when
12 did those conversations happen, if you can
13 remember, about what time frame?
14      A.    Probably around the same time as
15 these emails.
16      Q.    Around June 2023?
17      A.    Probably closer -- I remember us
18 talking specifically around late July -- or sorry.
19 I remember talking specifically about the tweets
20 around late June/early July.
21      Q.    Did hearing about those tweets give
22 you any cause for concern about the company's
23 future?
24      A.    No.  I thought the guy was kind of a
25 weirdo, you know, respectfully.  I kind of just was

Page 72

1 there to do the job.  And I don't know if it's
2 worth noting, but like this was -- whatever info we
3 were given was told at the beginning of shift,
4 right?
5           So like my concern level for it is
6 probably, if it's on a scale of one to ten, it's
7 probably four, I'm aware of it.  As soon as I leave
8 that room and meeting, there is a handful of other
9 things in the operation that demand my immediate
10 sense of urgency, you know.
11           So it's not like -- this isn't
12 something I was like thinking about like right
13 here, you know.
14      Q.    O'Brien's tweets specifically or --
15      A.    No.  Just the entirety of like
16 everything we've discussed so far.  Like I'm
17 thinking about a possible HAZMAT spill or I'm
18 thinking about what I've got to offload at 1:00
19 p.m., you know, so shift change, like all that
20 stuff is my primary concern because I'm -- I have
21 to take care of the operation.  It's my job.
22      Q.    Do you -- so earlier you had
23 testified about these morning meetings that you had
24 with the -- your other members of management.
25      A.    Yes.

Page 73

1  Q.  I know you were not sure of the exact
2  time frame.  Do you recall whether they were before
3  or after the strike notice?
4      MS. OLSEN:  Object to the form.
5  A.  Can you repeat the question?
6  Q.  (BY MS. NIGAM:)  Sure.  Do you recall
7  whether those morning meetings you were discussing
8  earlier that you had with your management
9  colleagues was before or after the strike notice
10  that was issued?
11      MS. OLSEN:  Object to the form.
12  Vague.
13  A.  We had morning meetings every morning
14  regarding the like shift and how we were going to
15  carry out the operation for the day.  The topics of
16  that changed a little bit up until I was laid off.
17  Q.  (BY MS. NIGAM:)  The meetings in
18  which your coworkers talked about the concern over
19  the strike that you testified about earlier, do you
20  recall whether those specific meetings were before
21  or after the strike notice was issued?
22  A.  I just want to make sure I'm
23  understanding.  I don't remember when the strike
24  notice was issued.  Like do you have a date?
25  Q.  Sure.

Page 74

1      MS. NIGAM:  So can we put up Tab 11,
2  please?  And we can mark that as Exhibit 6.
3      (Exhibit 6 was marked for
4      identification.)
5      MS. NIGAM:  Tab 11.
6      MR. YOUNG:  I don't have a Tab 11.
7      MS. NIGAM:  It's in the Exhibit
8  Share.  Yeah, I see it in there.
9      THE CONCIERGE:  Jeremy, refresh your
10  folder.
11      MR. YOUNG:  I've got it.  Give me
12  just a second.
13  Q.  (BY MS. NIGAM:)  Mr. Torres, I'll
14  represent to you that this is the official strike
15  notice that was issued.
16  A.  Okay.  Perfect.  Perfect.
17  Q.  You can see that the date is July
18  17th, 2023; do you see that?
19  A.  Yes.
20  Q.  Does that refresh your recollection
21  as to when the conversations about the strike would
22  have happened?
23  A.  It would have been, I think, a week
24  or two weeks after that, right?
25  Q.  So the conversations you're referring

Page 75

1  to in which you and your colleagues discussed
2  concern about the strike would have been after the
3  strike notice was issued?
4  A.  It was -- it would have been, right,
5  yeah, it would have been around -- it would have
6  been after this notice a hundred percent.  This is
7  when it became real, so to speak.
8      MS. NIGAM:  We can take that down.
9      Let's go to Tab 7, please, which will
10  be marked as Exhibit 7.
11      (Exhibit 7 was marked for
12      identification.)
13  Q.  (BY MS. NIGAM:)  Mr. Torres, while
14  they're pulling that up, is it fair to say that you
15  don't recall any conversations with others about
16  the possibility of the strike before the strike
17  notice was issued?
18  A.  That's correct.
19  Q.  So this is a July 20th, 2023, email
20  from Mr. Hawkins, again to all Yellow employees.
21  Do you have any reason to doubt that you received
22  this email?
23  A.  No.
24  Q.  Do you see the subject line is:  Our
25  offer to IBT for the future of Yellow?

Page 76

1  A.  Yes.
2  Q.  Do you see that?  And does that
3  subject line indicate to you that the negotiations
4  were determinative of Yellow's future as a company?
5  A.  What do you mean determinative?
6  Like --
7  Q.  That the future of the company
8  depended on the negotiations.
9  A.  No.
10  Q.  So this is after the strike notice,
11  right, so this is July 20th, 2023?
12  A.  Right.  Right.
13  Q.  So after you had received the strike
14  notice and seeing Mr. Hawkins state "Our offer to
15  the IBT for the future of Yellow," you didn't
16  believe that Yellow's future was at risk?
17  A.  I was concerned.
18  Q.  What was your concern specifically?
19  A.  That -- I was scared for my job for
20  sure.
21  Q.  And in the first paragraph,
22  Mr. Hawkins notes that Yellow made another proposal
23  to Teamster leadership that included a significant
24  wage increase for our union employees.  Do you see
25  that?

66

Page 77

1    A.    Uh-huh.
2    Q.    Do you recall discussing this wage
3  increase proposal with any of your colleagues?
4    A.    Colleagues being?
5    Q.    When I say colleagues, I'll refer to
6  generally any coworkers, so either people you were
7  supervising or --
8         THE REPORTER:  You cut out at the
9  end, Ms. Nigam.  Either people you were supervising
10  or --
11        MS. NIGAM:  Sure.
12    Q.    (BY MS. NIGAM:)  People you were
13  supervising or otherwise working with, so other
14  management.
15    A.    And I'm sorry, can you just repeat
16  the question?
17    Q.    Sure.  Do you recall discussing this
18  wage increase proposal with any of your colleagues?
19    A.    No.
20    Q.    So no discussions with any of your
21  union employee friends about the wage increase
22  proposal that Yellow had made?
23    A.    Sorry.  My dogs.  One second.
24        THE REPORTER:  Somebody needs to mute
25  themselves.

Page 78

1    A.    Yeah, is that a phone?  I don't know
2  if you can hear that, but that's not my dogs so --
3    Q.    (BY MS. NIGAM:)  Yeah, I can hear
4  that too.  I'm not sure what that is but --
5  hopefully everything is muted now except for me and
6  you and your counsel.
7    A.    Cool.
8    Q.    So I'll just repeat my question --
9    A.    Please.
10    Q.    -- Mr. Torres.  Do you recall --
11  strike that.
12        So no discussions with any of your
13  union employee friends about the wage increase
14  proposal that Yellow had made?
15    A.    No.
16    Q.    Do you recall any discussions
17  generally with the -- your union friends after the
18  strike notice had been issued?
19    A.    At work?
20    Q.    Or outside of work, at any time.
21    A.    Nothing of any substance.  I remember
22  one of my friends, I still keep in contact with
23  him, we work out together, we lift weights.  During
24  one of our times we were lifting weights, we were
25  like -- he had mentioned like if I had heard

Page 79

1  anything, and I was like:  No.  And he was like --
2  and then I said:  Have you?  And he was like:
3  Just -- just these tweets.  And I was like:  Okay.
4         And that was pretty much the extent
5  of what we talked about.
6    Q.    And no conversations with -- well,
7  were there any conversations with that friend or
8  other union friends before the strike notice about
9  the future of the company and whether their jobs
10  were at risk?
11    A.    No.  I remember -- you know, I try to
12  be lighthearted, right?  I think I remember a
13  handful of times I would ask my buddies like are we
14  down bad, like are we not feeling good, like that
15  type of stuff, just kind of about -- just the
16  general vibe of coming into work and knowing that a
17  possible strike was on the horizon was pretty
18  much -- but other than that, like that's -- you
19  know.
20    Q.    So when you say that knowing that a
21  possible strike was on the horizon, are you still
22  referring to after the strike notice or is this
23  before the strike notice was issued?
24    A.    No, this is after, what was it, June
25  17, the IBT image you showed.

Page 80

1    Q.    July 17th?
2    A.    July 17th?  Yeah.  Yeah.  Yeah.
3  After that, that was when it became a little bit
4  more real, so to speak.
5         MS. NIGAM:  We can go ahead and take
6  that exhibit down.
7    Q.    (BY MS. NIGAM:)  Do you recall at any
8  time receiving any written communications from your
9  supervisors about the financial state of Yellow?
10    A.    What do you mean?
11    Q.    For example, any like text messages
12  or emails about either the negotiations or whether
13  Yellow would survive as a company.
14    A.    No, I did not.
15    Q.    Any written -- written communications
16  through email or text or otherwise about whether
17  anybody's jobs were at risk?
18    A.    No.
19    Q.    Do you recall ever seeing any
20  communications from Mr. Hawkins posted on bulletin
21  boards?
22    A.    No, I do not.
23    Q.    Do you have bulletin boards in your
24  warehouse?
25    A.    We have -- I don't remember the

Page 81

1  number, but yeah, I know exactly that we at least
2  had one for sure.
3      Q.    And do you recall if any
4  communications or memos would be posted on those
5  bulletin boards?
6      A.    They were not.
7      Q.    What were those boards used for, to
8  your knowledge?
9      A.    I mean, it's an old hub, it's an old
10 terminal.  So there was like old barbecue postings.
11 There was a handful of like HR communications,
12 safety things, just like standard stuff that would
13 be like workplace stuff that would be on there,
14 like steward contact info, union meeting info, like
15 that type of stuff.  Sometimes there's overtime
16 sheets, you know.
17     Q.    And did you see any of your
18 colleagues -- to your understanding, do any of your
19 colleagues look at the bulletin boards?
20     MS. OLSEN:  Object to the form.
21     A.    I mean, there's a bulletin board I
22 know for sure down a staircase to the break room
23 that's like right on the stairs.
24     So when you -- if you were to walk
25 down in a circular way, it's like right here, so

Page 82

1  I'm sure everyone took a look at it every day.  I
2  saw it every day.
3      Q.    (BY MS. NIGAM:)  Going back to the
4  period after the strike notice was issued, were you
5  at work most of those days after the strike notice
6  was issued?
7      A.    Can I -- can I take my phone to look
8  at the calendar?  Is that cool?  Or --
9      Q.    Sure.
10     A.    -- can you bring up a calendar so I
11 can just like --
12     Q.    Yeah.
13     A.    I'm trying to like -- visually I
14 might be able to -- because if it was on the 17th
15 of July, that's a Monday.  So, yeah, I worked that
16 whole week.
17     Q.    Okay.
18     A.    I was working six days during this
19 time period.  I was working six days pretty much
20 from June.  I was working Monday through Sunday
21 Or, sorry, I was working Sunday to Friday.
22     Q.    So to the best of your recollection,
23 you would have been there every day after the
24 strike notice was issued?
25     A.    Yeah.  No, yeah, absolutely.  Yeah.

Page 83

1      Q.    Do you recall what the general
2  atmosphere of the warehouse was after the strike
3  notice was issued, separate from the meetings that
4  you had with other management?
5      A.    It was tense.
6      Q.    And were you upset at IBT at all once
7  you saw the strike notice?
8      A.    No.
9      Q.    Did you discuss with any of your
10 colleagues whether the strike notice should have
11 been issued?
12     A.    I did not.
13     Q.    So I want to move forward to July
14 28th, 2023.  When you were let go from the company,
15 did you have a conversation with your supervisor?
16     A.    I had a conversation with the hub
17 manager, that's correct.
18     Q.    Is the hub manager your supervisor at
19 the -- was your supervisor at the corporation?
20     A.    No.  It would have been the general
21 operations manager, but we did not have a general
22 operations manager at the time.
23     Q.    Do you recall whether the manager
24 discussed the negotiations between IBT and Yellow
25 during that conversation?

Page 84

1      A.    I'm sorry.  What -- can we -- what
2  are we talking about?  Are we talking about the day
3  that I was laid off?
4      Q.    Right.  So --
5      A.    Okay.
6      Q.    -- you did have a conversation with
7  the hub operations manager; is that correct?
8      A.    The terminal manager.
9      Q.    The terminal manager.
10     A.    I believe is his official title; I'm
11 not sure.
12     Q.    So during that conversation with the
13 hub manager, do you recall discussing the
14 negotiations between Yellow and IBT?
15     MS. OLSEN:  Object to the form.
16     A.    Can you be more specific or --
17     Q.    (BY MS. NIGAM:)  What do you recall
18 about the conversation between the hub operations
19 manager and you on the day that you were let go?
20     A.    I can tell you that I got into work
21 at 4:00 a.m., which is start of the shift.  And it
22 was empty, the warehouse was empty.  I was really
23 sad.  Again, just moved.
24     And I remember seeing the terminal
25 manager walking by, and I just looked at him and I

Page 85

1  said:  What's it looking like?  And he looked at me
2  and he said:  It's -- it's your last day.  And I
3  was like:  Okay.  He said:  I'll call everyone in
4  shortly.
5          And then from there, we went in.  It
6  was me, the shift operations manager and the person
7  that would have been the general operations
8  manager, who would have been promoted to that
9  position was in there as well.  And then I want to
10 say it was two other supervisors and then myself.
11         And he kind of just said:  It's --
12 it's over, basically.  We -- we -- we could not
13 reach an agreement with IBT and, you know, we
14 didn't have a strike, which we thought was cool --
15 that's not what he said.
16         But he was like:  We didn't -- there
17 was no strike, which we thought would have got us
18 out of any potential, you know, downside, like that
19 would have -- the strike was the biggest reason to
20 be concerned.
21         The strike didn't happen.  We thought
22 that was it.  It's over because I -- I can't -- I
23 don't remember his exact words, but something to
24 the effect of that -- yeah, we were being laid off.
25 He was getting fired too so --

Page 86

1         Q.    So I think you had originally --
2  initially mentioned that, you know, on that day, on
3  July 28th, you had come in to work at 4:00 a.m.
4  The warehouse was empty and you were sad.
5          Why were you sad before the
6  conversation with your supervisor or with the hub
7  operations manager?
8     A.    There was probably a bunch of
9  reasons, to be honest.  I mean, that week, that
10 entire week, we were -- again, I'm just going to
11 bring out my calendar just to -- let's see.
12        Yeah, that whole week, we had seen --
13 I mean, I was -- I was very close with the shift
14 operations manager at the time.  I was on my way to
15 get a promotion to shift operations manager.
16 That's the reason I was working those six days.
17        I was seeing, just witnessing like
18 the warehouse get lesser and lesser and lesser in
19 terms of the volume of freight we were receiving,
20 the amount of trucks that were scheduled to come
21 in, like the amount -- all the operations stuff was
22 declining rapidly within that week.
23        And by the time I came in for shift
24 that morning, it was -- it was literally a ghost
25 town, like everything was empty.  And I was like,

Page 87

1  man, I'm like -- so that was -- that was the main
2  reason why I was sad.
3          MS. NIGAM:  So I want to go to Tab 8
4  now, if we can please bring that up.
5          (Exhibit 8 was marked for
6          identification.)
7          MS. NIGAM:  We will mark that as
8  Exhibit 8.
9     Q.    (BY MS. NIGAM:)  Mr. Torres, this is                    73
10 a copy of your separation agreement.
11    A.    Uh-huh.
12    Q.    Have you seen this document before?
13    A.    Yes.  On Oracle, yes.
14    Q.    You accessed the agreement through
15 Oracle?
16    A.    Yes.
17    Q.    Do you recall where you were when you
18 accessed the agreement?
19    A.    I remember I tried to log in at work
20 but it didn't -- it wasn't working, so -- it wasn't
21 working for a few of the associates as well.
22        I ended up going home and getting a
23 call from my terminal manager, and he said that it
24 should be active now, to try to log in.  It wasn't.
25 And then I got -- I want to say like an hour or two

Page 88

1  later, I got another call and I was finally able to
2  log in at my house.
3     Q.    When you had the initial discussion
4  at the warehouse with the hub manager, did they
5  mention needing to access the agreement through
6  Oracle?
7     A.    Yes.
8     Q.    So when you -- I'm sorry.  Did you
9  say that you were at home when you ultimately
10 accessed the agreement?
11    A.    Yes, that's correct.
12    Q.    Was there anybody else with you?
13    A.    No, I was by myself.
14    Q.    So if you look towards the middle of                    74
15 this first paragraph, the agreement says:  The
16 company submits this notice to you in part to
17 satisfy any obligation that may exist under the
18 federal Worker Adjustment and Retraining
19 Notification Act, collectively, the WARN Act.
20        Do you see that?                                          75
21    A.    Can you highlight it, please?
22    Q.    Do you see that, Mr. Torres?
23    A.    Yes.
24    Q.    And it goes on to state:  The company                   76
25 was not able to provide earlier notice of the

Page 89

1  shutdown as it qualifies under the unforeseeable
2  business circumstances, the faltering company, and
3  liquidating fiduciary exceptions set forth in the
4  WARN Act.
5        Do you see that?
6        A.    Yes.
7            MS. NIGAM:  If you scroll down,
8  there's a paragraph that starts:  Release of
9  Claims.  Right there, if you could highlight that,
10 please.
11       Q.    (BY MS. NIGAM:)  So do you see this
12 paragraph titled "Release of Claims"?
13       A.    Yes.
14       Q.    The first sentence states:  In
15 exchange for the severance payment, I, the below
16 undersigned, agree to voluntarily and knowingly
17 release the company.  And it continues for a bit.
18 Do you see that?
19       A.    Yes.
20       Q.    And the next sentence states:  I
21 agree that this release includes, without
22 limitation, any claims arising from or relating to
23 my employment with the company.
24       Do you see that part?
25       A.    That's correct.

Page 90

1        Q.    Now, if you flip to the page ending
2  in 3537, is that your signature, your electronic
3  signature on the bottom?
4        A.    Yes.
5        Q.    And the date is July 28th, 2023?
6        A.    Yes.
7        Q.    And it states in the last sentence:
8  I agree that this release can be executed
9  electronically, and I intend my electronic
10 signature below, via Oracle, to be equivalent to my
11 handwritten signature.
12       Do you see that?
13       A.    Yes.
14       Q.    You signed the agreement through --
15 electronically through Oracle; is that right?
16       A.    Yes.
17       Q.    And you didn't go to work after that,
18 correct?
19            MS. OLSEN:  Object to the form.
20       A.    I don't believe so.
21       Q.    (BY MS. NIGAM:)  Mr. Torres, we saw a
22 reference to severance payment earlier in this
23 document.  Do you recall receiving that payment?
24       A.    Yes.
25       Q.    Do you recall when you received that

Page 91

1  payment?
2        A.    I want to say it was the 31st.
3        Q.    And you have not returned that
4  severance money, correct?
5        A.    No.
6        Q.    Are you aware of any other document
7  or policy entitling you to a severance payment
8  other than your release agreement?
9        A.    No.
10           MS. OLSEN:  Object to the form.
11       Q.    (BY MS. NIGAM:)  All right.
12 Mr. Torres, I'm going to take a quick five to
13 ten-minute break, but I think I'm nearing the end
14 of my questioning.
15       A.    Okay.
16           MS. NIGAM:  If we could go off the
17 record, please.
18           THE VIDEOGRAPHER:  The time is 11:07
19 a.m.  This is the end of Media Unit Number 2.
20           (Whereupon, a break was had from
21           11:07 a.m. until 11:16 a.m. PDT)
22           THE VIDEOGRAPHER:  The time is 11:16
23 a.m.  This is the beginning of Media Unit Number 3.
24       Q.    (BY MS. NIGAM:)  Mr. Torres, before
25 the break, we were speaking about the day that you

Page 92

1  were laid off from the company.  Do you recall that
2  discussion?
3        A.    Yes.
4        Q.    You mentioned that you had an initial
5  discussion with the hub operations manager, and
6  then I believe you discussed two additional calls
7  you received from supervisors; is that correct?
8        A.    I think it was a single call from the
9  terminal.  If my memory serves correctly, it was a
10 single call.
11       Q.    And that -- in that call, the
12 terminal manager expressed to you how to access
13 Oracle; is that right?
14       A.    Yes.
15           MS. OLSEN:  Object to the form.
16       A.    Or not to -- not how to access,
17 just -- just said that I should be able to sign
18 whatever needs to be signed.
19       Q.    (BY MS. NIGAM:)  Did he specifically
20 mention Oracle?
21       A.    He said to log into Oracle to find
22 the -- yes.
23       Q.    So is it fair to say that there were
24 two conversations in which a supervisor mentioned
25 accessing an agreement through Oracle?

Page 93

1     A.    Being which ones?
2     Q.    The release agreement --
3     A.    The one when I was at work and then
4  the one when I got home?
5     Q.    Right.
6     A.    He told me to go on Oracle at, I
7  believe it was 9:00 a.m.
8     Q.    So two conversations in total with
9  instructions on accessing your agreement through
10  Oracle?
11     A.    There was -- there was one
12  conversation about the instructions, and that was
13  when I was at the terminal.  And then when I got
14  home, there was a -- I guess you would say a
15  reminder to go online at the specified time, and
16  that I should be able to access what needed to be
17  accessed at that time.
18     Q.    Do you recall that day or shortly
19  thereafter discussing the unfortunate layoffs with
20  any of your colleagues?
21     A.    Just discussing what happened?
22     Q.    Sure.
23     A.    Yeah, I got a handful of calls from
24  people.  The same friend that I lifted weights
25  with, you know, was like:  Dude, we should have --

Page 94

1  I think he said something like:  We should just do
2  steroids and make YouTube blogs.  And I was like:
3  Dude, we've got all the time now.
4         But that was -- you know, there was a
5  handful of people, I said:  Hey, if you need to use
6  me as a reference, by all means, to a lot of
7  people, and, you know, they kind of were saying the
8  same thing.
9     Q.    Did anybody raise any questions with
10  you about how to access their release agreement?
11     A.    The day after?
12     Q.    That day or shortly after that.
13     A.    I can't recall at this time.
14     Q.    So no recollection of if someone
15  said:  Hey, I don't even know how I'm supposed to
16  see this release agreement or if I've been laid
17  off, anything like that?
18     A.    There was -- I want to say -- it's a
19  little bit over a year now too so it's like kind of
20  hard to remember.
21         I do -- I do recall -- I recall a
22  friend of mine saying that he couldn't access
23  Oracle the day after.  I told him to call Chris,
24  my -- the terminal hub manager -- the terminal
25  manager, excuse me.

Page 95

1         I think that was the day of, if I
2  recall correctly.
3     Q.    Is Chris the same terminal manager
4  that gave you the call about accessing Oracle?
5     A.    Yes.  And, if I recall correctly too,
6  I don't know if it's pertinent, but I do remember
7  now that it was text messages, it wasn't a phone
8  call.
9     Q.    So one in-person discussion and one
10  text message conversation?
11     A.    Yeah, he said -- I just remember at
12  the very end of that text conversation, he said:
13  Call me if you need anything, I'm here for you,
14  something like that.
15     Q.    Mr. Torres, have you answered all my
16  questions to the best of your ability today?
17     A.    Yes.
18     Q.    Is there anything from your testimony
19  today that you would like to change or correct
20  before we conclude?
21     A.    I don't believe so.
22     Q.    Is there anything that we haven't
23  discussed that you feel would be important to add?
24         MS. OLSEN:  Object to the form.
25  Lacks foundation, vague.

Page 96

1     A.    I loved Yellow.  I planned to spend
2  my career there.  I loved doing the operation and
3  what I did.  I loved seeing the way that the work
4  was carried out.
5         A lot of the associates, union or
6  not, and a lot of the management I still speak to
7  to this day.  And I would like to think that I
8  impacted their lives relatively positively.  And I
9  would say, without a doubt, that they have impacted
10  my lives positively.
11         One of the guys, like I said, he
12  worked there since he was eighteen years old, and
13  he was in his late fifties.
14         And he still texts me to this day
15  just about football or who I'm drafting in fantasy
16  leagues, you know.  And I'm really sad.  I just --
17  when I think about it, I get really bummed out.
18         MS. NIGAM:  Mr. Torres, thank you so
19  much for your time.  I have no further questions,
20  subject to any redirect that your counsel may have.
21         MS. OLSEN:  I don't have any
22  questions for you, Mr. Torres.
23         THE WITNESS:  Cool.
24         THE VIDEOGRAPHER:  Is that it, then?
25  Anyone else?

Page 97

1        Okay.  The time is 11:24 a.m.  This
2  is the end of Media Unit Number 3, the end of the
3  deposition.
4        THE REPORTER:  Ms. Olsen, would you
5  like a copy?
6        MS. OLSEN:  I would.
7        THE VIDEOGRAPHER:  Who needs a copy
8  of the video besides --
9        MR. CARREON:  This is Ryan Carreon
10  from Morris James, I'd like a copy of the
11  transcript, please.
12        THE REPORTER:  Sure.
13        MS. OLSEN:  I'm not sure if I'm going
14  to need the video.  Let me just begin with the
15  transcript and then I'll make a decision about the
16  video later.
17        THE REPORTER:  There was one more
18  person, Rebecca Kanner.  Do you need a copy of the
19  transcript?  She may not be here anymore.  Rebecca
20  Kanner, are you online?
21        THE CONCIERGE:  I don't see her.
22        (Off-the-record discussion.)
23        FURTHER THE DEPONENT SAITH NOT
24
25    (Deposition concluded at 11:25 a.m. PDT)

Page 98

1        C E R T I F I C A T E
2
3
4  STATE OF ALABAMA
5  JEFFERSON COUNTY
6        I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotypy, and the questions and answers thereto
9  were reduced to typewriting under my supervision,
10  and that the foregoing represents a true and
11  correct transcript of the deposition given by said
12  witness upon said hearing, to the best of my
13  ability.
14        I further certify that I am neither
15  of counsel nor of kin to the parties to the action,
16  nor am I in anywise interested in the result of
17  said cause.
18
19    <%18409,Signature%>
20    LAURA H. NICHOLS
21    Commissioner-Notary Public, State of AL
22    ACCR License No. 3, Exp. 9/30/2024
23    GA CCR No. 2714, Exp. 4/1/2025
24    TN LCR No. 679, Exp. 6/30/2025
25    Transcript Certified on 8/23/2024

## Annotation Notes

1.  **Pg: 10 Ln: 25 - Pg: 11 Ln: 3**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

2.  **Pg: 22 Ln: 7 - 17**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

3.  **Pg: 22 Ln: 21 - 23**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

4.  **Pg: 23 Ln: 7 - 9**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

5.  **Pg: 24 Ln: 23 - 25**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

6.  **Pg: 25 Ln: 1 - 2**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

7.  **Pg: 25 Ln: 3 - 23**

    **Note:** No Note Provided

    **Linked Issues:** Moore Counter

8.  **Pg: 25 Ln: 3 - 23**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Obj to Counter

9.  **Pg: 25 Ln: 24 - Pg: 26 Ln: 8**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Obj to Counter

10. **Pg: 32 Ln: 23 - Pg: 33 Ln: 14**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

11. **Pg: 33 Ln: 15 - 19**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

12. **Pg: 33 Ln: 23 - Pg: 34 Ln: 18**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

13. **Pg: 35 Ln: 15 - Pg: 36 Ln: 10**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

14. **Pg: 36 Ln: 11 - 23**

   **Note:** No Note Provided

   **Linked Issues:** Moore Counter

15. **Pg: 36 Ln: 24 - Pg: 37 Ln: 8**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

16. **Pg: 37 Ln: 9 - 13**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

17. **Pg: 39 Ln: 12 - 13**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

18. **Pg: 39 Ln: 15 - 17**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

19. **Pg: 39 Ln: 18 - 22**

   **Note:** No Note Provided

19. **Pg: 39 Ln: 18 - 22** continued...

   **Linked Issues:** Yellow Affirmative

20. **Pg: 39 Ln: 23 - Pg: 40 Ln: 5**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

21. **Pg: 40 Ln: 6 - 19**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

22. **Pg: 40 Ln: 20 - 22**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

23. **Pg: 40 Ln: 23 - 25**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

24. **Pg: 41 Ln: 1 - 3**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

25. **Pg: 41 Ln: 4 - 24**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

26. **Pg: 42 Ln: 6 - 14**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

27. **Pg: 42 Ln: 15 - 22**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

28. **Pg: 42 Ln: 23 - Pg: 43 Ln: 1**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

29. **Pg: 43 Ln: 5 - 10**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

30. **Pg: 44 Ln: 11 - 19**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

31. **Pg: 44 Ln: 19 - 20**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

32. **Pg: 46 Ln: 11 - Pg: 47 Ln: 1**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

33. **Pg: 47 Ln: 17 - 20**

   **Note:** No Note Provided

   **Linked Issues:** Coughlen Counter

34. **Pg: 47 Ln: 21 - 24**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

35. **Pg: 47 Ln: 25 - Pg: 48 Ln: 1**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

36. **Pg: 48 Ln: 2 - 6**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

37. **Pg: 49 Ln: 3 - 6**

   **Note:** No Note Provided

   **Linked Issues:** Moore Counter

38. **Pg: 49 Ln: 3 - 6**

   **Note:** No Note Provided

**38.  Pg: 49 Ln: 3 - 6** continued...

**Linked Issues:** Yellow Obj to Counter

**39.  Pg: 49 Ln: 7 - 10**

**Note:** No Note Provided

**Linked Issues:** Yellow Obj to Counter

**40.  Pg: 49 Ln: 11 - 14**

**Note:** No Note Provided

**Linked Issues:** Moore Counter

**41.  Pg: 49 Ln: 15 - 19**

**Note:** No Note Provided

**Linked Issues:** Yellow Counter Px Affirmative

**42.  Pg: 49 Ln: 15 - 19**

**Note:** No Note Provided

**Linked Issues:** Yellow Obj to Counter

**43.  Pg: 50 Ln: 14 - 24**

**Note:** No Note Provided

**Linked Issues:** Yellow Affirmative

**44.  Pg: 51 Ln: 2 - 5**

**Note:** No Note Provided

**Linked Issues:** Yellow Affirmative

**45.  Pg: 52 Ln: 13 - 15**

**Note:** No Note Provided

**Linked Issues:** Yellow Affirmative

**46.  Pg: 52 Ln: 16 - 19**

**Note:** No Note Provided

**Linked Issues:** Yellow Affirmative

**47.  Pg: 52 Ln: 20 - 24**

**Note:** No Note Provided

**Linked Issues:** Yellow Affirmative

48. **Pg: 53 Ln: 9 - 19**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

49. **Pg: 53 Ln: 23 - Pg: 54 Ln: 7**

   **Note:** No Note Provided

   **Linked Issues:** Coughlen Counter

50. **Pg: 58 Ln: 1 - 14**

   **Note:** No Note Provided

   **Linked Issues:** Moore Counter

51. **Pg: 58 Ln: 1 - 14**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Obj to Counter

52. **Pg: 58 Ln: 15**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Obj to Counter

53. **Pg: 59 Ln: 18 - Pg: 60 Ln: 5**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

54. **Pg: 60 Ln: 6 - Pg: 61 Ln: 24**

   **Note:** No Note Provided

   **Linked Issues:** Moore Counter

55. **Pg: 62 Ln: 4 - 7**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

56. **Pg: 62 Ln: 10 - 15**

   **Note:** No Note Provided

   **Linked Issues:** Yellow Affirmative

57. **Pg: 62 Ln: 25 - Pg: 63 Ln: 11**

   **Note:** No Note Provided

**57.** **Pg: 62 Ln: 25 - Pg: 63 Ln: 11** continued...

    **Linked Issues:** Yellow Affirmative

**58.** **Pg: 63 Ln: 20 - 22**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**59.** **Pg: 63 Ln: 23 - Pg: 64 Ln: 1**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**60.** **Pg: 64 Ln: 4 - 11**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**61.** **Pg: 68 Ln: 14 - Pg: 69 Ln: 8**

    **Note:** No Note Provided

    **Linked Issues:** Moore Counter

**62.** **Pg: 69 Ln: 9 - 10**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Counter Px Affirmative

**63.** **Pg: 69 Ln: 13 - 15**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Counter Px Affirmative

**64.** **Pg: 69 Ln: 16 - Pg: 70 Ln: 11**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**65.** **Pg: 71 Ln: 1 - 20**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**66.** **Pg: 76 Ln: 13 - 20**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**67.** **Pg: 80 Ln: 7 - Pg: 81 Ln: 6**

    **Note:** No Note Provided

    **Linked Issues:** Moore Counter

**68.** **Pg: 80 Ln: 7 - Pg: 81 Ln: 6**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Obj to Counter

**69.** **Pg: 81 Ln: 7 - 19**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Obj to Counter

**70.** **Pg: 81 Ln: 21 - 25**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Obj to Counter

**71.** **Pg: 82 Ln: 1 - 2**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Obj to Counter

**72.** **Pg: 84 Ln: 17 - Pg: 87 Ln: 2**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**73.** **Pg: 87 Ln: 9 - Pg: 88 Ln: 7**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**74.** **Pg: 88 Ln: 14 - 19**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**75.** **Pg: 88 Ln: 20 - 24**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**76.** **Pg: 88 Ln: 24 - Pg: 89 Ln: 4**

    **Note:** No Note Provided

**76.** **Pg: 88 Ln: 24 - Pg: 89 Ln: 4** continued...

    **Linked Issues:** Yellow Affirmative

**77.** **Pg: 89 Ln: 5 - 6**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**78.** **Pg: 89 Ln: 14 - Pg: 90 Ln: 13**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**79.** **Pg: 90 Ln: 14 - 18**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**80.** **Pg: 90 Ln: 20 - Pg: 91 Ln: 9**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**81.** **Pg: 92 Ln: 4 - 14**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**82.** **Pg: 92 Ln: 16 - Pg: 93 Ln: 5**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**83.** **Pg: 93 Ln: 6 - 17**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**84.** **Pg: 95 Ln: 3 - 4**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

**85.** **Pg: 95 Ln: 5 - 14**

    **Note:** No Note Provided

    **Linked Issues:** Yellow Affirmative

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                                          |   |                              |
|------------------------------------------|---|------------------------------|
|                                          | . | Chapter 11                   |
| IN RE:                                   | . | Case No. 23-11069 (CTG)      |
|                                          | . |                              |
| YELLOW CORPORATION, *et al.*,            | . | (Jointly Administered)       |
|                                          | . |                              |
|                Debtors.                  | . | **Re: Docket Nos. 5523 & 5448** |
| . . . . . . . . . Document . . .         | . |                              |
|                                          | . |                              |
| JEFF MOORE, ELIZABETH BROOKE             | . | Adv. Pro. No. 23-50457 (CTG) |
| MOORE, AND VIDAL TORRES ON               | . |                              |
| BEHALF OF THEMSELVES AND ALL             | . | **Re: Docket Nos. 208 & 214** |
| OTHERS SIMILARLY SITUATED,               | . |                              |
|                                          | . |                              |
|            Plaintiffs.                   | . |                              |
|                                          | . |                              |
|       v.                                 | . |                              |
|                                          | . |                              |
| YELLOW CORPORATION, *et al.*,            | . |                              |
|                                          | . |                              |
|            Defendants.                   | . |                              |
| . . . . . . . . . . . . . . . .          | . |                              |
|                                          | . |                              |
| WILLIAM G. COUGHLEN, *et al.*,           | . | Adv. Pro. No. 23-50761 (CTG) |
|                                          | . |                              |
|            Plaintiffs.                   | . | **Re: Docket Nos. 163 & 169** |
|                                          | . |                              |
|       v.                                 | . | Courtroom No. 7              |
|                                          | . | 824 North Market Street      |
| YELLOW CORPORATION, *et al.*,            | . | Wilmington, Delaware 19801   |
|                                          | . |                              |
|            Defendants.                   | . | Tuesday, January 21, 2025    |
| . . . . . . . . . . . . . . . .          | . | 9:30 a.m.                    |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE


(APPEARANCES CONTINUED)

```
 1   APPEARANCES (CONTINUED):

 2   For the Debtors:          Allyson Smith, Esquire
                               KIRKLAND & ELLIS LLP
 3                             KIRKLAND & ELLIS INTERNATIONAL LLP
                               601 Lexington Avenue
 4                             New York, New York 10022

 5
                               Michael Esser, Esquire
 6                             KIRKLAND & ELLIS LLP
                               KIRKLAND & ELLIS INTERNATIONAL LLP
 7                             555 California Street
                               27th Floor
 8                             San Francisco, California 94104

 9                             Neha Nigam, Esquire
                               Michael Sciaccotta, Esquire
10                             KIRKLAND & EILLIS LLP
                               KIRKLAND & ELLIS INTERNATIONAL LLP
11                             333 West Wolf Point Plaza
                               Chicago, Illinois 60654
12
     For the Teamsters:        Yingtao Ho, Esquire
13                             THE PREVIANT LAW FIRM, S.C.
                               310 West Wisconsin Avenue
14                             Suite 100 MW
                               Milwaukee, Wisconsin 53203
15
     For the Committee:        Kevin Zuzolo, Esquire
16                             AKIN GUMP STRAUSS HAUER & FELD LLP
                               One Bryant Park
17                             Bank of America Tower
                               New York, New York 10036
18
     (APPEARANCES CONTINUED)
19
     Audio Operator:           Teasha Marsh, ECRO
20

21   Transcription Company:    Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email:  gmatthews@reliable-co.com

24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

3

1  APPEARANCES (CONTINUED):

2  For the PBGC:              Stephanie Thomas, Esquire
                              PENSION BENEFIT GUARANTY CORPORATION
3                             1200 K Street, N.W.
                              Suite 320
4                             Washington, DC 20005

5  For the Moore
   Plaintiffs:                Jack Raisner, Esquire
6                             RAISNER ROUPINIAN LLP
7                             270 Madison Avenue
                              Suite 1801
8                             New York, New York 10016

9  For the Coughlen
   Plaintiffs:                Eric Monzo, Esquire
10                            MORRIS JAMES LLP
                              500 Delaware Avenue
11                            Suite 1500
12                            Wilmington, Delaware 19801

13

14

15

16

17

18

19

20

21

22

23

24

25

1  called Conway, which was another national LTL company, and I

2  spent four years there.

3  Q     Did you come back to Yellow after that?

4  A     I did.  I was recruited back to Yellow when there was

5  a leadership change.  And I came back as a senior vice

6  president.

7  Q     Did your role change after that?

8  A     It did.  About a year in, it changed to president.

9  And then four or so years later, it changed to president of

10 the entire holding company and chief operating officer.  And

11 then four months after that, I became CEO.

12 Q     When did you become a CEO?

13 A     2018.

14 Q     How long did you hold that position?

15 A     Six years.

16 Q     Sir, could you please describe the company's business

17 at the time you began as CEO?

18 A     Yellow was the largest unionized LTL company in North

19 America.  We dealt with commercial, industrial, retail

20 clients that shipped less-than-truckload shipments, average

21 of about 1,200 pounds per shipment.  We would consolidate

22 those and move them nationwide and Canada.

23 Q     You mentioned a portion of Yellow's employee base was

24 Unionized, approximately how much?

25 A     Two-thirds.

1    Q      Sir, in the year preceding the company's bankruptcy,

2    what did Yellow's average shipment volumes look like?

3    A      Around 50,000 shipments per day.

4    Q      Shifting gears a bit.  Are you familiar with the term

5    "One Yellow?"

6    A      I am.

7    Q      What was One Yellow?

8    A      Yellow was made up of five separate companies.  They

9    had been acquired over time.  There were regional companies,

10    a national company and they all operated in similar markets.

11    For instance, in this market that we're in today, you would

12    have had three of our operating companies operating in that

13    market.  So, they would -- we could have three company

14    drivers at one customer at the same time.  The purpose of One

15    Yellow was to eliminate that redundancy and do that

16    geographically with one company and one face to the customer.

17    Q      Did Yellow plan to implement that One Yellow plan in

18    phases?

19    A      Yes, in three phases.

20    Q      What did Phase One entail?

21    A      It was the West Coast.  There were two companies

22    involved there:  YRC Freight, which was the national company,

23    and Reddaway, which was the western company that covered the

24    eleven western states.  And that was phase one of One Yellow.

25    Q      When was that phase completed?

1    of information about the negotiations between the IBT and

2    Yellow to implement phase two during 2022 and 2023.  I'd like

3    to focus with you on the period directly leading up to the

4    IBT strike notice.  What was the state of Yellow's financials

5    during the summer of 2023?

6    A    We were having a liquidity issue.  When you look at

7    what was happening in the overall economy and other pieces,

8    we knew that without -- it was crucial to get phase two

9    completed because our refinancing, basically, hinged on the

10   completion of phase two and that we needed to get that done

11   before August.

12            MR. HO:  Your Honor, I do object to the witness

13   having the document in front of him without further reports

14   being shown in the last week collection of what he's

15   testifying about.

16            THE COURT:  Mr. Esser.

17            MR. ESSER:  Your Honor, the witness has testified

18   that he helped prepare this demonstrative.  He has

19   recollection about it.  We asked permission to publish.  He's

20   using it to aid his testimony today.

21            THE COURT:  So, I think that that is fine.

22   That is the question that was addressed when you asked to

23   publish, and so I'll permit it.  If there's a particular

24   issue with respect to the testimony, I'll hear a specific

25   objection, if and when it were to arise.  But I don't think I

1  need to bar the witness from referring to the document under

2  the circumstances.  So, you can proceed.

3          MR. ESSER:  Thank you, Your Honor.

4  BY MR. ESSER:

5  Q    Sir, what measures did Yellow take to address the

6  possible liquidity issues at the company?

7  A    Yeah, well the first was to get phase two completed.

8  So, we worked with union leadership in trying to get that

9  process wrapped up and implemented.  Second, we hired a firm

10 to help us look at strategic options for refinancing.

11 Q    Sir, did phase two involve negotiations with the

12 unions?

13 A    Yes.

14 Q    Did it involve negotiations with the IBT?

15 A    Yes.

16 Q    And just for the record, what does "IBT" stand for?

17 A    International Brotherhood of Teamsters.

18 Q    Sir, at a high level, what did those negotiations

19 entail?

20 A    Well, it was on the company to prepare all the

21 documents around this process and then to meet with the Union

22 leadership and discuss that because the Union is in control

23 of any seniority impacts that we have in that process.  So

24 the company put all the information together, and then there

25 would be a meeting to discuss that.

1  Q     Throughout your negotiations with the IBT, did you

2  believe a deal could be reached?

3  A     Yes.

4  Q     Why?

5  A     Well, we had always -- we had done a lot of change of

6  operations over the years.  There's a contractual process for

7  that.  We've always been able to accomplish that process.  So

8  I had no reason to think that I wouldn't be successful in

9  doing it this time.

10 Q     Now, you mentioned Ducera.  What specifically were

11 they working on?

12 A     We had a term loan.  We had a loan with the U.S.

13 Treasury.  They were looking at all options around that in

14 replacing that financing, adjusting that, freeing up

15 liquidity for the company so that we would have an

16 appropriate runway to accomplish all the things that I

17 mentioned.

18 Q     And you mentioned contingency planning during this

19 summer.  Can you explain that a bit further?

20 A     Yeah, well, contingency planning as the summer went on

21 -- a lot of it was around how long the liquidity was going

22 to last, and absent a deal, what steps could be taken to

23 ensure that we created enough time to get a deal done.

24 Q     Sir, we'll get to the strike notice on this timeline

25 in a bit but prior to the strike notice, was Yellow actively

```
 1  preparing for bankruptcy in the summer?
 2  A     No.
 3  Q     Focusing on the June and July period during 2023,
 4  sir, did you send updates to employees about the ongoing
 5  negotiations with the IBT?
 6  A     Yes.
 7  Q     Why did you send those communications?
 8  A     To be transparent.  I had been at the company a long
 9  time.  I was well-known.  Many of the employees knew me
10  personally, and vice versa.  I wanted to make sure that they
11  were informed of the events that were playing out.  There was
12  a tremendous amount of media coverage and other things that
13  were happening, and I wanted to make sure that everyone had
14  accurate information as it involved all of our employees.
15  Q     Let's look at some of those communications.  Let's
16  first focus on the June 8th e-mail to employees listed here
17  as JX-41, which I believe JX-41 should be in your binder if
18  you turn to that tab.
19         MR. ESSER:  And Your Honor, this document is
20  already in evidence, so permission to publish?
21         THE COURT:  Any objection?
22         MR. HO:  No.
23         THE COURT:  You may do so.
24  BY MR. ESSER:
25  Q     And Mr. Hawkins, do you recognize this e-mail?
```

47

1  Mr. Hawkins, Hawkins Demo X-1.  I'd like to talk about the

2  June 14th to 15th entry on the timeline.  What happened then,

3  backing up a bit?

4  A    We had discussed many options.  And one of our largest

5  expenses each month was around $50 million that we

6  paid in health care and pension benefits to the funds.  And

7  in a way to extend the runway so that we could get a deal

8  done, and this was something we had done before, we reached

9  out to Central States and some other funds and requested a

10  two-month deferral on contributions.

11  Q    Why did Yellow seek these deferrals?

12  A    Well, it was impactful.  It would give us additional

13  time.  We had used this exact process before to free up

14  liquidity to keep going and also successfully done it without

15  the employees being absent their health care benefits by us

16  making a retroactive -- the benefits stayed retroactive, and

17  then we paid what we owed for the deferral.

18  Q    Were you hopeful these requests would be granted?

19  A    Certainly, yes.

20  Q    Why?

21  A    Well, that gave us the opportunity to put something

22  together that would allow us to move forward with the

23  refinancing, have time to further negotiate with the union

24  and get something done on phase two.

25  Q    What happened with the requests?

1  A      They were denied.

2  Q      Fast forwarding to the July 7th entry on your timeline,

3  what happened?

4  A      We did not make the payments.  Our plan was to move

5  forward exactly with the deal that we had offered for a two-

6  month deferral, but making those payments would create a

7  liquidity issue that we might not be able to tolerate.

8  Q      Even after not making those contributions, did Yellow

9  still hope to get to a deal with the Teamsters and their

10  pensions?

11  A      That's why -- absolutely.  That's why I did not make

12  the contributions, was to have time to work a deal out.

13  Q      Did not making these payments solve Yellow's

14  liquidity situation?

15  A      No, not long-term.

16  Q      Were you still seeking to negotiate One Yellow with

17  the IBT after not making these contribution payments?

18  A      Yes, it was the number one priority.

19  Q      Okay.  I'd like to focus on July 17th, 2023.  What

20  happened that day?

21  A      It was a Monday, and that -- late in the day, I became

22  aware that a strike notice had been issued with a specific

23  date of the following Sunday at midnight.  It was very

24  surprising.  It started a whirlwind of activity that

25  very night with customers, employees, media and other

 1  avenues.

 2  Q     Let's talk about the aftermath of the strike notice.

 3  Did you help prepare a second demonstrative that's just

 4  specific to the post-strike notice aftermath?

 5  A     Yes.

 6  Q     If you could turn to Tab Hawkins Demo X-2 in your

 7  binder?

 8  A     Okay.

 9  Q     Is that that demonstrative?

10  A     It is.

11  Q     And will it aid with your testimony today?

12  A     Yes.

13         MR. ESSER:  Your Honor, permission to publish?

14         THE COURT:  Any objection?

15         MR. HO:  I object to the witness using this

16  document to refresh his recollection.  I won't object to the

17  document so long as it's not being offered as evidence.

18         THE COURT:  The document is not being

19  offered as evidence.

20         MR. HO:  I object to the witness using this

21  document to refresh his recollection unless it's been shown

22  he cannot remember something first.

23         MR. ESSER:  Your Honor, I believe I laid the

24  requisite foundation that it will aide his testimony here

25  today.

 1              THE COURT:  Yeah, but that's different from

 2   testimony about refreshed recollection.  Why don't you

 3   proceed by asking the witness what he remembers, and if we

 4   run into an issue, we can deal with it then?

 5              THE WITNESS:  So, close the document?

 6              THE COURT:  Yes.

 7   BY MR. ESSER:

 8   Q      Sir, was the company surprised by the strike notice

 9   on July 17, 2023?

10   A      Yes, we were shocked.

11   Q      Why?

12   A      A strike notice in this precarious time period with a

13   date on it of the following Sunday forces action in the

14   marketplace.  The one thing that had always been consistent

15   at the company, regardless of how public our negotiations

16   were over decades, was that our foundational customers always

17   stayed with us.  They would ignore all the doom and gloom.

18   Those foundational customers were also shocked by the strike

19   notice with a date on it.  And with that being public, they

20   had no choice but to make decisions to start diverting

21   shipments.  And that started immediately.

22          I'd been at the company a long time.  I had

23   relationships with the majority of our large customers.  And

24   for the 24 hours -- the first 24 hours into a strike notice,

25   I was just inundated with those conversations.  And they were

 1  all very similar, that they were -- they were moving their

 2  business.  Some of the customers were so large, they couldn't

 3  move it immediately.  It took them a day or two, but it just

 4  created a domino effect.  And we watched our shipments

 5  evaporate over those days, and that had never happened like

 6  that before.

 7  Q    I'd like to talk with you about the days immediately

 8  following July 17.  Could you describe the atmosphere at the

 9  company during those days?

10  A    Chaos.  It was -- there was a lot going on.  We were

11  having to plan for a date of a strike.  There were

12  absenteeism just because in a unionized environment, if

13  there's anything that comes up like that, you know, people

14  use sick days, PTO days, other things, as well.  And then

15  with the falling shipment counts.  We plan our work, and then

16  we work that plan.  And because of that, we didn't have the

17  freight, so we had people in the wrong places.  It was

18  incredibly expensive to the company trying to manage all that

19  and confusing in that process.  And then came the issue of

20  planning for the actual date of the intended strike of that

21  Sunday and how we would manage the equipment and those type

22  things.

23  Q    Was the press following the situation?

24  A    Immensely.  There was tremendous coverage on this

25  event.

1   Q      Was this the day after the strike notice?

2   A      Yes.

3   Q      Given the amount of press and social media engagement

4   at the time, what was your impression of the morale of the

5   employees at Yellow?

6   A      They were highly concerned.  You know, some of the

7   employees had been around long enough that they had

8   experienced a strike.  I was there in '94 when the last

9   strike occurred.  And they were very concerned.  They knew

10  the condition of the company.  We had been very public about

11  that through a variety of ways; and also know that, you know,

12  a walk-out in honoring a strike notice, if that was, you

13  know, completed, would be an extreme challenge.

14  Q      Sir, based on that testimony, did you believe that

15  employees were aware of the strike notice's impact on the

16  company?

17  A      Absolutely.

18  Q      Now, earlier you mentioned customers were leaving,

19  specifically institutional customers, after the July 17th

20  strike notice.  Could you please describe that a little bit

21  more?

22  A      Yeah, so at Yellow, you know, we moved America.  So,

23  all of the big retailers that you either shop at daily or

24  online, that was the core of our business.  And we had really

25  good relationships -- long-term relationships with some of

1       Why did you make this decision to disclose

2  communications between you and the IBT at this time?

3

4  A     Well, in the timing, so the strike notice, July 17th, I

5  sent this on July 20th.  This was to show the employees and,

6  hopefully, our customers that there were negotiations

7  happening.  There were discussions, that that voice of the

8  employee could be heard at the local unions.  And they do a

9  very nice job of making sure that what's shared locally is

10 shared, you know, across that; that everyone would know what

11 was going on because at this period of time, there -- no one

12 knew, except me and the union leadership, that there had been

13 these exchanges.

14 Q     Now, what did you believe was at stake at this time?

15 A     Yeah, it was the same as it had been all summer long.

16 What's at stake is if we don't negotiate and complete Phase

17 2, I won't get refinancing that will move us out of this.

18 And also, now that shipments were plummeting, the liquidity

19 piece would be quite a challenge.  And the day before this

20 was my first notice that Citizens had frozen the ABL, so the

21 first 25 million of the ABL.

22 Q     Did you believe you were communicating those stakes

23 to your employees?

24 A     Absolutely.

25 Q     Now, did union employees have e-mail addresses?

1    A    Some did, most didn't.  We would send out a document

2    like this and everyone at the facilities that had e-mails,

3    the terminal manager would print it and post it.  But there

4    was a -- a good process in place as soon as it was posted or

5    all the union employees that worked in customer service and

6    others -- you know, some were around -- over a thousand, all

7    had e-mail.  And as soon as they would get it, they would

8    take a picture of it with their phone and then put it on

9    trucking boards, social media.  FreightWaves would pick it

10   up.  And it's amazing how efficient it was on any information

11   we sent out became public almost immediately.  But that's how

12   it was shared.

13   Q    You anticipated my next question.  Did you often see

14   your all-hand e-mails appear on FreightWaves and trucking

15   boards?

16   A    I did.

17   Q    Sir, amidst -- we can take this document down.  Amidst

18   all the publicity we've discussed, what was the

19   company doing to prepare for the possibility of a strike

20   actually taking place?

21   A    Yeah, so any large trucking company that you see on the

22   roads every day, the way this process works is we all run

23   24/7, 365.  So, all of our equipment is never at our

24   facilities.  We actually don't have the space to store all of

25   our equipment because our drivers are out 24/7, 365.  If all

1  that equipment comes home, it's grid lock.  And of course

2  that's what we were having to do.  Our experiences with

3  previous situations like this, from a strike standpoint, we

4  didn't want any equipment abandoned on public roadways.

5       We didn't want to endanger any of our employees by –

6  if the walk-out were going to occur at Sunday night at

7  midnight, we had to make sure everyone was off the roads.  If

8  they're at the facilities, that we've got a way to handle

9  that.  And it just is a complex process and incredibly

10  expensive process to do that because you're no longer running

11  a route to where the freight is supposed to go.  You're

12  taking the shipments to where they will fit in a yard and you

13  can secure the equipment.

14       So, we continued that that entire week.  In the middle

15  of all the other chaos that was going on, we developed a plan

16  around how to actually protect our equipment, the customer

17  shipments that were left in the network, et cetera.

18  Q     Did your management team have a group focused on

19  strike preparations?

20  A     They did.  There was a whole process and plan around

21  that.  The customer service was inundated with customers

22  needing shipments.  You know, with our industrial exposure,

23  there could be plants that were going to shut down because of

24  the shipments, which is their inventory that they hadn't

25  received.  So, we were picking through the freight, trying to

1  deliver what was most important to customers that were going

2  to be in a very precarious situation if we didn't.

3      So, we planned that throughout the entire week.  But we

4  knew on Saturday that we had to halt all those operations.

5  And from Saturday evening through Sunday at midnight, that

6  the complete focus had to be on having equipment inside the

7  facility.

8  Q    Now, was one of the focuses of this group employee

9  safety?

10 A    Absolutely, first and foremost.  Emotions were high.

11 If you're going to have -- if they are going to walk out and

12 those things are going to occur, you've got to make sure that

13 they're in a position to -- to do that.  And us try to

14 prevent anything terrible from playing out, so.

15           MR. HO:  Your Honor, I'm going to object to the

16 relevance of this line of testimony.  We're talking about the

17 legality of the notice.  There was concern for the safety of

18 employees is too far beyond the scope of what is actually

19 relevant for the purpose and the warrant good faith.

20           MR. ESSER:  Your Honor, concern for employee

21 welfare is one of the factors that courts look at when

22 determining both subjective and objective good faith under

23 the good faith standard.  And this testimony is directly

24 relevant to that.

25           THE COURT:  Alright, look, there are cases that

1   mean, literally, we had trailers touching each other when we

2   tried to get all our equipment on terminal lots and gates

3   locked.  So, undoing that and then resetting to try and run

4   the operation would be a multiday event.  And kind of the

5   year like we're in now, when unexpected snowstorms would

6   come, when we would have one area of our network log jammed

7   because of snowstorms and not being able to move, it would

8   take weeks to unwind it.  In this case, we had the entire

9   network in that situation.  So, it was a very difficult

10  process to get those things accomplished.

11  Q    So on the Monday after the strike notice was called

12  off, July 24, was Yellow in a position to continue accepting

13  new shipments?

14  A    Barely.  We were trying to get the freight that we

15  already had freed up.  And also at this point, customers are

16  insisting on priority delivery and getting that accomplished

17  for those that had the most pressing need.

18  Q    Now, I'd like to talk about the Wednesday of that

19  week, July 26th.  What is the significance of that date to

20  you?

21  A    Well, that's the day that I told union leadership

22  that I would not have the liquidity to pay employees beyond

23  that week; and with what we've seen from the customer

24  response and the freight's not coming back any time soon.

25  And because of that and how things had played through, this

1  was -- we were going to have to liquidate the company.  And

2  the plan for liquidating the company is -- that was the day I

3  realized that we'd crossed over to a point of -- I could not

4  get this company back in business.

5  Q    Now, what did Yellow do after deciding to liquidate

6  the company?

7  A    We started making a plan on how to do an orderly

8  close and put a process in place that would protect

9  employees, protect shipments, be respectful in every way we

10 could to all the people involved; unions, vendors, lenders,

11 the United States government, everybody that was involved in

12 this great company that, you know, we would -- we would do

13 that as timely and as efficiently and as safely as possible.

14 Q    You mentioned safety.  What were Yellow's

15 considerations in this shutdown process?

16 A    Well, the first is:  How do we do it with the activity

17 that's going on.  We're still delivering shipments, working

18 through all of that.  And based on what happened the

19 prior week and just the nature of our business, Sunday is the

20 day we have the least employees present.  We decided, as we

21 were developing a process to liquidate, that Sunday in

22 daylight hours would be the most ideal time; and to

23 coordinate and plan the next few days to try to make that

24 happen.

25          MR. HO:  Your Honor, I'm going to make the same

1  critical shipments through Saturday.  And then into Saturday

2  evening, the only process -- the only part of the process

3  left was to ensure all equipment was inside the gates and we

4  had all of our employees back at our facilities before noon

5  so that they could be outside of the gates when the closing

6  occurred at noon Eastern.

7  Q    You mentioned deliveries on Saturday, returning

8  equipment on Sunday.  Were deliveries ongoing on Sunday?

9  A    No.

10  Q    Earlier you mentioned a concern for employee welfare.

11  Did you take any steps to help individuals find employment

12  once they were terminated?

13  A    Yeah, as the American Trucking Association, where I was

14  on the board, which is -- they represent thousands of

15  trucking companies, they developed a portal that many of our

16  employees chose to participate in, union and non-union.  And

17  that was made available to other trucking companies across

18  the U.S.

19        MR. HO:  Your Honor, I'm going to object to this

20  line of testimony as far as behavior after the WARN violation

21  has already occurred, it's irrelevant.

22        THE COURT:  What's your response?

23        MR. ESSER:  Well, I disagree with that, as well.

24  But also, these were steps taken before the notices were

25  sent.  So, I believe the temporal component of the be

1   objection --

2          THE COURT:  Alright, I'll permit the test -- I'll

3   overrule the objection and we'll sort through the scope of

4   the relevance in light of the testimony.

5   BY MR. ESSER:

6   Q    Mr. Hawkins, did Yellow have a communications plan

7   for employees about the company's shutdown?

8   A    Yes.

9   Q    What were the overarching concerns that guided that

10  communications plan?

11  A    Well, several discussions about this.  But the

12  overarching piece is the mud slingings.  It's over.  The

13  piling on is over.  This -- these are people's livelihood

14  that had

15  been with the company.  We had long tenure there.  People

16  came to work at Yellow and they stayed there.  It was a good

17  company to work there.  And you know, at this point, you

18  know, adding fuel to the fire with things that had already

19  been said and put out there wasn't appropriate.

20  Q    I'd like to talk about the WARN notices the company

21  drafted.  Did the company have experience with WARN before

22  July 2023?

23  A    Yes.

24  Q    How so?

25  A    Many examples.  You know, for instance, when I started

1  Did Yellow decide to lay off all of its union employees on

2  July 26, 2023?

3  A    The decision was made to liquidate the company.  As far

4  as the timing of that piece, my answer would be yes.

5  Q    Okay.  On July 26, 2023, you were concerned about

6  Yellow not having enough cash to pay wages to its employees

7  by the following week, correct?

8  A    Yes.

9  Q    In July -- by July 26, 2023, did you think it was

10  possible to operate Yellow for another 30 days?

11  A    No.

12  Q    And Yellow ultimately decided to close its terminals

13  and discharge its union employees on noon Eastern Time on

14  July 30, 2023, right?

15  A    Yes.

16  Q    When was that day and time selected?

17  A    The process started on the 26th.  We picked Sunday

18  because of the fewest employees at work and other pieces.

19  So, in the ensuing hours, you know, after we decided that the

20  company was going to liquidate, you know, all that planning

21  was taking place.

22  Q    So would it be a fair summary that by July 27, 2023,

23  Yellow had decided on noon Eastern Time on July 30th as the

24  timeframe to shut off its terminals?

25  A    I don't know that we knew it by the 27th, but, you

1  Q     Okay.  And during -- correct me if I'm -- do you

2  remember testifying about the phrase "these circumstances"?

3  A     Yes.

4  Q     Is it correct the sentence before that refers to these

5  circumstances refer to Yellow's attempt to get financing, not

6  the strike notice?

7  A     My interpretation is that all of these circumstances,

8  you know, the financing couldn't be achieved, you know,

9  because they had not met with us; and then the strike notice

10  was a result of all that playing through, as well.  So, I

11  think all those circumstances led to this WARN notice having

12  to be sent.

13  Q     There's nothing in this notice that says a strike

14  notice is one of those circumstances, right?  That's your

15  interpretation based on your knowledge of the history?

16  A     I don't -- yeah, the word "strike notice" is not here.

17  Q     Did you attend any meetings that discussed the

18  preparation of the WARN notices that Yellow issued to the

19  Teamsters or the machinists?

20  A     I didn't draft anything, but I was on calls where the

21  WARN process was discussed.

22  Q     Any other meetings, other than just calls?

23  A     Calls or video calls.

24  Q     Do you know whether Yellow did anything to investigate

25  whether a WARN notice should have mentioned the strike

1   notice?

2   A    No.

3   Q    Do you know whether Yellow ever concluded before the

4   end of July 2023 that the WARN notice did not need to mention

5   the strike notice because it was already well-known there was

6   a strike notice at Yellow?

7   A    Every employee had a front row seat for that and saw

8   it, so I think it was very well known.  But now our human

9   resources group and my internal legal team would have been

10  the ones drafting this.

11  Q    I'm not asking you what was known.  I'm asking you what

12  Yellow believed.

13       So, I'm not sure I got an answer to my question.  Let

14  me ask the question again.

15       Before July 30th, do you know whether Yellow ever

16  concluded, on or before July 30, 2023, that a WARN notice did

17  not need to mention a strike notice because it was already

18  well-known that Yellow was killed by the strike notice?

19  A    I didn't draft the document.  I don't know the answer

20  to that.  I know what I believed as CEO, that it was obvious

21  what killed the company.

22  Q    But you do not know why the drafters of the notice did

23  not mention the strike notice in the WARN notice, correct?

24  A    No.

25  Q    If you look at Joint Exhibit 84?

1    Q     Can Yellow even identify a hundred Teamsters' employees

2    who did not have MyYellow.com e-mail addresses who saw Joint

3    Exhibit 50?

4         MR. ESSER:  Objection, Your Honor.  Is he asking

5    this witness if he can personally identify those right now?

6    This is not the discovery request that could have identified

7    that.

8         THE COURT:  I'm sorry, could you just clarify what

9    your question for this witness is?

10        MR. ESSER:  My question for this witness is can

11   Yellow identify even 100 people -- a hundred Teamsters

12   members who saw this notice that would respond to Yellow's

13   argument that because this was in the press, the Teamsters

14   must have seen it.

15        THE COURT:  I think if the witness knows the

16   answer to that, he can answer that question.

17        THE WITNESS:  I believe all employees were seeing

18   everything that was sent out.  It was posted.  It was

19   photographed.  It was posted over and over again.  I believe

20   all employees were seeing all information.

21   BY MR. HO:

22   Q     And the basis of that belief, one, is it was in some

23   trucker bulletin boards?

24   A     No, I believe that we posted it where they clock in and

25   clock out every day.  It's in prominent locations throughout

1    the facilities.

2    Q    And how do you know your members -- the Teamsters

3    members would read what's posted on the bulletin boards of

4    your terminals?

5    A    I can't testify to that.

6    Q    If you look at Joint Exhibit 55.  Joint Exhibit 55 is

7    another e-mail from you to fellow truckers, correct?

8    A    Yes.

9    Q    This document also predates the strike notice, correct?

10   A    Correct.

11   Q    Therefore, this document does not and cannot -- it does

12   not mention the strike notice, correct?

13   A    Correct.

14   Q    If you look at Joint Exhibit 75.  Joint Exhibit 75 is

15   another e-mail from you to fellow truckers, right?

16   A    Yes.

17   Q    And this e-mail postdates the strike notice, correct?

18   A    Yes.

19   Q    And -- but this e-mail does not mention the Teamsters

20   strike notice, correct?

21   A    Not that I'm aware of.

22   Q    How many --

23   A    I do believe, in the letters between me and the general

24   president, when you click there, that I mention the

25   devastating consequences of a strike.  But, you know,

 1  shipments with Yellow?

 2  A    Yes.

 3  Q    Look at Joint Exhibit 73.  Joint Exhibit 73 are the

 4  minutes for the Yellow board of directors meeting on July

 5  18th, 2023, correct?

 6  A    Yes.

 7  Q    If you go to the second page of the document, do you

 8  see where it says, "Customer Update"?

 9  A    Yes.

10  Q    Is that an accurate record of what you said to the

11  board of directors on July 18th, 2023?

12  A    I think that's a summary of what I said.

13  Q    So you said to the board of directors that Yellow can

14  expect a massive decline in shipments per day, correct?

15  A    That's accurate around the message, yes.

16  Q    And that statement is based on conversations you were

17  already having with people -- with customers that you

18  referred to as Yellow's foundational customers?

19  A    That is correct, yes.

20  Q    Who would those foundational customers be?

21  A    I can say the names.

22  Q    Go ahead.

23  A    Amazon; that night, Walmart, Home Depot.

24  Q    On July 19th, 2023, Yellow picked up about 32,500

25  shipments, right?  If you don't know, I could show you your

1  Q      Why not?

2  A      It would be piling on.  It would take a very difficult

3  situation and make it worse.

4  Q      Okay.  You were also asked -- I can show you the

5  document if necessary, but you were asked about a set of

6  talking points that were used with non-union employees.  Do

7  you recall that?

8  A      Yes.

9  Q      And that set of talking points, for lack of a better

10  term, did lay some blame at the feet of the IBT, correct?

11  A      Yes.

12  Q      Were the same exact talking points used with union

13  employees?

14  A      No.

15  Q      Why not?

16  A      Because the difference in them was just that, that

17  there was no reason to pile on further with employees that

18  were going to be represented by these locals and national

19  unions moving forward.

20  Q      Did you have concerns for physical violence in

21  connection with the layoffs on July 30th?

22  A      Yes.

23  Q      Did that concern play into your communication strategy

24  with union employees for that date?

25  A      Yes.

1   A     Yes.

2   Q     Prior to July of 2023, were you involved in the

3   issuance of WARN notices to employees on behalf of Yellow?

4   A     Yes.

5   Q     When did that work take place?

6   A     Primarily in February and March of 2023 and then, prior

7   to that, in May of 2022.

8   Q     Let's take that in two parts.  Can you please describe

9   the process that was used by the Company to prepare the WARN

10  notices in May of 2022?

11  A     Legal counsel would have drafted the notices and then

12  we would have worked -- me and my team would have worked with

13  them to determine the appropriate way to distribute those

14  notices.

15  Q     Was that same process you just described also followed

16  for Yellow's preparation of the February and March 2023 WARN

17  notices?

18  A     Yes.

19  Q     In this next set of questions, I'd like to focus

20  specifically on July of 2023, and I want to be precise with

21  my questions in light of the Court's rulings on the motions

22  in limine.  Were you in the HR department involved in

23  Yellow's preparation of WARN notices in July of 2023?

24  A     Yes.

25  Q     Do you know when Yellow began preparing WARN notices?

1   A       I believe that work began on July 26th.

2   Q       Were you in Yellow's HR department actively involved in

3   the effort to prepare the issue the July WARN notices?

4   A       Yes.

5   Q       Who was involved with specifically drafting the July

6   WARN notices?

7   A       Our in-house and outside counsel.

8   Q       Were nonlegal advisors involved with specifically

9   preparing the July WARN notices?

10          MR. HO:  Objection; vague and ambiguous as to who

11  was a nonlegal advisor.

12          THE COURT:  I'm sorry.

13          MR. HO:  Vague and ambiguous as to who was a legal

14  advisor.

15          THE COURT:  Alright, can you clarify -- by "legal

16  advisor," do you mean "lawyer"?

17          MR. SCIACCOTTA:  Yeah.

18          THE COURT:  Ask the question that way.

19  BY MR. SCIACCOTTA:

20  Q       Were non-lawyers involved with preparing the July WARN

21  notices?

22  A       Yes.

23  Q       Did that include individuals at Alvarez & Marsal?

24  A       Yes.

25  Q       And I think you mentioned HR had a role as well?

1    A      Yes.

2    Q      Were you involved with issuing the July WARN notices?

3    A      Yes.

4    Q      Did you review the notices sent to the non-Union and

5    Union employees before they were issued?

6    A      Yes.

7    Q      Were you also involved with preparing the non-Union and

8    Union talking points informing employees of the layoffs in

9    July of 2023?

10   A      Yes.

11   Q      Did you have an opportunity to review the talking

12   points before they were communicated to employees?

13   A      Yes.

14   Q      Were you in the courtroom during Mr. Hawkins' testimony

15   today?

16   A      Yes.

17   Q      Did you hear Mr. Hawkins testify where he discussed the

18   differences between the non-Union and Union talking points in

19   response to counsel's questions?

20   A      Yes.

21   Q      Do you share in Mr. Hawkins' belief that the reason the

22   strike notice was not mentioned in the union talking points

23   was there were concerns about laying blame at the IBT to

24   Union employees?

25             MR. HO:  Objection; leading.  I think that

1    question crosses the line.

2          THE COURT:  Why don't you rephrase the question?

3    BY MR. SCIACCOTTA:

4    Q    Do you know why, Ms. Statlander, in the Union talking

5    points, the strike notice was not issued -- or was not

6    referenced?  Excuse me.

7          MR. HO:  Objection; foundation.  No foundation was

8    made that this witness was involved in preparing talking

9    points.

10          THE COURT:  I'll overrule the objection.  She just

11    testified to that fact, so you can answer the question.

12          THE WITNESS:  I'm sorry, can you repeat that?

13    BY MR. SCIACCOTTA:

14    Q    Yes.  I apologize.

15          Do you know why this notice was not specifically

16    referenced in the union talking points?

17    A    My belief is that we didn't want to potentially inflame

18    the situation by citing the actions of the IBT and the Union

19    to the Union employees.

20    Q    With respect to both the non-Union WARN notice and the

21    Union WARN notice, were you under pressure to get those

22    notices issued at the time of your review?

23    A    Yeah, very much so, yes.

24    Q    Even with the time pressures that you were up against,

25    if you had seen something you thought was incorrect or

1   inaccurate in the WARN notice during your review, would you

2   have raised it?

3   A      Yes.

4   Q      After the notices were issued, did you believe there

5   was any reason to amend the notices?

6   A      No.

7   Q      What do you remember about the pressures you were

8   feeling while preparing the WARN notices in July of 2023?

9   A      Yeah.  I think we were obviously under a tremendous

10  time pressure, and I would say the situation was very fluid,

11  to say the least, with regard to just the amount of time that

12  we had to do just a gigantic amount of work.

13         So, you know, I'd say it was a very, you know,

14  emotional situation.  Many of us weren't -- you know, weren't

15  getting a lot of sleep certainly during those days, and it

16  was just a very emotional situation, you know, given what we

17  were going through.

18  Q      What kind of HR concerns -- and I know you mentioned

19  some of these -- were there during the shutdown and layoffs

20  Yellow conducted in July of 2023?

21  A      I think, you know, from an HR standpoint, we were

22  always concerned about the well-being of our employees and

23  wanting to make sure we were doing the very best we could in

24  those circumstances to do the best we could for our

25  employees.

1  133, do they include every WARN notice that Yellow issued in

2  March of 2023 -- in February or March of 2023?

3  A    I'm sorry.  I believe this also includes the Compton

4  terminals that did not occur at that same time.

5  Q    And Exhibits 125 through 133 also include some notices

6  issued in 2022, right?

7  A    Yes, yes.  That was my reference to the Compton

8  terminals.

9  Q    Would it be fair to say that Exhibits 125 through 133

10 each of them give employees at least 60 days' notice of the

11 potential job loss?

12 A    I'm sorry.  Can you repeat that?

13 Q    Sure.  Each of the notices, Exhibits 125 through

14 Exhibit 133, gave the employees at least 60 days' notice of

15 the potential job loss?

16 A    Yes.

17 Q    Before July of 2023, had Yellow ever issued any WARN

18 notices to its employees that gave them less than 60 days'

19 notice of their job loss?

20 A    Not that I'm aware of.

21 Q    Can I ask you to turn specifically to Exhibit 125?  And

22 directing you to the second and third pages of Exhibit 125.

23 A    Okay.

24 Q    Exhibit 125, the second and third pages, is a prepared

25 WARN notice from Yellow to some Teamsters officials, right?

1    A      Yes.

2    Q      And Exhibit 125 was issued in connection with terminal

3    closing that would only occur if Phase 2 of One Yellow was

4    implemented, correct?

5    A      Yes.

6    Q      And even that terminal closing -- according to Yellow,

7    even that terminal closing would not have caused -- was not

8    likely to cause any job loss because Yellow believed it could

9    find jobs for those employees elsewhere within the system,

10   correct?

11   A      Yes.  That was the hope, yes.

12   Q      So Exhibit 25 -- 125 was a WARN notice that Yellow

13   issued even though it believed the prospects of employees

14   actually losing their jobs was not high, correct?

15   A      Correct.

16   Q      So Yellow understood, in March of 2023, that issuing

17   WARN notices to its employees for a job loss covered by WARN

18   may occur, correct?

19           MR. SCIACCOTTA:  Your Honor, I'm going to object

20   to this line of questioning.  We have a motion in limine that

21   was granted with respect to relitigating the issue of whether

22   notice was required on May 30th in 2023.  Counsel's entire

23   line of questioning assumes that there is possibly an earlier

24   date that the debtor should have issued notices.

25           THE COURT:  So, I'm going to overrule the

1   A      Yes.

2   Q      Okay.  On the same page, lines 18 through 20:

3          "Were you ever involved in the preparation of Yellow's

4   WARN notices to the IAM?

5          Answer:  Not that I recall."

6          Did I read that correctly?

7              MR. SCIACCOTTA:  Objection, Your Honor, that's

8   improper impeachment.  She's saying she doesn't recall; not

9   that she wasn't involved.

10             MR. HO:  But she still continued her answer, Your

11  Honor.

12             THE COURT:  You know, I think that in the absence

13  of something having happened in between to spur her

14  recollection, it's fair impeachment.  So I'll overrule the

15  objection.  You can proceed.

16  BY MR. HO:

17  Q      I read that correctly, right?

18  A      Yes.

19  Q      And you understood that -- you questioned that question

20  understanding that IAM referred to the International

21  Association of Machinists, correct?

22  A      Yes.

23  Q      Were any nonlawyers ever involved in drafting or

24  awarding any WARN notices that Yellow issued in July of 2023?

25  A      I mean, yes, I -- I was -- well, I was involved in the

1            THE WITNESS:  There were no deliveries made to

2    customers by a Yellow driver on July 30th.

3    BY MR. SCIACCOTTA:

4    Q    What did the results of this search show for July 29th,

5    2023?

6    A    That there were, in fact, shipments delivered to Yellow

7    customers on July 29th and that the final shipments were

8    delivered -- six shipments were delivered together on a

9    single trailer to a customer.

10   Q    Would you recognize the result of this search showing

11   these shipments you just discussed if you saw them here

12   today?

13   A    I would.

14   Q    Could you please turn to your binder to what's been

15   marked as Debtors Exhibit 112?

16   A    Okay.

17   Q    Do you recognize this document?

18   A    I do.

19   Q    What is it?

20   A    That is one of those six shipments that I just

21   mentioned that was delivered to the Walmart in D.C. on July

22   29th, 2023.

23   Q    And could you please describe what is shown on this

24   document, Mr. Olivier?

25   A    This is a screen shot from the MCC system, that

| | |
|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT |
| | DISTRICT OF DELAWARE |
| 2 | |

```
                                     .  Chapter 11
 3   IN RE:                          .  Case No. 23-11069 (CTG)
                                     .
 4   YELLOW CORPORATION, et al.,     .  (Jointly Administered)
                                     .
 5            Debtors.               .  Re: Docket Nos. 5523 & 5448
     . . . . . . . . . . . . . . .   .
 6                                   .
     JEFF MOORE, ELIZABETH BROOKE    .  Adv. Pro. No. 23-50457 (CTG)
 7   MOORE, AND VIDAL TORRES ON      .
     BEHALF OF THEMSELVES AND ALL    .  Re: Docket Nos. 208 & 214
 8   OTHERS SIMILARLY SITUATED,      .
                                     .
 9            Plaintiffs.            .
                                     .
10       v.                          .
                                     .
11   YELLOW CORPORATION, et al.,     .
                                     .
12            Defendants.            .
     . . . . . . . . . . . . . . .   .
13                                   .
     WILLIAM G. COUGHLEN, et al.,    .  Adv. Pro. No. 23-50761 (CTG)
14                                   .
              Plaintiffs.            .  Re: Docket Nos. 163 & 169
15                                   .
         v.                          .  Courtroom No. 7
16                                   .  824 North Market Street
     YELLOW CORPORATION, et al.,     .  Wilmington, Delaware 19801
17                                   .
              Defendants.            .  Wednesday, January 22, 2025
18   . . . . . . . . . . . . . . .   .  10:00 a.m.

19

20                   TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE CRAIG T. GOLDBLATT
21              UNITED STATES BANKRUPTCY JUDGE

22
                     (APPEARANCES CONTINUED)
23

24

25
```

1  APPEARANCES (CONTINUED):

2  For the Debtors:          Allyson Smith, Esquire
                            KIRKLAND & ELLIS LLP
3                           KIRKLAND & ELLIS INTERNATIONAL LLP
                            601 Lexington Avenue
4                           New York, New York 10022

5
                            Michael Esser, Esquire
6                           KIRKLAND & ELLIS LLP
                            KIRKLAND & ELLIS INTERNATIONAL LLP
7                           555 California Street
                            27th Floor
8                           San Francisco, California 94104

9                           Neha Nigam, Esquire
                            Michael Sciaccotta, Esquire
10                          KIRKLAND & EILLIS LLP
                            KIRKLAND & ELLIS INTERNATIONAL LLP
11                          333 West Wolf Point Plaza
                            Chicago, Illinois 60654
12
                            Orla O'Callaghan, Esquire
13                          KIRKLAND & ELLIS LLP
                            KIRKLAND & ELLIS INTERNATIONAL LLP
14                          609 Main Street
                            Houston, Texas 77002
15

16

17

18  (APPEARANCES CONTINUED)

19  Audio Operator:          Teasha Marsh, ECRO

20
    Transcription Company:   Reliable
21                           1007 N. Orange Street
                            Wilmington, Delaware 19801
22                          (302)654-8080
                            Email:  gmatthews@reliable-co.com
23

24  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

25

1   APPEARANCES (CONTINUED):

2   For the PBGC:              Stephanie Thomas, Esquire
                               PENSION BENEFIT GUARANTY CORPORATION
3                              1200 K Street, N.W.
                               Suite 320
4                              Washington, DC 20005

5   For the Moore
6   Plaintiffs:               Jack Raisner, Esquire
                              RAISNER ROUPINIAN LLP
7                              270 Madison Avenue
                               Suite 1801
8                              New York, New York 10016

9   For the Coughlen
    Plaintiffs:               Eric Monzo, Esquire
10                             MORRIS JAMES LLP
                               500 Delaware Avenue
11                             Suite 1500
                               Wilmington, Delaware 19801
12

13  For the Committee:        Kevin Zuzolo, Esquire
                              AKIN GUMP STRAUSS HAUER & FELD LLP
14                             One Bryant Park
                               Bank of America Tower
15                             New York, New York 10036

16  For the Teamsters:        Yingtao Ho, Esquire
                              THE PREVIANT LAW FIRM, S.C.
17                             310 West Wisconsin Avenue
                               Suite 100 MW
18                             Milwaukee, Wisconsin 53203

19

20

21

22

23

24

25

1    that we would need to start that process.

2    Q    What topics were discussed at that meeting, if you

3    recall, just at a high level?

4    A    Sure.  We went through, essentially, the long list of

5    information that would be required in order to be gathered to

6    prepare the petitions for Chapter 11, the first day motions,

7    in order to take what we had been doing on the liquidity side

8    and convert that into a DIP sizing and DIP budget exercise,

9    as well as some of the other items to prepare for filing in

10   terms of accounting cutoff and employee issues, including the

11   potential need to issue WARN notices.

12   Q    Now, does contingency planning always result in a

13   bankruptcy filing?

14   A    No.  We often are involved in situations where Chapter

15   11 is plan B, or sometimes plan C or plan D.  The company is

16   looking to restructure out of court, do a sale, raise new

17   money, what-have-you, but there's a risk that those plans

18   will fall through, and the company will start doing

19   contingency planning -- also sometimes to use that as a

20   leverage point in those negotiations.

21   Q    On July 20th -- or July 17th, 2023, when you began

22   helping Yellow with contingency planning following the strike

23   notice, did you believe that Yellow would actually end up

24   filing for bankruptcy at that point?

25   A    No, I did not.

1   Q      Why not?

2   A      This is a company that had been through a lot of crises

3   in its history.  As I mentioned, I had been involved back in

4   2013, early 2014.  There had been prior preparations for a

5   Chapter 11 filing before that and after that.  So, this is a

6   company that had been there before and had been able to

7   negotiate a solution and move on.

8   Q      Did Yellow ultimately end up filing for bankruptcy in

9   2023?

10  A      Unfortunately, yes, they did.

11  Q      Do you recall when Yellow determined that it needed to

12  file for bankruptcy?

13  A      We reached a point on July 26th where the company's

14  liquidity, looking at where it was going to be over the next

15  several days, as well as payments that we needed to make sure

16  happened prior to filing, put us at a place where we needed

17  to be ready to file by the 31st of July, by the end of the

18  day on the 31st.  And that day, on the 26th, we had a board

19  meeting and discussed that with the board and had the

20  agreement to move forward to be ready for a filing at that

21  point in time.

22  Q      Why did Yellow need to be ready to file by the end of

23  the day on July 31st?

24  A      We expected that we would have, by the end of that day,

25  less than $1 million of cash on hand.

1  call amongst Kirkland, A&M and Ducera to coordinate amongst

2  the professionals on all the various issues that needed to be

3  accomplished from the DIP financing to the WARN issues. And

4  then there were the management calls, as well, on a daily

5  basis.

6  Q    And when did the daily advisor calls first begin?

7  A    They would have been started, I believe at some point

8  the week of the 17th, but certainly by the 24th.  And then

9  they continued from that point through the petition date.

10  And then on a less frequent basis, they continue all the way

11  to this day.

12  Q    Did any of those calls involve discussions regarding

13  Yellow's communication strategy?

14  A    They did.

15  Q    What -- why was it important to discuss Yellow's

16  communication strategy on those calls?

17  A    Communications is an important topic in any Chapter 11

18  process.  Here, given the number of people involved, the

19  nature of the shutdown, we were very concerned about getting

20  the right message into the hands of people in order to answer

21  the questions we knew people were going to have, whether that

22  be employees, customers, vendors; as well as to, again, keep

23  this situation as calm as possible.

24  Q    Now, you also mentioned daily meetings with Yellow's

25  management team.  Do you recall when those began?

1    A      The management team calls -- actually, the large in-

2    person meeting started, I believe, the week of the 17th when

3    I was on site and certainly by the 24th.

4    Q      Did those meetings also involve discussions involving

5    Yellow's communication strategy?

6    A      Yes, they did.

7    Q      Did any of those meetings involve discussions regarding

8    the WARN Act?

9    A      They did.

10   Q      Now, was Yellow ultimately able to issue WARN notices

11   to employees 60 days in advance of layoffs?

12   A      They were not.

13   Q      Why not?

14   A      The layoffs did not become probable. As I mentioned,

15   even on the 17th when we started to do contingency planning,

16   we weren't thinking that this was really going to happen.  It

17   was a possibility, but not a high possibility.  At the time

18   of the 26th, that's when it really became real that these

19   reductions were going to happen.

20   Q      Did Yellow communicate the reason it had to give

21   shortened notice to its employees?

22   A      Yes, Yellow did.

23   Q      How did it do that?

24   A      Through a variety of means.  There were certain

25   information that was included within the WARN notice, itself.

1   In addition, there had been communications prior to the

2   reductions in force. There were e-mails or notices from the

3   CEO that went out to employees about what had been

4   developing. There were some press releases.  At the time of

5   the reduction, as it related to the non-union employees,

6   there was talking points that were verbally conveyed from

7   supervisors to those employees.  And then following the

8   layoffs, between there and the petition date, there were some

9   other external, sort of, public communications.  And finally,

10  on the petition date, when, sort of, the communication

11  constraints were removed, there was a more fulsome public

12  release.

13  Q    When you say, "communication constraints were removed

14  on the filing date," what do you mean by that?

15  A    Yellow was a public company, and like any company, and

16  particularly a public company, really couldn't disclose that

17  it was potentially filing for Chapter 11 until that happened.

18  And so some of, you know, what we would have liked to say

19  about Chapter 11 filing couldn't be said until we got to the

20  6th.

21  Q    Now, I believe you mentioned that the company

22  communicated some information through the WARN notices,

23  themselves.  Were WARN notices issued to all of the 25 to

24  26,000 employees who were laid off in late July 2023?

25  A    They were.  For the non-union employees, notices were

24

1  provided on Friday the 28th. And then for the union

2  employees, notices were provided to the union representatives

3  on Sunday, the 30th, and then mailed to individuals.

4  Obviously, we had 20-some-odd thousand notices to print and

5  get mailed out, Sunday not a mailing day, were mailed out on

6  the 31st.

7  Q    Alright, and taking a step back, prior to Yellow's

8  Chapter 11 proceedings, had you ever encountered issues under

9  the WARN Act in your prior restructuring work?

10  A    I have.

11  Q    How often?

12  A    Relatively frequently.  I would say between a dozen and

13  two dozen times.

14  Q    And in that experience, is there a general process that

15  you've seen companies employ when assessing WARN issues?

16  A    Yes.

17  Q    Can you describe that process?

18  A    When there's a possibility there will be significant

19  layoffs, companies will consult with counsel to educate

20  themselves on the WARN Act. Companies will then make the

21  determination if the WARN Act could apply to the layoffs that

22  they're considering.  When those layoffs become more known in

23  terms of when is it going to happen, who's it going to

24  effect, companies will work with counsel to prepare WARN

25  notices and then execute on the distribution of those

1    Q     Did Yellow, itself, deliver any of that freight after

2    July 29th?

3    A     No, they did not.

4          MS. O'CALLAGHAN:  Thank you, Mr. Whittman.  No

5    further questions at this time.

6          THE COURT:  Very well, thank you.

7          Mr. Ho, cross-examination.

8                        CROSS-EXAMINATION

9    BY MR. HO:

10   Q     Mr. Whittman, you were the overall lead for Alvarez &

11   Marsal on the Yellow project, right?

12   A     Yes.

13   Q     All other Alvarez & Marsal employees who worked on the

14   Yellow project reported to you, correct?

15   A     Yes.

16   Q     As a part of contingency planning, did Alvarez & Marsal

17   compute Yellow's potential WARN exposure?

18   A     There came a time where we did compute the potential

19   exposure.  I don't know that I would say it would be part of

20   contingency planning, but we did do that.

21   Q     Did Alvarez & Marsal include a priority cap in

22   computing Yellow's amount of WARN exposure?

23   A     We calculated the potential WARN exposure if Yellow was

24   found to be required to pay 60 full days.  And then at some

25   point, we did determine, as it became able to be determined,

64

1  situation was.

2  Q    Alright, and I just have one final question for you,

3  Mr. Whittman.  Given your experience with WARN Act issues in

4  your restructuring work, do you believe the company devoted a

5  sufficient amount of resources to the -- to drafting and

6  issuing its WARN notices?

7  A    Yes, the company did.  They devoted a significant

8  amount of time and effort in a very compressed timeline.

9            MR. ESSER:  No further questions, Your Honor.

10            THE COURT:  Any recross, Mr. Ho?

11                      RECROSS-EXAMINATION

12  BY MR. HO:

13  Q    Debtors Exhibit 95 does not even mention the strike

14  notice, correct?

15  A    I mean, I guess I'd have to look at it again.  I mean,

16  there's certainly the reference to the threat to strike as we

17  just talked about.  But whether it mentions the specific

18  notice itself, I don't know.

19  Q    And there's nothing in Exhibit -- in Debtors Exhibit 95

20  that mentions any possible effects of a strike notice, right?

21  A    Well, I --

22  Q    You could read the document.

23  A    Yeah, I think it does.  That's, in fact, what I just --

24  what I just read a moment ago. The "who may soon become

25  collateral" -- "the Teamsters' collateral damage," I think is



**Yellow Corporation Announces That the International Brotherhood of Teamsters Breach of the Collective Bargaining Agreement Caused Yellow's Inability to Make Its Monthly Contribution to Central States Funds**

July 19, 2023

NASHVILLE, Tenn., July 19, 2023 (GLOBE NEWSWIRE) -- Yellow Corporation announces that the leadership at the International Brotherhood of Teamsters (IBT) has publicly claimed that the union may lawfully strike Yellow Corporation (NASDAQ: YELL) over its failure to make its July contribution to Central States pension and health and welfare funds, but a strike would be anything but lawful, as it would violate the parties' collective bargaining agreement. The Union's breaches of the collective bargaining agreement, which are detailed in the complaint Yellow filed in its District of Kansas lawsuit against the Teamsters, are the direct cause of Yellow's inability to make contributions to the funds. *(June 27 complaint and press release can be found below in PDF format.)*

In June, Yellow wrote to the funds, requesting a short-term deferral of its obligation to pay contributions for two months, July and August, with interest. This request is not without precedent. Regrettably, the Board of Trustees of Central States refused Yellow's request, despite the funds' healthy reserves.

Even more regrettably, Teamsters General President Sean O'Brien  has blamed Yellow for failing its workers, but it is the Teamsters' leadership who has failed the 22,000 Teamsters employed by Yellow as well as the 8,000 non-union employees who may soon become the Teamsters' collateral damage. For many months, Teamsters' leadership has steadfastly refused to negotiate the company's long-planned and necessary modernization effort that would enable Yellow, a 100-year-old company, to streamline and strengthen its operations to compete against non-union carriers.

To keep up with the times and customers' needs, the Company must implement its well-publicized business modernization plan known as "One Yellow," yet Teamsters' leadership has rejected all proposed changes of operations and all proposed interim agreements, freezing the company's business plan for nine months. This has cost Yellow in excess of $137M in Adjusted EBITDA and has prevented critical refinancing for the Company.

Ever since Teamsters' leadership made its request that Yellow open its contract early, Yellow has tried to meet to negotiate a contract that would provide wage increases for its Teamster employees. In fact, just last week, Yellow made yet another proposal to the Teamsters, offering a significant wage increase that aligns with its union competitors. Commencement of meaningful negotiations with the Teamsters would set the stage for Yellow to reengage in comprehensive refinancing efforts with its lenders while clearing a path to advance One Yellow. All stakeholders- lenders, shareholders, employees, and customers need to see progress.

In short, Teamsters' leadership's obstruction of One Yellow directly caused Yellow's liquidity crisis and Yellow's need to implement cash-conservation measures, including its benefit funding deferral request.

For nine months, Yellow has been ready, willing, and able to meet with the Teamsters at any time and at any place to discuss the future of its union and non-union employees and to work through the implementation of One Yellow. Even today, the Company remains ready, willing, and able to hold serious negotiations.

**About Yellow Corporation**

Yellow operates one of the largest, most comprehensive logistics and less-than-truckload (LTL) networks in North America, providing customers with regional, national, and international shipping services throughout. Backed by a team of nearly 30,000 transportation professionals, Yellow's flexible supply chain solutions and best-in-class expertise ensure the safe, timely delivery of industrial, commercial, and retail goods for customers of all sizes. Yellow's principal office is in Nashville, Tenn., and is the holding company for a portfolio of LTL brands including  Holland, New Penn, Reddaway and YRC Freight, as well as the logistics company Yellow Logistics.

To learn more about Yellow and our services, visit myyellow.com.

Media Contacts:                                          Mike Kelley
                                                        913-696-6121
                                                        mike.kelley@myyellow.com

                                                        Heather Nauert
                                                        heather.nauert@myyellow.com

Investor Contact:                                       Tony Carreño
                                                        913-696-6108
                                                        investor@myyellow.com

PDFs accompanying this announcement are available at

http://ml.globenewswire.com/Resource/Download/792c4f25-9d58-4602-9383-3ac34bee3d05

SA0316                              **DEBTORS' EX. 095.001**

http://ml.globenewswire.com/Resource/Download/c4b541e7-95cf-4fc5-b4e1-295017274a90



Source: Yellow Corporation

**DEBTORS' EX. 095.002**